**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| Michael E. Williamson, The Estate of Don C. Craft, Kirk O'Donnell, John Lettow, Timothy McGinnis, Fred Newton, William Watson, Chris Hancock, Dale Schoeneman, and International Deep Sea Survey, Inc., | |
| Plaintiffs, | Civil Action No. C2-06-292 |
| v. | (Upon Removal from Court of Common Pleas, Franklin County, Ohio – Case No. 06CVH03-4469) |
| Recovery Limited Partnership, Columbus Exploration, LLC, Columbus-America Discovery Group, Inc., Columbus Exploration Limited Partnership, Omni Engineering, Inc., Omni Engineering of Ohio, Inc., Economic Zone Resource Associates, Inc., Economic Zone Resource Associates, Ltd., EZRA, Inc., EZRA of Ohio, Inc., Econ Engineering Associates, Inc., DOE.E, Inc., Thomas G. Thompson, Gilman D. Kirk, Jr., James F. Turner, Michael J. Ford, and W. Arthur Cullman, Jr., | Judge Sargus Magistrate Judge Kemp **JURY DEMAND ENDORSED HEREON** |
| Defendants. | |
| AND | |
| The Dispatch Printing Co., et al., | |
| Plaintiffs, | (Upon Removal from Court of Common Pleas, Franklin County, Ohio – Case No. 05CVH04-4220) |
| v. | |
| Recovery Limited Partnership, et al., | |
| Defendants. | |
| AND | |
| The Dispatch Printing Co., et al., | |
| Plaintiffs, | (Upon Removal from Court of Common Pleas, Franklin County, Ohio – Case No. 05CVH10-11795) |
| v. | |
| Gilman D. Kirk, et al., | |
| Defendants. | |

## THE *WILLIAMSON* PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs, Michael Williamson, The Estate of Don C. Craft, Kirk O'Donnell, John

Lettow, Timothy McGinnis, Fred Newton, William Watson, Chris Hancock, Dale Schoeneman

(the "Individual Plaintiffs"), and International Deep Sea Survey, Inc. ("IDSS") (collectively, the "*Williamson* Plaintiffs"), by and through their attorneys, McNamara & McNamara, L.L.P. and Holland & Knight LLP, for their first amended complaint against defendants Recovery Limited Partnership ("RLP"), Columbus Exploration, LLC ("CXLLC"), Columbus-America Discovery Group, Inc. ("CADG"), Columbus Exploration Limited Partnership ("CXLP"), Omni Engineering, Inc. ("Omni"), Omni Engineering of Ohio, Inc. ("Omni Ohio"), Economic Zone Resource Associates, Inc., Economic Zone Resource Associates, Ltd., EZRA, Inc., EZRA of Ohio, Inc., Econ Engineering Associates, Inc. ("Econ"), DOE.E, Inc., Thomas G. Thompson ("Thompson"), Gilman D. Kirk, Jr. ("Kirk"), James F. Turner ("Turner"), Michael J. Ford ("Ford"), and W. Arthur Cullman, Jr. ("Cullman") (collectively "Defendants"), allege, upon information and belief, as follows:

## JURISDICTION AND PARTIES

1.      This is a case of admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333 as hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2.      The *Williamson* Plaintiffs are persons or entities to which some or all of the Defendants herein promised remuneration based on the gross value of gold, silver and valuable artifacts recovered from the shipwreck of the *S.S. Central America*, a United States Mail Steamship that sank off the coast of South Carolina in 1857.  Specifically, the *Williamson* Plaintiffs were promised a percentage of the gross value of the recovered treasure as consideration for executing non-disclosure and non-compete agreements.  The Individual Plaintiffs all are members of Defendant Thomas G. Thompson's team, which first imaged the *S.S. Central America* in 1986 and which confirmed that it was the *Central America* in 1988, and

which subsequently recovered gold, silver and other artifacts from the sunken ship.  Despite there being unquestionable proof that literally tons of gold and other valuables were recovered from the *S.S. Central America*, Defendants never have paid the *Williamson* Plaintiffs as promised and have refused to provide the *Williamson* Plaintiffs with any information as to what happened to the treasure (or the proceeds from the treasure).  Defendants' failure to pay the *Williamson* Plaintiffs and to provide the requested information constitutes a breach of contract.

3.     The *Williamson* Plaintiffs originally thought that CADG was either a trade name or other representative name of some of the other Defendants herein or is an alter-ego of those Defendants.  The *Williamson* Plaintiffs learned only recently of the actual corporate existence of, or ongoing existence of, the remainder of the additional defendants named in this first amended complaint.

4.     At all times material herein, the *Williamson* Plaintiffs were individuals that resided, or were companies incorporated and with principal places of business, in states of the United States.

5.     The Individual Plaintiffs all are persons who provided technical expertise to one or more of the Defendants in the course of the search for and/or recovery of the gold, silver and other artifacts from the *S.S. Central America.*

6.     Plaintiff IDSS rented deep sea survey equipment to one or more of the Defendants in the course of the search for and/or recovery of the gold, silver and other artifacts from the *S.S. Central America.*

7.     Upon information and belief, Defendant RLP is a limited partnership organized under the laws of the State of Ohio, with its principal place of business in Columbus, Ohio.

8.     Upon information and belief, Defendant CXLLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Fernandina Beach, Florida.

9.     Upon information and belief, Defendant CADG is a corporation organized under the laws of the State of Ohio, with its principal place of business in Columbus, Ohio.

10.     Upon information and belief, Defendant CXLP is a limited partnership organized under the laws of the State of Ohio, with its principal place of business in Fernandina Beach, Florida.

11.     Upon information and belief, Defendant Omni is a corporation organized under the laws of the State of Delaware, with its principal place of business in Fernandina Beach, Florida.   Upon information and belief, Defendant Omni is the general partner of Defendant CXLP.

12.     Upon information and belief, Defendant Omni Ohio is another registered name for Defendant Omni.

13.     Upon information and belief, Defendant Thompson is the president of Defendant Econ and is a resident of Ohio or Florida.  He also is a member of Defendant CXLLC and serves as the chairman of the company's board of directors ("Chairman").  Thompson also was formerly the general partner of Defendant RLP.

14.     Upon information and belief, Defendant Econ is a corporation organized under the laws of the State of Ohio, with its principal place of business in Columbus, Ohio.  Econ is the current general partner of Defendant RLP.

15.     Upon information and belief, Defendant Economic Zone Resource Associates, Inc. is or was a corporation organized under the laws of the State of Ohio, with its principal place

of business in Columbus, Ohio.  Economic Zone Resource Associates, Inc. is the corporate predecessor and/or alter-ego of some or all of the other Defendants herein, and Thompson was an officer of or the general partner of Economic Zone Resource Associates, Inc.

16.     Upon information and belief, Defendant Economic Zone Resource Associates, Ltd. is or was a partnership organized under the laws of the State of Ohio, with its principal place of business in Fernandina Beach, Florida.  Economic Zone Resource Associates, Ltd. is the corporate predecessor and/or alter-ego of some or all of the other Defendants herein, and Thompson was an officer of or the general partner of Economic Zone Resource Associates, Ltd.

17.     Upon information and belief, Defendant EZRA, Inc. is or was a corporation organized under the laws of the State of Ohio, with its principal place of business in Columbus, Ohio.  EZRA, Inc. is the corporate predecessor and/or alter-ego of some or all of the other Defendants herein, and Thompson is the president of EZRA, Inc.

18.     Upon information and belief, Defendant EZRA of Ohio, Inc. is another registered name for Defendant EZRA, Inc.

19.     Upon information and belief, Defendant DOE.E, Inc. is a corporation organized under the laws of the State of Florida, with its principal place of business in Fernandina Beach, Florida.  Upon information and belief, Defendant Thompson is the president of Defendant DOE.E, Inc., and DOE.E, Inc. is the alter-ego of some or all of the other Defendants herein.

20.     At all material times, Defendant Kirk is and was a director of CXLLC and resident of Ohio.  Mr. Kirk owes or owed fiduciary duties to Plaintiffs.

21.     At all material times, Defendant Turner is and was a director of CXLLC and a resident of Ohio.  Mr. Turner owes or owed fiduciary duties to Plaintiffs.

22.     At all material times, Defendant Ford is and was a director of CXLLC and a resident of Ohio.  Mr. Ford owes or owed fiduciary duties to Plaintiffs.

23.     At all material times, Defendant Cullman is and was a director of CXLLC and resident of Ohio.  Mr. Cullman owes or owed fiduciary duties to Plaintiffs.

## RELATED LITIGATION

24.     Other proceedings that have been filed that are related to this proceeding include, but are not necessarily limited to, the following matters in the jurisdictions indicated:

a.      *Williamson, et al. v. Recovery Limited Partnership, et al.*, No. 06 Civ. 5724 (S.D.N.Y.) (filed July 28, 2006) (a supplemental proceeding in which the *Williamson* Plaintiffs are seeking security for their claims herein pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure) (the "New York Rule B Proceeding");

b.      *Williamson, et al. v. Recovery Limited Partnership, et al.*, Case No. CV 06-5689 (C.D. Cal.) (filed September 11, 2006) (a supplemental proceeding in which the *Williamson* Plaintiffs are seeking security for their claims herein pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure) (the "Los Angeles Rule B Proceeding"); and

c.      *ABC, plc. v. HIJ, Inc.*, No. 98 Civ. 5036 (S.D.N.Y.) (in which the *Williamson* Plaintiffs have filed a motion to intervene and unseal previously-closed and sealed matter filed on August 11, 2006) (the "Christie's Litigation").

## BACKGROUND FACTS

25.     In 1977, Thompson began researching deep-ocean shipwrecks and the methods and technologies for locating them.  Thompson became particularly interested in the United States Mail Steamship *Central America* (*"S.S. Central America"*), which sank off the coast of South Carolina during a hurricane on September 12, 1857.  The *S.S. Central America* was carrying several tons of gold when it sank.

26.     Thompson put together a team to conduct a search-and-recovery project for the *S.S. Central America*, and in 1985 he organized RLP as an Ohio limited partnership to finance the project.  Thompson then began soliciting leaders from the Central Ohio business community to invest in RLP.

27.     Upon information and belief, in May 1985, the limited partnership agreement for RLP was executed.  Under the terms of the agreement, Thompson was to act as general partner of RLP.  Thompson has directly or indirectly managed the finances and operations of RLP since its inception.

28.     Thompson's team went to sea in the summer of 1986 to begin their search for the *S.S. Central America*.  The Individual Plaintiffs all were members of Thompson's team, and RLP contracted with IDSS for the rental of IDSS equipment that was critical to Thompson's team succeeding in finding the *S.S. Central America.*

29.     The Individual Plaintiffs all were paid in part or in full for their service and labor pursuant to oral or written agreements.  In addition to their employment agreements, the Individual Plaintiffs were required to execute separate, distinct, non-disclosure and non-compete agreements with Thompson (the "Non-Disclosure Agreements"), in consideration for which each of the Individual Plaintiffs was promised remuneration not in definite sum, but rather based on a

percentage of the value of the total treasure recovered from the wreck of the *S.S. Central America*, without deduction for competing claims or recovery, marketing or other expenses. As part of its compensation package, IDSS similarly was promised additional compensation based on a percentage of the value of the total treasure recovered from the wreck of the *S.S. Central America*, without deduction for competing claims or recovery, marketing or other expenses. An exemplary copy of the Individual Plaintiffs' Non-Disclosure Agreements is annexed as Exhibit 1, and the IDSS Agreement is annexed as Exhibit 2.

30. In the case of Don C. Craft, he also negotiated a reduction of his daily hire rate from $450.00 to $300.00 in exchange for an additional .15% interest in the total treasure recovered from the wreck of the *S.S. Central America*, without deduction for competing claims or recovery, marketing or other expenses. Copies of Don C. Craft's Non-Disclosure Agreement and a letter from RLP confirming Mr. Craft's daily hire rate as $450.00 are annexed as Exhibits 3 and 4, respectively.

31. In September 1988, during the third year of the search effort, Thompson and his team confirmed that a wreck site imaged by IDSS's equipment during search operations in 1986 was the wreck of the *S.S. Central America*. The wreck site was approximately 160 miles off the coast of South Carolina, in approximately 8,000 feet of water. Thompson and his team were successful in recovering *S.S. Central America's* bronze bell, a gold bar, and certain artifacts before they had to come ashore for the winter. Ultimately, Thompson and his team were able to recover more than a ton of gold and silver as well as numerous artifacts from the *S.S. Central America*.

32. Upon confirming the discovery of the *S.S. Central America*, CADG – for itself and/or on behalf of the other Defendants – initiated an admiralty action in federal court in the

Eastern District of Virginia to establish ownership of the shipwreck and all of its contents (the "Admiralty Litigation").  During certain of the proceedings, members of the Individual Plaintiffs provided testimony in support of CADG's claims.  The Admiralty Litigation's first trial was held in April 1990, during which a multitude of insurance companies (the "Underwriters") claimed either a direct or descendant subrogated interest in the treasure recovered from the *S.S. Central America* resulting from insurance claims paid resulting from the loss of the *S.S. Central America*. In a decision dated August 14, 1990, the district court held that the Underwriters had abandoned any claim that they might have to the treasure and dismissed the Underwriters' claims in their entirety.  The Underwriters appealed the district court's decision.

33.    Shortly after the conclusion of the first trial in the Admiralty Litigation, in response to inquiries made by the *Williamson* Plaintiffs and their attorneys as to when they would be paid under their respective Non-Disclosure Agreements, Thompson wrote each of the *Williamson* Plaintiffs a letter (the "1990 letter") and promised that payment would be forthcoming after resolution of the Admiralty Litigation and marketing of the treasure had been effected.  An exemplary copy of Thompson's 1990 letter is annexed as Exhibit 5.

34.    On information and belief, during the several months following distribution of the 1990 letter, Thompson spoke to several of the Individual Plaintiffs and asked them "to call off the lawyers" (i.e., for the Individual Plaintiffs to instruct their attorneys to hold off filing suit or otherwise pressuring Defendants regarding payment of their claims under the Non-Disclosure Agreements).  On information and belief, when speaking with those members of the Individual Plaintiffs, Thompson confirmed that the amounts to be paid the *Williamson* Plaintiffs under the Non-Disclosure Agreements was to be based on the gross amount received from the sale of the gold, silver and other artifacts recovered from the *S.S. Central America*, without deduction for

search expenses, recovery expenses, legal expenses, marketing expenses, salaries, competing claims or other costs.

35.     Having received these written and oral assurances, the *Williamson* Plaintiffs consented to Thompson's request and instructed their attorneys to desist in pressing their requests for payment.

36.     On August 26, 1992, the United States Court of Appeals for the Fourth Circuit reversed the district court's decision dismissing the Underwriters' claim as abandoned and its decision to not afford intervening parties an opportunity to conduct discovery.  The Fourth Circuit remanded the case to the district court for further proceedings.

37.     After a second trial, on November 18, 1993 the district court awarded CADG 90% of the insured treasure and 100% of the uninsured treasure, which decision again was appealed by the Underwriters.  On appeal, by decision dated June 14, 1995, the Fourth Circuit affirmed the district court's decision.

38.     After the Fourth Circuit affirmed the second trial decision, the matter was remanded to the district court for further proceedings, including resolution of the process by which the treasure would be marketed and sold.  The district court issued orders in 1996 that provided certain terms and conditions under which CADG was to proceed with marketing the entire treasure, of which the Underwriters would receive their awarded percentage.

39.     Although Thompson's companies had been given control of the marketing and sales process, the process became contentious and resulted in further litigation.  Eventually, in May 1998, the Underwriters and Thompson's companies settled the marketing and sales dispute by agreeing to divide up the treasure into the parties' respective portions, which was effected on

or about June 17, 1998 and which resulted in CADG (on behalf of some or all of the Defendants) obtaining 92.2% of the treasure.

40.     Upon information and belief, in November 1998, Thompson organized CXLLC to take over from RLP the recovery, marketing and sale efforts regarding the *S.S. Central America* treasure.  RLP's partners were granted ownership interests in CXLLC based on their respective ownership interests in RLP.  Thus, RLP's partners became members of CXLLC.  The members of CXLLC entered into an Operating Agreement, under which Thompson was named Chairman of CXLLC's board of directors.

41.     Upon information and belief, CXLLC entered into a Management and Recovery Services Agreement ("Management Agreement") with RLP, whereby RLP transferred its salvage rights to the treasure that already had been recovered from the *S.S. Central America* (the "Up Treasure") as well as the treasure from the shipwreck that Thompson believed was still on the ocean floor (the "Down Treasure") in exchange for an additional ownership interest in CXLLC for RLP and its partners and certain other consideration.   Also, under the Management Agreement, CXLLC took over from RLP the management of operations to market the Up Treasure and also the financing, recovery and marketing efforts regarding the Down Treasure (furthermore, upon information and belief, in May 2004, RLP amended its limited partnership agreement to name Econ as its new general partner to replace Mr. Thompson, which change did not affect the management of RLP, inasmuch as Thompson is the president of Econ).

42.     In January 1999, the *Williamson* Plaintiffs once again instructed their attorneys to contact Defendants' attorneys to obtain information regarding the status of the marketing and sale of the treasure.  Defendants' attorney, Richard T. Robol, Esq., visited the *Williamson* Plaintiffs' attorney, James T. Shirley, Jr., Esq., to assure the *Williamson* Plaintiffs that they would be paid

at the same time that Defendants' investors would be paid. The *Williamson* Plaintiffs' attorney and several attorneys representing Defendants corresponded over the course of the next year concerning the *Williamson* Plaintiffs' inquiries regarding the status of the marketing and sale of the treasure.

43.     Upon information and belief, after recovering the Up Treasure from the *S.S. Central America*, Thompson and/or one or more of the other Defendants initially engaged Christie's Galleries, Inc. auction house to market and sell the treasure. However, while the Up Treasure was tied up in the Admiralty Litigation, disputes arose between Thompson and Christie's resulting in the Christie's Litigation. As stated above at paragraph 25(c), the *Williamson* Plaintiffs have made a motion to intervene and unseal records of the closed Southern District of New York litigation between Christie's and Defendants in order to obtain further information regarding the contract between Christie's and Defendants and the eventual settlement of their dispute. That motion to intervene and unseal the file is *sub judice* before United States District Judge Robert Sweet.

44.     After the dispute arose between Christie's and Defendants, Thompson engaged another company, California Gold Marketing Group, LLC ("California Gold"), a Newport Beach, California company, to market and sell the Up Treasure. Upon information and belief, California Gold was retained in or about December 1999 and began marketing the gold for sale in or about February 2000. As related to Plaintiffs' counsel, James T. Shirley, Esq., of Holland & Knight's New York office in a telephone conversation on February 17, 2000, Defendants' attorney (and corporate officer for several of the corporate Defendants) Richard Robol, advised Mr. Shirley that Defendants had not relinquished their interest in the *Central America* treasure to California Gold. Rather, the "sale" of the treasure to California Gold was effected in order to

give California Gold the ability to represent that it had title to the treasure for loan and/or sales purposes. A copy of a redacted version of the contract purported to be the sales contract between Defendants RLP/CADG and California Gold (the "Asset Purchase Agreement"), which redacted contract was annexed to the Declaration of California Gold's Managing Partner Dwight Manley submitted in the Los Angeles Rule B Proceeding, is annexed as Exhibit 6. While CXLLC's Management Agreement purportedly transferred RLP's interests, and CADG's interests as well, in the treasure to CXLLC after CXLLC's creation, RLP and CADG are the parties that executed the Asset Purchase Agreement and purported to give California Gold full title to the treasure.

45. According to Mr. Robol's statement to Mr. Shirley, Defendants retain an interest of between 25% and 75% of the sales proceeds depending on the nature of how and to whom particular sales were made. By letter dated March 2, 2000, Richard T. Robol, Esq. wrote the *Williamson* Plaintiffs (on CADG letterhead) to report status of marketing and sale of the treasure. In that letter, CADG advised that "[o]n the marketing front, retail sales have been very robust to date." A copy of CADG's March 2, 2000 letter is annexed as Exhibit 7.

46. According to media reports, as of November 2003, California Gold had sold virtually all of the Up Treasure. Furthermore, according to Dwight Manley in his Declaration in the Los Angeles Rule B Proceeding, Defendants executed a supplemental agreement with California Gold which purportedly extinguished Defendants' residual interest in the treasure in or about June 2001 in exchange for a lump sum additional payment. Mr. Manley also submitted that supplemental agreement as an exhibit to his Declaration. A copy of Mr. Manley's full Declaration submitted in the Los Angeles Rule B Proceeding (including the two redacted contracts annexed thereto) is annexed as Exhibit 8.

47.     Despite the promises to the *Williamson* Plaintiffs in the Non-Disclosure Agreements that each of the *Williamson* Plaintiffs would be paid a share of the value of the treasure, despite the Manley Declaration and annexed agreements purportedly indicating that the Defendants' remaining interest in the treasure was extinguished in June 2001, and despite the repeated assertions by Defendants' attorneys and Thompson himself that payment was forthcoming, Defendants have not paid any of the *Williamson* Plaintiffs.  Upon information and belief, Thompson likewise has not made any cash distributions to his investors, or otherwise provided them with any return on their investment.

48.     According to Defendant Thompson's statements in an interview on Dateline NBC in 1998, he estimated that the Up Treasure might be valued at as much as $400,000,000.00.  He has professed in federal court to secret marketing techniques which will enable him to achieve this value, which is several multiples of the believed bullion value of the recovered treasure. According to news reports, the "Eureka Bar" – the largest gold bar or ingot recovered from the *S.S. Central America* which weighed approximately 80 pounds – sold for $8 million, or roughly $6,250 an ounce at a time when gold's value on the commodities markets was approximately $600 an ounce.  A copy of a news release regarding the sale of the "Eureka Bar" is annexed as Exhibit 9.  This evidences the Defendants' success in selling pieces of literal bullion – rather than coins – for as much as 10 times the bullion value of the gold.

49.     Furthermore, upon information and belief, since at least 2000, Thompson has refused to provide the partners of RLP and the members of CXLLC with any meaningful information regarding the finances and operations of those entities.  Because of this failure to communicate, some of the Defendants' investors commenced the Ohio lawsuits against

Defendants last year to determine what had become of their investments, into which proceedings the *Williamson* Plaintiffs herein intervened with their claims.

50.     As described above and as further set forth below, Defendants have breached their obligations under the Non-Disclosure Agreements by failing to pay the *Williamson* Plaintiffs the consideration promised despite their having performed fully under those agreements.

51.     As a result of all the foregoing, and as described below, Defendants are liable to the *Williamson* Plaintiffs in the principal amount of $7,800,000.00, exclusive of interest and costs.

52.     In addition to the principal amount owed, the *Williamson* Plaintiffs also are entitled to recover reasonable prejudgment interest on their claim, which amount is estimated to be $3,274,931.00 as of November 9, 2006, calculated as interest at 5% per annum since the division of the treasure by settlement between the Underwriters and CADG on June 17, 1998.

## ALTER EGO FACTS

53.     Some or all of the other defendants are alter egos of, and/or successors to, Defendants Thompson and RLP and of each other.  Alternatively, RLP and the other corporate defendants are so dominated by the individual defendants that this Court should disregard all of the corporate defendants' corporate veils.

54.     Defendant Thompson was the General Partner of RLP and is an officer and/or director of every one of the corporate defendants for which the Williamson Plaintiffs have been able to obtain company information.

55.     In his correspondence with Mr. Craft, Defendant Thompson used both RLP's and Economic Zone Resource Associates, Inc.'s names in connection with Mr. Craft's retention. Although Mr. Craft's NDA is printed on Economic Zone Resource Associates, Inc. letterhead,

Thompson used RLP letterhead to instruct Mr. Craft to disregard the Economic Zone Resource Associates, Inc. NDAs while performing some of his services. The two companies' letterheads also show both had the same street address and the same telephone number in the 1980s. These practices continued until recently when Economic Zone Resource Associates, Inc. was, according to available records, dissolved administratively in 2003. The foregoing behavior is typical of all of the corporate Defendants.

56. In the New York Rule B Proceedings, Defendant Kirk filed a declaration claiming that Economic Zone Resource Associates, Inc. is the "owner" of the *M.V. Artic Discoverer* (one of the vessels used by Defendants during the *Central America* project). In Gary Kinder's book *Ship of Gold in the Deep Blue Sea*, cited extensively by Defendants in this proceeding, Defendant Kirk is identified as the party who funded the purchase of that vessel. Neither Defendant Kirk nor any other defendant has put forward any different information on the capitalization of Economic Zone Resource Associates, Inc.

57. Defendant Kirk's declaration in New York also refers to Economic Zone Resource Associates, Inc. as EZRA, Inc., although the two are otherwise held out to be separate identities. Defendant Kirk's sleight of hand was intentional. If Economic Zone Resource Associates, Inc. was the owner of the ship as he stated, and that company has been dissolved as the records show, the principals – such as Defendant Kirk – are now liable for its debts.

58. Defendant Kirk stated in his New York declaration that Economic Zone Resource Associates, Inc.'s funds had been attached in September 2006, and it had not paid its employees as result. He did not document any attachment of Economic Zone Resource Associates, Inc.'s funds. Plaintiffs have been advised by Deutche Bank of Defendant Kirk's personal funds being attached, but not by any bank of any attachment of funds belonging to Economic Zone Resource

Associates, Inc. or of EZRA, Inc.  Therefore, Defendant Kirk is continuing to fund the operations of either the defunct Economic Zone Resource Associates, Inc. or of EZRA, Inc., and/or the Defendants are commingling funds of the personal defendants and the corporate defendants.

59.     Upon information and belief, Economic Zone Resource Associates, Inc. was capitalized either (i) entirely by the investors' contributions to RLP or (ii) by Defendant Kirk, whose seized funds had been meant to meet its payroll.  Economic Zone Resource Associates, Inc. was not independently funded, but rather was created out of funds provided to RLP by one or more of its investors or directly by one or more of the investors.

60.     The agreements between RLP and CXLLC (the Management Agreement and the Operations Agreement) show that RLP was functionally merged into CXLLC in 1998.  RLP partners all gained proportionate rights in CXLLC.  All of RLP's functions were assumed by CXLLC.  All of RLP's liabilities were assumed by CXLLC.  Management of RLP's assets was transferred to CXLLC.

61.     CXLLC is a Delaware corporation with a Florida address, which is a dockyard at the end of a street in Fernandina Beach, Florida.  CXLLC's office address is the same as the present address of most of the other corporate defendants – 433 West Sixth Avenue, Columbus, Ohio.  Every one of the corporate defendants has a corporate address either at 433 West Sixth Avenue in Columbus, Ohio or at the end of 14th Street in the dockyard in Fernandina Beach, Florida.  All office addresses are 433 West Sixth Avenue.  Of all corporate filings for these Defendants reviewed by the *Williamson* Plaintiffs, the officers all are the same: Mr. Thompson, Mr. Robol, Robert Evans, Debra Burley, and Curtis Loveland.

62.     The person at the head of CXLLC and of all the corporate defendants is Defendant Thompson.  Since CXLLC has taken control of RLP, and its members are RLP's

partners, despite an identity change and a convenient extra corporate shell, CXLLC merely is
continuing RLP's business.

63.     Since CXLLC began managing and controlling RLP, the following events have
occurred as related by the *Dispatch/Fanta* Plaintiffs in these proceedings:

a.     Defendants Kirk, Turner, Ford and Cullman (the "Director Defendants") were
nominated or elected for an initial 2-year term (running from 1998 to 2000).
Since then, they never have stood for re-election.

b.     The Director Defendants met from 2002-2005 and unanimously voted to preclude
investors from having access to books and records; and concealed this decision in
violation of their fiduciary obligations.

c.     The Director Defendants refused to disclose financial information so as to conceal
mismanagement.

d.     From the papers filed by the *Dispatch/Fanta* Plaintiffs in these proceedings to
date, the investors have no idea that the Treasure fully was sold by June 2001 and
that their rights to the treasure or any more proceeds from its sale were
extinguished in that sale.

e.     Despite the Operating Agreements specifically providing CXLLC's investors with
the right to examine CXLLC's books and review records, on December 16, 2005
the four Director Defendants issued the following ultimatum: (1) the
*Dispatch/Fanta* Plaintiffs must forego their rights under existing Operating
Agreements with Defendants; (2) the *Dispatch/Fanta* Plaintiffs must sign a new
non-disclosure agreement; and (3) the *Dispatch/Fanta* Plaintiffs must agree to pay
liquidated damages to the Director Defendants.

64.     Because of the actions of the Defendants recited in paragraphs 53 to 63, and other actions yet to be discovered, each and every Defendant is liable to the *Williamson* Plaintiffs either (i) as an alter-ego and/or successor of the primary defendant to those claims, or (ii) on grounds that Defendants' actions require this Court to disregard the Defendants' corporate veils and treat Defendants as a single entity dominated by the individual Defendants Thompson, Kirk, Turner, Ford and Cullman.

## COUNT I

## INDIVIDUAL PLAINTIFFS' BREACH OF CONTRACT CLAIM

65.     Plaintiffs incorporate by reference Paragraphs 1 through 64 above.

66.     Each of the Individual Plaintiffs' Non-Disclosure Agreements provides that it is an agreement:

> [B]y and between Thomas G. (Harvey) Thompson, a research scientist in the field of ocean engineering with principal offices in Columbus, Ohio (herein called "Thompson"), who represents interests, in addition to his own, of certain other science professionals and individuals, including one or more entities, and [the Individual Plaintiffs].

67.     In executing each of the Individual Plaintiffs' Non-Disclosure Agreements, Thompson was acting for each of the Defendants herein.

68.     Each of the Individual Plaintiffs' Non-Disclosure Agreements provides that, in consideration for the Individual Plaintiffs' promise to not disclose information regarding the *S.S. Central America* project and to not compete with that project, Defendants would remunerate each of the Individual Plaintiffs in an amount to be based on the value of the treasure recovered from the *S.S. Central America*.

69.     Each of the Individual Plaintiffs has complied with his obligations under his respective Non-Disclosure Agreement.

70.     Each of the Individual Plaintiffs, having complied with his obligations under his respective Non-Disclosure Agreement, is entitled to compensation in accordance with the terms of the Non-Disclosure Agreements.   The respective percentages owed each of the Individual Plaintiffs is as follows:

| | | |
|---|---|---|
| Michael Williamson: | .45% | (45/100 of 1%) |
| Don C. Craft: | .35% | (35/100 of 1%) |
| Kirk O'Donnell: | .025% | (2.5/100 of 1%) |
| John Lettow: | .05% | (5/100 of 1%) |
| Timothy McGinnis: | .025% | (2.5/100 of 1%) |
| Fred Newton: | .025% | (2.5/100 of 1%) |
| Chris Hancock | .05% | (5/10 of 1%) |
| Dale Schoeneman | .025% | (2.5/100 of 1%) |
| William Watson: | .05% | (5/100 of 1%) |

71.     Despite being entitled to payment under the Non-Disclosure Agreements of their consideration for honoring those agreements (which consideration was measured by percentages of the total treasure recovered off the *S.S. Central America*), and despite numerous demands to Thompson and Defendants' attorneys for payment under the Non-Disclosure Agreements having been made, the Individual Plaintiffs have not been paid their consideration under the Non-Disclosure Agreements.

72.     Defendants' failure to pay the Individual Plaintiffs their consideration due under the Non-Disclosure Agreements constitutes a breach of contract, as a result of which each of the Individual Plaintiffs has been damaged and is entitled to bring his claim herein.

73.     As a result of all the foregoing, and as described below, Defendants are liable to the Individual Plaintiffs in the principal amount of $4,200,000.00, exclusive of interest and costs.

74.     In addition to the principal amount owed, the Individual Plaintiffs also are entitled to recover reasonable prejudgment interest on their claim, which amount is estimated to be $1,763,424.00 as of November 9, 2006, calculated as interest at 5% per annum since the division of the treasure by settlement between the Underwriters and CADG on June 17, 1998.

## COUNT II

### IDSS' BREACH OF CONTRACT CLAIM

75.     The *Williamson* Plaintiffs incorporate by reference Paragraphs 1 through 74 above.

76.     IDSS and Defendant RLP entered into the IDSS Agreement.

77.     In addition to certain rental fees and expenses provided in the IDSS Agreement, Defendant RLP promised to give IDSS .9% of the total treasure recovered off the *S.S. Central America*.

78.     IDSS has complied with its obligations under the IDSS Agreement.

79.     Having complied with its obligations under the IDSS Agreement, IDSS was paid by Defendant RLP, or by one of the other Defendants on behalf of RLP, the rental fees and expenses promised IDSS as consideration for its performance.

80.     IDSS, having complied with its obligations under the IDSS Agreement, also is entitled to its percentage of the total treasure recovered from the *S.S. Central America* as promised in the IDSS Agreement.

81.     Despite being entitled the additional consideration in the form of a percentage of the total treasure recovered off the *S.S. Central America*, and despite numerous demands to

Thompson and Defendants' attorneys for payment under the IDSS Agreement having been made, IDSS has not been paid its additional consideration under the IDSS Agreement.

82.    RLP's failure to pay IDSS its percentage of the total treasure recovered off the *S.S. Central America* constitutes a breach of the IDSS Agreement, as a result of which IDSS has been damaged and is entitled to bring this claim herein.

83.    As a result of all the foregoing, and as described below, Defendants are liable to IDSS in the principal amount of $3,600,000.00, exclusive of interest and costs.

84.    In addition to the principal amount owed, Plaintiff IDSS also is entitled to recover reasonable prejudgment interest on its claim, which amount is estimated to be $1,511,506.00 as of November 9, 2006, calculated as interest at 5% per annum since the division of the treasure by settlement between the Underwriters and CADG on June 17, 1998.

85.    Some or all of the other Defendants are alter egos and/or successors to RLP and, accordingly, likewise are liable to IDSS for its claim. Alternatively, RLP and the other corporate defendants are so dominated by the individual defendants that this Court should disregard the corporate defendants' corporate veils.

86.    As but one example of the domination of the corporate defendants by the individual defendants, upon information and belief the individual defendants were appointed as directors of Columbus Exploration, LLC to serve two year terms. Despite the individual directors being appointed in or about 1998 or 1999, none of those directors has stood for re-election because Defendant Thompson has refused to allow corporate meetings or allow corporate elections.

87.    Moreover, many of the Defendants have allowed their corporate status to lapse under the laws of their respective states, thereby failing to observe corporate formalities.

## COUNT III

### *WILLIAMSON* PLAINTIFFS' CONVERSION CLAIM

88.     The *Williamson* Plaintiffs incorporate by reference Paragraphs 1 through 87 above.

89.     Some or all of the Defendants have been, and still are, exercising dominion and/or control over the treasure recovered off the *S.S. Central America* and/or the proceeds from the sale of that treasure.

90.     The *Williamson* Plaintiffs each are entitled to a share of the treasure recovered off the *S.S. Central America* and/or the proceeds from the sale of that treasure.

91.     Although the *Williamson* Plaintiffs have repeatedly demanded that Defendants release to the *Williamson* Plaintiffs that portion of the proceeds of the sale of the treasure recovered off the *S.S. Central America* that is the *Williamson* Plaintiffs', Defendants have refused to comply with the *Williamson* Plaintiffs' demand, which refusal is inconsistent with the *Williamson* Plaintiffs' rights to that treasure and/or the proceeds therefrom.

92.      As a result of Defendants' conversion of the treasure recovered off the *S.S. Central America* and/or the proceeds therefrom, the *Williamson* Plaintiffs have been damaged collectively in the principal amount of $7,800,000.00, exclusive of interest and costs.

93.     In addition to the principal amount owed, the *Williamson* Plaintiffs also are entitled to recover reasonable prejudgment interest on their claim, which amount is estimated to be $3,274,931.00 as of November 9, 2006, calculated as interest at 5% per annum since the division of the treasure by settlement between the Underwriters and CADG on June 17, 1998.

## COUNT IV

### PLAINTIFF ESTATE OF DON C. CRAFT'S PENALTY WAGE CLAIM

94.     The *Williamson* Plaintiffs incorporate by reference Paragraphs 1 through 93 above.

95.     By the terms of his Non-Disclosure Agreement, Don C. Craft agreed to take one-third of his daily hire rate of $450.00 (i.e., $150.00) in the form an additional .15% percentage of the recovered treasure.  As such, a portion of The Estate of Don C. Craft's claim herein is for outstanding unpaid wages.

96.     Some or all of the Defendants, including but not limited to Defendant Kirk, were the owners of the vessel on which Don C. Craft was employed.

97.     Under the penalty wage provisions of the U.S. Wage Statute, 46 U.S.C. § 10313, The Estate of Don C. Craft is entitled to two days wages for every day since June 17, 1998, the date that Defendants entered the settlement agreement with the Underwriters, up to the date his outstanding wages are paid.  (The Verified Complaints in the Los Angeles Rule B Proceeding and the New York Rule B Proceeding incorrectly identifies 46 U.S.C. § 10504 – coastwise voyages – as the statutory section applicable to Mr. Craft's claims, when in fact the services for which penalties are sought related to Mr. Craft's service aboard the Defendants' vessel during a foreign voyage from Newfoundland, Canada to a port in or near Florida).

98.     As a result of Defendants' failure to pay the specified wages, Defendant Kirk and some or all of the remaining Defendants are liable to The Estate of Don C. Craft in the amount of $919,900.00 as of November 9, 2006, which amount continues to accrue at the rate of $300.00 per day.

## COUNT V

### *WILLIAMSON* PLAINTIFFS' CONSTRUCTIVE TRUST CLAIM

99.     The *Williamson* Plaintiffs incorporate by reference Paragraphs 1 through 98 above.

100.     The relationship between Defendants and the *Williamson* Plaintiffs is and was a confidential and/or fiduciary relationship.

101.     Some or all of Defendants promised the *Williamson* Plaintiffs that, in consideration for the *Williamson* Plaintiffs' assisting Defendants and in complying with their respective Non-Disclosure Agreements and the IDSS Agreement, Defendants would pay the *Williamson* Plaintiffs their respective shares of the total treasure recovered off the *S.S. Central America* or the proceeds from the sale of that treasure.

102.     The *Williamson* Plaintiffs entrusted to some or all of Defendants the *Williamson* Plaintiffs' shares of the total treasure recovered off the *S.S. Central America* or the proceeds from the sale of that treasure.  The *Williamson* Plaintiffs' entrusted the possession of their shares of the treasure to some or all of Defendants in reasonable reliance on Defendants' promise and repeated assurances that for the *Williamson* Plaintiffs' actions they would be given their respective shares of the treasure and that the treasure would be much more valuable if marketed and sold in a manner insisted upon by Defendants.

103.     Upon information and belief, some portion of the total treasure recovered off the *S.S. Central America*, or the proceeds from the sale of that treasure, or other property purchased through the use of the treasure as collateral, is present in this jurisdiction including, but not limited to, the aforementioned gold and some, or all, of Defendants' properties from which they conduct business.

104.    The *Williamson* Plaintiffs have repeatedly demanded that Defendants provide the *Williamson* Plaintiffs with their shares of the total treasure recovered off the *S.S. Central America* or the proceeds from the sale of that treasure.

105.    Unless the *Williamson* Plaintiffs are compensated for their successful efforts in what experts consider to be one of the most remarkable feats ever achieved, the *Williamson* Plaintiffs (including, among others, (a) the persons who designed and operated the side-scan sonar gear that located the *S.S. Central America*, (b) the veteran sailor who obtained and refitted the vessel used to perform the search and recovery operation, and (c) the scientist who invented the search pattern by which the *S.S. Central America* was located) all will be victims of unjust enrichment.  Defendants will have been unjustly and unfairly enriched to the detriment and prejudice of the *Williamson* Plaintiffs, whose efforts the Defendants requested and whose efforts made Defendants' operations successful.

106.    Under principles of equity, the *Williamson* Plaintiffs are entitled to an order from this Court in their favor and against Defendants, imposing a constructive trust upon Defendants as to their respective interests in assets located within the jurisdiction of this Court imposing a constructive trust upon Defendants as to their respective interests in assets located within the jurisdiction of this Court that are part of, or were obtained by Defendants as a result of, the total treasure recovered off the *S.S. Central America*, and for an accounting of all such property and assets obtained from the total treasure recovered off the *S.S. Central America* or the proceeds from the sale of that treasure.

## COUNT VI

### *WILLIAMSON* PLAINTIFFS' BREACH OF FIDUCIARY DUTIES CLAIM

107.   The *Williamson* Plaintiffs incorporate by reference Paragraphs 1 through 106 above.

108.    The *Williamson* Plaintiffs, as owners of shares of the total treasure recovered off the *S.S. Central America* or the proceeds from the sale of that treasure, were owed a fiduciary duty by each of the Defendants having an interest in, or control over, the treasure recovered off the *S.S. Central America* or the proceeds from the sale of that treasure.

109.   One of the fiduciary duties owed by Defendants to the *Williamson* Plaintiffs is a duty to provide the members with timely and accurate reporting regarding the operations and finances of the company when requested.

110.   Defendants repeatedly have breached their fiduciary duties to the *Williamson* Plaintiffs by failing to provide them with the information and reports requested and by engaging in a pattern and practice of non-disclosure regarding material matters affecting the *Williamson* Plaintiffs' shares in the treasure recovered off the *S.S. Central America* or the proceeds from the sale of that treasure.

111.   As a result of Defendants' breaches of their fiduciary duties, the *Williamson* Plaintiffs each have suffered damages in an amount to be determined at trial, but not less than $25,000.

## COUNT VII

### *WILLIAMSON* PLAINTIFFS' REQUEST FOR AN ACCOUNTING

112.   The *Williamson* Plaintiffs incorporate by reference Paragraphs 1 through 111 above.

113.    The *Williamson* Plaintiffs, as owners of shares of the total treasure recovered off the *S.S. Central America* or the proceeds from the sale of that treasure, were owed a fiduciary duty by each of the Defendants having an interest in, or control over, the treasure recovered off the *S.S. Central America* or the proceeds from the sale of that treasure.

114.    One of the fiduciary duties owed by Defendants to the *Williamson* Plaintiffs is a duty to maintain accurate books and records of Defendants' operations and financial affairs and to provide timely and accurate information to shareholders regarding those subjects.

115.    Defendants have refused to provide the *Williamson* Plaintiffs with true and accurate disclosures regarding Defendants' finances. Instead, for several years Defendants have adopted a policy of non-disclosure regarding their financial condition. Indeed, upon information and belief, Defendants have refused even to disclose such information to limited partners in their enterprises.

116.    In order to determine the true and accurate status of Defendants' financial condition and the worth of the *Williamson* Plaintiffs' shares in the treasure recovered off the *S.S. Central America* or the proceeds from the sale of that treasure, it is necessary that Defendants provide a full accounting of their finances.

**WHEREFORE**, Plaintiffs Michael Williamson, the Estate of Don C. Craft, Kirk O'Donnell, John Lettow, Timothy McGinnis, Fred Newton, William Watson, Chris Hancock, Dale Schoeneman and International Deep Sea Survey, Inc. request judgment as follows:

1.    A complete accounting of the finances of each of the Defendants;

2.    An award of money damages for Defendants' breaches of their obligations under the Non-Disclosures Agreements and the IDSS Agreement and/or their conversion and/or their

breaches of other duties set forth above in an amount to be determined at trial, but in the aggregate not less than $11,250,000;

3.     An award of money damages in favor of the Estate of Don C. Craft and against some or all of the Defendants, including but not limited to Defendant Gilman D. Kirk, Jr., for Defendants' failure to timely pay wages to Don C. Craft pursuant to penalty wage provisions of the U.S. Wage Statute, 46 U.S.C. § 10313, in an amount to be determined at trial but estimated to be $919,900.00 as of November 9, 2006 and continuing to accrue at the rate of $300.00 per day;

4.     Restitution to the *Williamson* Plaintiffs resulting from Defendants' unjust enrichment at the expense of the *Williamson* Plaintiffs in an exact amount to be determined at trial and for a constructive trust and/or equitable lien to be imposed on Defendants as to their respective interests in property or assets located within the jurisdiction of this Court that are part of, or were obtained by Defendants as a result of, the total treasure recovered from the *S.S. Central America*, and for an accounting of all such property and assets obtained from the total treasure recovered off the *S.S. Central America* or the proceeds from the sale of that treasure; and/or

5.     An award of interest, costs, expenses, attorney fees, and any other relief the Court deems appropriate.

Respectfully submitted,

*/s/Michael R. Szolosi, Sr.* (0022317)
Michael R. Szolosi, Sr.  (0022317)
McNamara and McNamara, L.L.P.
88 East Broad Street, Suite 1250
Columbus, Ohio 43215

(614) 228-6131/(614) 228-6126 (Fax)
Email: mrs@mcnamaralaw.us
*Attorneys for Williamson Plaintiffs*

OF COUNSEL:

James T. Shirley, Jr.
Michael J. Frevola
Holland & Knight LLP
195 Broadway, 24th Floor
New York, New York 10007-3189
(212) 513-3200/(212) 385-9010 (Fax)

## JURY DEMAND

The Plaintiffs herein request a trial by jury in all triable issues.

*/s/ Michael R. Szolosi, Sr.*
Michael R. Szolosi, Sr. (0022317)

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a copy of the foregoing motion was served via the Court's electronic filing, on the 9th day of February, 2007 upon the following parties:

John W. Zeiger (0010707)
Steven W. Tigges (0019288)
Bradley T. Ferrell (0070965)
Zeiger, Tigges & Little LLP
3500 Huntington Center
41 South High Street
Columbus, Ohio 43215
(614) 365-9900/(614) 365-7900
*Attorneys for Plaintiffs*
*The Dispatch Printing Company*
*and Donald C. Fanta*

William M. Mattes (0040465)
Dinsmore & Shohl LLP
175 South Third Street, 10th Floor
Columbus, Ohio 43215-5134
(614) 628-6901/(614) 628-890 (Fax)

*Attorney for Defendants*
*Gilman D. Kirk, James F. Turner, Michael*
*J. Ford and W. Arthur Cullman, Jr.*

Richard T. Robol (0064345)
Robol Law Office, LPA
555 City Park Avenue
Columbus, Ohio 43215
(614) 737-3739/(614) 737-3756
*Attorney for Defendants*
*Recovery Limited Partnership*
*and Columbus Exploration, LLC*

Kenneth A. Zirm (0010987)
Walter & Haverfield LLP
1300 Terminal Tower, 50 Public Square
Cleveland, Ohio 44113-2253
(216) 781-1212/(216) 575-0911 (Fax)

Lynn Oberlander, Esq.
Editorial Counsel
Forbes Inc.
60 Fifth Avenue
New York, New York 10011
(212) 620-2329/(212) 620-1873 (Fax)
*Attorneys for Forbes, Inc.*

Rex H. Elliott (0054054)
Charles H. Cooper (0037295)
Cooper & Elliott, LLC
2175 Riverside Drive
Columbus, Ohio 43221
(614) 481-6000/(614) 6001 (Fax)
*Attorneys for Defendants*
*Thomas G. Thompson and*
*ECON Engineering Associates, Inc.*

*/s/ Michael R. Szolosi, Sr.*
Michael R. Szolosi, Sr.