# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**MICHAEL E. WILLIAMSON,**
**et al.,**

             **Plaintiffs,**

        **v.**

**RECOVERY LIMITED**
**PARTNERSHIP, et al.,**

             **Defendants.**

      **Case No. 2:06-CV-292**
      **JUDGE SARGUS**
      **MAGISTRATE JUDGE KEMP**

## OPINION AND ORDER

This matter is before the Court for consideration of the Parties' cross-motions for summary judgment (Docs. 546, 547, 548, 549, and 588). Also before the Court are Plaintiffs' motion to disqualify Richard Robol as trial counsel for the Entity Defendants (Doc. 599), the Entity Defendants' motion to disqualify Michael Frevola as trial counsel for Plaintiffs (Doc. 621), Robol's conditional motion to withdraw as attorney (Doc. 622), the Entity Defendants' motion to supplement their counterclaim (Doc. 603), and Plaintiffs' motion to strike Defendants' demand for a jury trial on Defendants' counterclaims (Doc. 628). For the reasons set forth herein, Defendants' motions for summary judgment are **GRANTED in PART** and **DENIED in PART**; Plaintiffs' respective motions for partial summary judgment are **GRANTED in PART** and **DENIED in PART**; Plaintiffs' motion for summary judgment on the Entity Defendants' counterclaims is **GRANTED**; the Entity Defendants' motion to supplement their counterclaims is **DENIED**; the motions to disqualify counsel are **HELD in ABEYANCE**; and Plaintiffs' motion to strike jury demand is **GRANTED**.

## I. Background

### A. Introduction

In September 1857, the S.S. Central America ("Central America"), a steamship bound for New York City from Panama, sank several hundred miles off the coast of South Carolina during a hurricane. Lost in the shipwreck were hundreds of lives, tons of gold recently mined from the California gold fields, and other valuables. Approximately 130 years later, a group of scientists, engineers, and investors led by Defendant Thomas G. Thompson ("Thompson"), located the wreck of the Central America at a depth of over one mile, and were able to successfully recover much of its precious cargo. In a development perhaps as decidedly American as the entrepreneurial spirit and ingenuity necessary to achieve what Defendants were able to achieve, the recovery of the Central America's treasure has been followed by nearly twenty-five years of litigation.

The initial litigation lasted for over a decade in the Eastern District of Virginia as Thompson and his group fought to establish their salvage rights in the Central America against the competing claims of insurance companies that had insured the loss of the ship. Following an initial award by the trial court of one-hundred percent of the treasure to Thompson and his group pursuant to the law of finds, in 1992, the Fourth Circuit Court of Appeals remanded the case with instructions to the trial judge to apply the law of salvage to the case. *See Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 974 F.2d 450, 468 (4th Cir. 1992). On remand, the District Court awarded 90% of the recovery to Thompson and his group, and the award was subsequently upheld by the Fourth Circuit. *See Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 573 (4th Cir. 1995). The Fourth Circuit also upheld the District Court's decision that Thompson and his group would be responsible for marketing the treasure. *See id.* at 574–75.

2

Subsequent rounds of litigation over the marketing of the treasure ensued, and the Parties

ultimately settled the case by agreeing to divide the treasure item for item and then go their

separate ways. Despite Thompson's group's efforts to rescind the settlement agreement, it was

upheld by the Fourth Circuit in 2000. *See Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*,

203 F.3d 291, 302–03 (4th Cir. 2000).

## B. The Current Litigation

The instant case, which was initially filed in 2006, involves a group of individuals and

one business entity engaged by Thompson to participate in the search for the Central America.

They include Michael Williamson, Don Craft,[1] Kirk O'Donnell, John Lettow, Timothy

McGinnis, Fred Newton, William Watson, Chris Hancock, Dale Schoeneman, and International

Deep Sea Survey, Inc. ("IDSS", collectively "Plaintiffs"). The individual Plaintiffs claim to

have each signed a nondisclosure agreement ("NDA") with Thompson promising them a

percentage of the net recovery of the Central America's treasure in exchange for meeting certain

conditions, including performing services and maintaining confidentiality. IDSS claims to have

executed an equipment lease with Defendant Recovery Limited Partnership promising it a

percentage of the net recovery. Defendants in this case include Thompson; a series of business

entities including Recovery Limited Partnership; Columbus Exploration, LLC; ECON

Engineering Associates, Inc.; Columbus-America Discovery Group, Inc.; Columbus Exploration

Limited Partnership; Omni Engineering, Inc.; Omni Engineering of Ohio, Inc.; Economic Zone

Resource Associates, Inc.; Economic Zone Resource Associates, Ltd.; EZRA, Inc.; EZRA of

---

[1] Plaintiff Craft passed away on April 2, 2006 (Doc. 72), and his estate, represented by his widow, Evelyn Craft, has been substituted as a party. (*See* Doc. 78.)

3

Ohio, Inc.; and DOE.E, Inc. (collectively "Entity Defendants"); and individuals Gilman Kirk, James Turner, Michael J. Ford, and Arthur Cullman, Jr.[2]

Recovery Limited Partnership ("RLP"), an Ohio limited partnership, was formed by Thompson in 1985, with Thompson as general partner. (*See* Doc. 550-1 at 2.) In 1999, ECON Engineering Associates, Inc. ("ECON"), a corporation owned and controlled by Thompson, was substituted as general partner of RLP. (*See* Docs. 588-1 at 4–6; 362-3 at 3.) RLP was cancelled as an Ohio business entity in October 2010. (Doc. 550-1 at 34.) Defendant Columbus-America Discovery Group ("CADG") is an Ohio corporation incorporated in May 1987. (Doc. 557-1 at 1.) At trial during the salvage litigation in the Eastern District of Virginia, Thompson testified that CADG acted as an agent of RLP through an agreement between the two entities. (Doc. 567-2 at 64–65.) For instance, Thompson testified that CADG initiated the salvage litigation on behalf of RLP. (Doc. 567-2 at 65.)

Columbus Exploration, LLC ("Columbus Exploration") is a Delaware limited liability company and the successor of Columbus Exploration Limited Partnership, which was formed in 1990. (Doc. 550-1 at 16–17.) In November 1998, the limited partnership was converted into a limited liability company. (*See* Doc. 2-8 at 2.) In December 1998, RLP entered a "Management and Recovery Services Agreement" ("Management Agreement") with Columbus Exploration providing that Columbus Exploration would generally be responsible for marketing the treasure recovered from the Central America and continuing the salvage operations at the site of the wreck. (*See* Doc. 26-1 at 4.) The Management Agreement, which appears heavily redacted in the record, specifically provides that "RLP retains and irrevocably appoints [Columbus Exploration] as its agent with full power and authority to manage the business, assets and liabilities of RLP, and hereby ratifies all acts of [Columbus Exploration] taken pursuant to such

---

[2] Defendants may also collectively be referred to herein as "Thompson's group."

appointment." (Doc. 26-1 at 6.) The agreement also gives Columbus Exploration the authority to "cause the Obligations of RLP to be paid and discharged as they become due" and "apply the Net Proceeds[3] as provided" in the agreement. (Doc. 26-1 at 6.)

Economic Zone Resource Associates, Inc. ("Economic Zone") is an Ohio Corporation formed in May 1986. (*See* Doc. 550-1 at 14.) At trial in the Eastern District of Virginia, Thompson testified that this corporation, along with EZRA, Inc., also served as an agent of RLP. (567-2 at 65.) For instance, the record indicates that the Arctic Discoverer, a ship used for salvaging the Central America's wreck, was purchased by Economic Zone in 1988. (*See* Doc. 588-1 at 24–26.) Economic Zone was cancelled as a business entity in January 2004. (Doc. 550-1 at 32.) There is evidence in the record that Economic Zone Resource Associates, Ltd. is another name for Economic Zone as the "Ltd." name was registered in Florida as a foreign entity originating in Ohio, but no such entity was apparently ever registered in Ohio. (*See* Doc. 588-2 at 11.)

EZRA, Inc. ("EZRA") is an Ohio corporation incorporated in 1990. (Doc. 596-1 at 17.) There is evidence indicating that EZRA, Inc. and EZRA of Ohio, Inc. are one and the same because EZRA of Ohio, Inc. is apparently a "cross-reference" name used for EZRA, Inc. in Florida. (*See* Doc. 588-2 at 2.) The record reflects that the name "EZRA" has been used interchangeably with Economic Zone Resource Associates, Inc. by Thompson's group. (*See* Doc. 588-1 at 45.) Additionally, records show that Defendant Omni Engineering, Inc. is a Delaware corporation registered to do business in Florida using the cross-reference name Omni Engineering of Ohio, Inc, indicating that these two entities are also one and the same. (*See* Doc. 588-2 at 5–6.)

---

[3] The definition of the term "Net Proceeds" is apparently redacted on the copy of the Management Agreement appearing in the record.

The individual Defendants—Thompson, Kirk, Turner, Ford, and Cullman—all served as directors of Columbus Exploration. According to Kirk, as of September 2008, only he, Thompson, and Ford remained as directors. (Doc. 362-4 at 3.) Kirk also testified that, despite provisions in Columbus Exploration's operating agreement calling for the expiration of directors' terms, no elections were ever held, and directors simply remained in office. (*See* Doc. 362-4 at 3.)

### C. Plaintiffs' Role in Salvaging the Central America

Plaintiffs' claims date back to Thompson's initial efforts to locate the Central America. After several years of research into the disaster, and after consulting with an expert in the mathematical field of search theory, Thompson and his team identified a 1400-square mile search area, which they subdivided into smaller segments each assigned a probability that the Central America had gone down within the particular segment. In the summer of 1986, Thompson outfitted a ship called the Pine River, which, over the course of several weeks in June and July of that year, searched the target area using sonar. Eight of the nine individual Plaintiffs were engaged by Thompson to participate in this initial search aboard the Pine River. Craft served as the maritime coordinator. (Doc. 546-3 at 2.) Williamson, who has been an officer of IDSS, Hancock, Lettow, McGinnis, O'Donnell, Schoeneman, and Watson served as part of the team operating the sonar equipment. While he apparently never worked onboard the Pine River, Newton claims that he helped to evaluate data concerning the location of the Central America's wreck, helped develop the search plan, and also assisted in the development of technology used to recover the ship's treasures. (*See* Doc. 546-7 at 2.)

The purpose of the 1986 voyage was to identify possible shipwrecks on the ocean floor that would warrant further investigation during subsequent seasons. In September 1988, one of

the possible targets identified in 1986 was positively identified as the Central America. The

1986-search and the subsequent identification of the ship was described by the Fourth Circuit in

detail:

> The search plan was designed to survey all of the high- and medium-probability
> cells, and as many low-probability cells as possible. During the survey, however,
> Williamson had difficulty adhering exactly to the course dictated by the plan.
> Like a gardener who has overestimated the cutting width of his lawnmower,
> Williamson was forced to make additional sonar runs between the planned track
> lines to ensure that there were no "holidays," or gaps, in the survey. It was near
> the terminus of one of these extra runs, very close to the southwest extreme of the
> probability map and in a cell with an assigned probability of less than one in one
> thousand, that the sonar recorded an image of what turned out to be the
> CENTRAL AMERICA.
>
> Of course, because a sonar image has appreciably less resolution than a
> conventional photograph, positive identification of any of the targets discovered
> during the survey had to wait until cameras could be lowered into the depths. The
> following summer, Thompson's group went to sea aboard the ARCTIC
> DISCOVERER. The group, however, did not immediately proceed to the
> "correct" target; they instead traveled to a similar target in a more promising,
> high-probability cell over thirty miles to the northeast. After recovering several
> lumps of coal, along with some pottery and other artifacts from the site,
> Columbus–America received an injunction from the district court granting them
> the exclusive right to operate in the immediate area.
>
> Columbus–America explored the site throughout the summer of 1987, but was
> unable to obtain any proof of the wreck's identity. That winter, the group
> reexamined the survey data and noticed similarities between the target they had
> been exploring and the target thirty miles to the southwest. When, during the
> summer of 1988, Columbus–America lowered NEMO [(a recovery robot)] to the
> ocean floor near this new target, the robot's almost immediate revelation of the
> ship's sidewheels provoked an exuberant uproar in the ARCTIC DISCOVERER's
> control room. Not long thereafter, the group found the proof that it had been
> seeking—the bell of the CENTRAL AMERICA.

*Columbus-Am. Discovery Grp.*, 56 F.3d at 565.

The NDAs entered into between Thompson and the individual Plaintiffs can be divided

into two distinct groups having very similar provisions. In each of the NDAs, Thompson is

described as representing "interests, in addition to his own, of certain other science professionals

and individuals, including one or more entities." (*See* Doc. 546-7 at 26.) The NDA signed by

Williamson, Craft, Watson, and Lettow provides the following with regard to compensation:

> Thompson agrees to give Confidant .45 (45/100) of One Percent (1%) of the net
> recovery, provided the target Shipwreck site(s) is found as a result of Confidant
> having participated in the search operations effort and providing that subsequent
> recovery operations are successful, regardless of when the recovery operation is
> performed and provided that Confidant employs his best efforts to complete his
> assigned tasks in connection with the search operations.

(Doc. 546-2 at 32.) The only variation with regard to this provision in the NDAs of Williamson,

Craft, Watson, and Lettow is that Williamson's agreement provides for payment of 45/100 of 1%

while the agreements of Craft, Watson, and Lettow provide for payment of 1/20 of 1%. (*See*

Docs. 546-3 at 28; 546-10 at 28; 546-5 at 28.)

The "payment" provision in the NDAs executed by McGinnis, O'Donnell, and Newton

provides the following:

> Thompson agrees to give McGinnis One-Fortieth (1/40) of One Percent (1%) of
> the recovery profits, provided the target Shipwreck site(s) is located in June-July
> of 1986 regardless of when the recovery operation is performed and provided that
> McGinnis employs his best efforts to complete his assigned tasks in connection
> with the search operations.

(*See* Docs. 546-6 at 29; 546-8 at 28, 546-7 at 28.) All of the NDAs contain language

substantially similar to the following:

> Confidant agrees that he will not remove, copy, or make any notes concerning any
> Confidential Information provided him, either directly or indirectly, through
> Thompson without obtaining Thompson's prior consent. Further, Confidant
> agrees to hold in confidence and not directly or indirectly reveal, report, publish,
> disclose or transfer any Confidential Information to any person or entity. For the
> purpose of performing his assigned tasks, Confidant may consult as necessary
> with other operations personnel on the basis of the "need-to-know" criteria.
> . . .
>
> This Agreement shall be governed by Ohio law applicable to contracts between
> residents of Ohio wholly executed and performed in Ohio.

(Doc. 546-2 at 31–33.) The term "Confidential Information" is extensively defined in the NDAs.

Schoeneman has been unable to locate a copy of the NDA that he signed, but has produced a letter from Thompson dated December 18, 1986 that he claims references the NDA. (*See* Doc. 546-9 at 2, 26.) Schoeneman contends that the NDA he signed is identical in form to the agreement signed by McGinnis. (*See* Doc. 546-9 at 2, 28.) Hancock also has been unable to locate the NDA he claims to have signed, but represents that it was in a form similar to that signed by McGinnis or Watson. (Doc. 546-4 at 2, 26, 30.)

Finally, the lease agreement ("Lease Agreement") between IDSS and RLP, executed on behalf of IDSS by Williamson, contains the following provisions:

> In the event that Lessee is successful in locating and verifying the target sought by Lessee through the Equipment and Services provided by IDSS, in addition to the compensation to IDSS as provided in this Agreement, Lessee agrees to pay IDSS 0.9% of the net recovery of any salvage operation conducted by Lessee on the target.
>
> . . .
>
> This Agreement shall be governed by and construed under the laws of the State of Ohio.

(Doc. 546-2 at 36–39.) The Lease Agreement was executed on behalf of RLP by Thompson in his capacity as general partner. (Doc. 546-2 at 40.)

As stated above, the Central America's wreck was positively identified in 1988, and a large quantity of gold and other valuables was subsequently recovered by Thompson and his group. However, Plaintiffs claim to never have been paid the amounts they say are owed to them under the NDAs and Lease Agreement. The individual Plaintiffs claim to have received a letter from Thompson in 1990 discussing the status of the litigation in the Eastern District of Virginia. Thompson closed the letter by stating:

> As noted, if things go our way, we hope to begin making cash distributions to our investors, perhaps as early as 1991. Any cash distribution to which you are entitled by virtue of your Non-Disclosure agreement will be made at the same time as distributions to investors and me, on a pro rata basis. In other words, we

plan for you to be paid at the same time, and following the same procedures, as other participants in this project.

I appreciate everyone's support for our project. I'll try to keep you posted of significant developments as time and circumstances permit.

(Doc. 546-2 at 42.)

Plaintiffs claim that at some point in the late 1990s or early 2000s Thompson's group sold its interest in the gold awarded to them by the Eastern District of Virginia to an entity called California Gold Marketing Group, LLC ("California Gold"). The record includes a 1999 asset purchase agreement between California Gold and RLP and CADG, and a June 2001 amendment to that agreement, both in redacted form. (*See* Doc. 546-1 at 29, 48.) According to Plaintiffs, they initially believed, based on representations from counsel for Thompson, that Thompson's group had retained a reversionary interest in the treasure when it partnered with California Gold. However, upon commencing a maritime attachment action in the Central District of California several months after the instant action was filed, they learned that Defendants had sold their reversionary interest in the gold. This was allegedly done through the June 2001 amendment to the asset purchase agreement referenced above. On March 2, 2000, Richard Robol, counsel for Thompson's group, wrote to James Shirley, former counsel to Plaintiffs, in apparent response to inquiries from Plaintiffs concerning the proceeds they claim are owed to them. In this letter, which was written on CADG letterhead, Robol stated the following:

On the marketing front, retail sales have been very robust to date. Three of the largest numismatic dealers in the world are involved, and progress has been encouraging. (*Coin World* and *Numismatic News* have been carrying information about the gold tours, and should be a good source for announcements by the California Gold Group).
. . .

The California Gold Group's purchase of 92.4% of the treasure awarded to Columbus-America has resulted in settlements with Christie's and the Bank of California. The end result appears essentially to be the elimination of those

10

claims, with a pay-off of approximately $43 million. (The newspaper reports on payments of $50 million and $100 million, respectively, are inaccurate).

While the terms of the agreement are confidential, essentially it provides, in addition to the sums paid Christie's and the Bank of California, for a split of profits between Columbus-America and the California Gold Group, with the percentages varying depending on who procures the buyer's and the amount of sales made.

To date, there has been no net profit to Columbus-America. The Group is very hopeful that profits may be obtained within the next 6-12 months, as sales progress.

It has been, and remains, Tommy's intention to make payment to Don Craft and others of like standing their *pro rata* portion of the profits due to them under the Non-Disclosure Agreements simultaneously with his receipt of any net profits. Tommy is grateful for the work done and is as anxious for net profits as anyone.

We should have a much better idea of the nature and size of those net profits as sales progress over the next several months.

(Doc. 546-2 at 45–46.)

### D. Procedural History

Plaintiffs filed the instant action in the Franklin County Court of Common Pleas on March 31, 2006. The case was subsequently removed by Defendants to this Court, along with a case filed against Defendants by a group of their investors. While the Court later remanded the investors' case to the state court (see Doc. 469), in an Opinion and Order dated January 29, 2009, the Court concluded that Plaintiffs' claims were maritime in nature, and thus within the exclusive jurisdiction granted to the federal district courts by 28 U.S.C. § 1333. (*See* Doc. 441.) In so doing, the Court relied upon a decision by the Second Circuit, in an appeal arising from a decision in an identical suit filed by Plaintiffs in the Southern District of New York, concluding that the NDAs and Lease Agreement at issue in this case are maritime contracts. *See Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 49–50 (2d Cir. 2008).

Plaintiffs' amended complaint initially included claims for breach of contract, conversion, a maritime wage claim on behalf of Craft, constructive trust, breach of fiduciary duty, and accounting. By Opinion and Order dated September 24, 2010, the Court dismissed the maritime wage claim. (*See* Doc. 528.) The Entity Defendants bring counterclaims against Plaintiffs for breach of contract (CADG and RLP), civil conspiracy, and unfair competition.

By Order dated January 14, 2011, the Court permitted the Parties to file motions for summary judgment. Presently before the Court are four such motions: Plaintiffs' motion to dismiss and/or for summary judgment as to the Entity Defendants' Counterclaims (Doc. 546); the individual Defendants' motion for summary judgment (Doc. 547); the Entity Defendants' motion for summary judgment (Doc. 548); and Plaintiffs' motion for partial summary judgment as to their claims (Doc. 549). Additionally, by order dated March 18, 2011, the Court granted Plaintiffs leave to file a supplemental motion for partial summary judgment. That motion is also presently before the Court (Doc. 588), along with Plaintiffs' motion to disqualify Mr. Robol as trial counsel (Doc. 599), the Entity Defendants countermotion to disqualify Mr. Frevola (Doc. 621), Robol's Conditional Motion to Withdraw as Counsel (Doc. 622), and Plaintiffs' motion to strike the Entity Defendants' jury trial demand for the Entity Defendants' counterclaims (Doc. 628).

## II. Summary Judgment Motions

### A. Standard for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to

support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587–88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

Here, the Parties have filed cross-motions for summary judgment. Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that he or it is entitled to a judgment as a matter of law. The fact that one party fails to satisfy that burden on his or its own Rule 56 motion does not automatically indicate that the opposing party or parties has satisfied the burden and should be granted summary judgment

13

on the other motion. In reviewing cross-motions for summary judgment, courts should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). "The filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (quoting *John v. State of La. (Bd. of Trs. for State Colls. & Univs.)*, 757 F.2d 698, 705 (5th Cir.1985)). The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *Taft Broad.*, 929 F.2d at 248.

### B. Defendants' Motions for Summary Judgment

The Court first considers Defendants' motions for summary judgment. As the grounds for summary judgment raised by the Entity and individual Defendants substantially overlap, the Court considers their motions in tandem. Defendants contend that Plaintiffs' claims are barred by the statutory limitations period on civil actions for salvage services. In the alternative, they argue that the equitable doctrine of laches bars the claims, or that Plaintiffs' non-contractual claims are time-barred or are not maintainable given the contractual nature of the relationship between the Parties. The Court will discuss Defendants' arguments on a claim by claim basis.

### 1. Contract Claims

### a. Applicability of 46 U.S.C. § 80107(c)

Defendants' assert that Plaintiffs' claims are barred by 46 U.S.C. § 80107(c), which provides that:

> A civil action to recover remuneration for giving aid or salvage services must be brought within 2 years after the date the aid or salvage services were given, unless

14

> the court in which the action is brought is satisfied that during that 2-year period there had not been a reasonable opportunity to seize the aided or salvaged vessel within the jurisdiction of the court or within the territorial waters of the country of the plaintiff's residence or principal place of business.

46 U.S.C. § 80107(c). According to Defendants, summary judgment should be awarded to them as to Plaintiffs' claims because this is a civil action wherein Plaintiffs seek compensation for salvage services performed during the summer of 1986, and Plaintiffs did not bring this action within two years of that date. Plaintiffs respond by asserting that they were not performing salvage services for Thompson, but instead were contractually obligated to aid him in his search for the Central America.

The term "salvage services" is not defined in Title 46. However, the Supreme Court long ago described the term "salvage" and the elements of a salvage claim as follows:

> Salvage is well defined as the compensation allowed to persons by whose assistance a ship or vessel, or the cargo of the same, or the lives of the persons belonging to the ship or vessel, are saved from danger or loss in cases of shipwreck, derelict capture, or other marine misadventures.

> Other jurists define it as the service which volunteer adventurers spontaneously render to the owners, in the recovery of property from loss or damage at sea under the responsibility of making restitution and with a lien for their reward.

> Persons who render such service are called salvors, and a salvor is defined to be a person who, without any particular relation to the ship in distress, proffers useful service and gives it as a volunteer adventurer without any pre-existing contract that connected him with the duty of employing himself for the preservation of the vessel.

> Enough appears in those definitions to show that the elements necessary to constitute a valid salvage claim are as follows: (1.) A marine peril to the property to be rescued. (2.) Voluntary service not owed to the property as matter of duty. (3.) Success in saving the property or some portion of it from the impending peril.

*The Clarita and the Clara*, 90 U.S. (23 Wall.) 1, 16 (1874) (footnotes omitted). "Suits for salvage may be *in rem* against the property saved or the proceeds thereof, or *in personam* against the party at whose request and for whose benefit the salvage service was performed." *The*

15

*Sabine*, 101 U.S. 384, 386 (1879). Claims based on salvage services voluntarily given with no contractual relationship are known as "pure" salvage claims. The law also recognizes salvage claims based on contracts between the salvor and the owner of the imperiled property.

It is clear that § 80107(c) at the very least applies to the so-called pure salvage claims described above wherein one party voluntarily aids property in distress, resulting in an obligation on the part of the distressed party to compensate the salvor. As illustrated by the Fourth Circuit's 1992 decision, in the litigation in the Eastern District of Virginia, Defendants were in a position of salvor vis-à-vis the insurance companies, who were deemed to be the owners of the gold via subrogation. *See Columbus-Am.*, 974 F.2d at 457 ("Under applicable law, then and now, once the underwriters paid the claims made upon them by the owners of the gold, the treasure became theirs."). The facts of the instant case, however, are distinguishable from that situation. Here, Defendants, whose goal was to discover the wreck of the Central America and recover her treasures, entered into contractual relationships with Plaintiffs for the provision of services and with a promise of confidentiality in exchange for a portion of the net recovery.

The question then becomes whether the two year limitations period found in § 80107(c) should be applied in cases of a contractual dispute between parties that have jointly participated in an undertaking that is, in a very broad sense, a salvage. There is a dearth of case law on this question. However, while the issue is very close, in the Court's view, the best possible interpretation of the phrase "[a] civil action to recover remuneration for giving aid or salvage services" is that it does not establish a limitations period applicable to the instant dispute.[4]

The Court's holding is bolstered by the quasi-contractual nature of pure-salvage claims and by the unusual result that would occur if § 80107(c) were applied to this case and other cases

---

[4] The Court does not consider whether § 80107(c) would apply to contractual salvage claims, in which a contract exists between the salvor and the party in distress for the performance of salvage services.

involving contracts.  The Court first notes two distinct features of § 80107(c), features that lend

support to the conclusion that § 80107(c) was intended for pure salvage claims, and cast doubt

on that section's applicability to traditional contract disputes.  First, the limitations period of two

years is relatively short.  In this regard, the mobile nature of ships and cargo serves as a

justification for having a short limitations period.  Second, the limitations period begins to run

upon the actual provision of salvage services.  In a pure salvage action, a ship or property in peril

is voluntarily aided by the salvor.  The parties have no relationship prior to the performance of

the salvage services, and therefore, at the time services are performed, the parties' rights and

obligations are first established.  Further, at the time services are provided in such a case, the

parties respective rights are also obvious and have fully accrued as to the services rendered.

Thus, having a relatively short limitations period starting at the point at which services are

rendered is imminently reasonable in cases of pure salvage, which essentially are quasi-

contractual.

In the instant case, although the overall mission of Thompson's group was to discover the

Central America and recover its treasures, and that mission was later ruled to be one for salvage,

Thompson and Plaintiffs carefully defined their relationship in written agreements.  Plaintiffs'

contractual claims are for recovery from Thompson's group, not the owners of the treasure

recovered from the Central America.  Plaintiffs' claims are thus not salvage claims.  If §

80107(c) were applicable to such a case, the Parties' ability to freely define their relationship

through contract would be infringed.  Plaintiffs would have been required to file suit within two

years of the time they had performed their contractual obligations to Thompson.  However, the

wreck of the Central America had not even been positively identified until after the two year

period had expired for most of the Plaintiffs.  The treasure was not sold until many years after

that. Accordingly, application of § 80107(c) to this case would lead to a legal bind—the Plaintiffs would be forced to bring suit before it was even possible for Defendants to have breached the contracts at issue or alternatively lose any right to enforce the contracts. This is because at the time the limitations period expired the gold was still at the bottom of the ocean, and no profit or net-recovery had therefore been achieved. If § 80107(c) were deemed to apply to cases involving contractual agreements, the fact that the limitations period would run at the time services are provided, would allow parties to freely breach conditional terms of their contracts in situations where conditional obligations arose more than two years after the other party's provision of services. Given this obvious dilemma, the Court declines to construe the statute in such a fashion.

Finally, the Court's holding that § 80107(c) is only applicable to pure salvage actions, with the salvor making claims against the owner of the salvaged ship or the ship itself, is also bolstered by the fact that the exception clause to the two year statute of limitations is specifically applicable to jurisdiction over "the aided or salvaged vessel." This exception implicates a pure salvage claim where the salvor is able to recover *in rem* from the vessel salvaged. The exception does not fit in cases such as this where recovery is sought upon contract against another party involved in the work performed for the distressed vessel.

For the above stated reasons, the Court concludes that the two year limitation period found in 46 U.S.C. § 80107(c) is not applicable to Plaintiffs' contract claims, and declines to adopt the rationale of the court in *Suarez Corp. Indus. v. The Wrecked and Abandoned Vessel R.M.S. Titanic*, 130 F. Supp. 2d 558 (S.D.N.Y. 2001).

### b. Laches

Having concluded that the statutory limitations period applicable to salvage claims does

not apply to this case, the Court next evaluates the timeliness of Plaintiffs' suit under the

equitable doctrine of laches. *TAG/ICIB Servs., Inc. v. Pan Am. Grain Co.*, 215 F.3d 172, 175

(1st Cir. 2000). "When applying the doctrine of laches, the court examines whether plaintiff's

delay in bringing suit was unreasonable and whether defendant was prejudiced by the delay." *Id.*

The Court must:

> utilize[] as a benchmark the limitations period contained in the most analogous
> statute. That limitations period is not per se dispositive, but rather courts rely
> upon it to establish burdens of proof and presumptions of timeliness and
> untimeliness. Hence, if a plaintiff files a complaint within the analogous statutory
> period, the burden of proving unreasonable delay and prejudice falls on the
> defendant. If a plaintiff files after the statutory period has expired, the burden
> shifts and a presumption of laches is created. The analogous limitation period can
> be located either in state or federal law.

*Id.* at 175–76 (citations and quotations omitted). In the Sixth Circuit, "there is a strong

presumption that a plaintiff's delay in asserting its rights is reasonable as long as an analogous

state statute of limitations has not elapsed." *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d

397, 408 (6th Cir. 2002). Conversely, the failure of a plaintiff to file within the analogous

limitations period creates a presumption of laches. *See id.*

Here, Defendants assert that § 80107(c) should be viewed as the most analogous statute

of limitation for Plaintiffs' contract claims. However, as the Court has previously ruled, Counts I

and II of the amended complaint represent claims for breach of contract instead of for salvage.

Accordingly, the fifteen year limitations period applicable to claims for the breach of written

contracts in the state of Ohio, see OHIO REV. CODE § 2305.06, provides a much closer analog to

these counts, especially given that each of the NDAs and the Lease Agreement specify that they

are governed by Ohio law.

The Court also concludes that under any measure, Plaintiffs filed suit within the analogous period of limitations, creating a presumption of reasonableness. O.R.C. § 2305.06 provides that "an action upon a specialty or an agreement, contract, or promise in writing shall be brought within fifteen years after the cause thereof accrued." *Id.* Here, a cause of action could only have accrued at a point in time after the Fourth Circuit affirmed the District Court's award of 90% of the treasure to Defendants in 1995. Prior to that time, it would not been possible for Defendants to be in breach of the contracts at issue in this case because they had legally recovered nothing. Suit was brought in this matter in 2006, well within the fifteen year statute of limitations.

Defendants have thus far not demonstrated that the presumption of reasonableness attaching to Plaintiffs' delay in filing should be rebutted and/or that Defendants were in any way prejudiced by the delay. In this regard, Defendants have produced no evidence of unreasonableness or prejudice, other than to suggest that they are prejudiced specifically by the death of Craft, who passed away on April 2, 2006, and generally by the nearly twenty-five years that have passed since the Pine River's expedition. The Court notes, however, that Plaintiffs filed suit in this case before Craft had passed away. Also, while Craft appears to be somewhat differently situated than the Plaintiffs who worked as part of Williamson's team, Defendants have made no showing that they will be harmed by Craft's unavailability at trial sufficient to meet their burden. In this regard, as the Court concludes in Part II.C.1 *infra*, that Defendants are judicially estopped from asserting that Craft failed to perform his obligations under the NDA, issues regarding the specific activities of Craft in conjunction with his NDA will not be submitted to the finder of fact.

Similarly, Defendants have provided only vague allegations that they are prejudiced by the substantial amount of time that has passed since the Pine River's voyage. Defendants will of course be able to point to the passage of time as a factor to be considered by the finder of fact in determining the accuracy of witnesses' recollections, but, in the Court's view, the passage of time, standing by itself, is not enough to establish prejudice. However, in an abundance of caution, the Court will give Defendants the opportunity at trial to overcome the presumption of the reasonableness of Plaintiffs' delay in bringing suit and to establish prejudice.

### c. Contractual Liability of the Entity Defendants

The Court next considers whether the record is sufficient for a finder of fact to find liability on Plaintiffs' contract claims as to the various Entity Defendants. The Court concludes that summary judgment in favor of Defendants is not warranted as to the potential liability of RLP, CADG, Columbus Exploration, Economic Zone, EZRA, and ECON. However, as Plaintiffs have failed to demonstrate that a material issue of fact exists for the remaining entities, including Omni Engineering, Inc., Omni Engineering of Ohio, Inc., and DOE.E, Inc., the contract claims (Counts I and II of the amended complaint) will be dismissed as to these Defendants. Whether summary judgment should be granted in favor of Plaintiffs as to the potential joint direct or alter ego liability of RLP, CADG, Economic Zone, and EZRA, and as to the successor liability of Columbus Exploration on Plaintiffs' breach of contract claims will be discussed in Parts II.C and D *infra*.

### i. The NDAs

Thompson was the lone Defendant to sign the NDAs. However, each of the NDAs indicates that Thompson represented his own interests plus the interests of one or more entities. RLP, which was formed in 1985, existed at the time all of the NDAs were signed. Economic

21

Zone, which was formed in the spring of 1986, existed at the time at least several of the NDAs were signed. Moreover, some of the NDAs were printed on Economic Zone letterhead. (*See* Doc. 546-2 at 30.) Accordingly, the Court finds that Plaintiffs have established a material issue of fact as to whether Thompson executed the NDAs on behalf of RLP and Economic Zone, which would potentially subject those entities to liability. While nothing in the record conclusively establishes that these were the entities referred to in the NDAs, the Plaintiffs have submitted evidence of record from which to conclude that there is a genuine issue of material fact.

As for CADG, it was not formed until 1987. Plaintiffs, however, argue that liability should attach to it because it acted as an agent of RLP, or otherwise should be included in the group consisting Thompson, RLP, and Economic Zone. As explained in Part II.D *infra*, the Court finds that Plaintiffs have, at the very least, created a material issue of fact as to CADG's potential derivative liability under the NDAs. Of potential significance in this regard is the fact that the salvage litigation in the Eastern District of Virginia was conducted in CADG's name, and the fact that CADG was a party to the agreements with California Gold by which the treasure was allegedly sold.

Plaintiffs, however, have failed to produce evidence demonstrating that liability under the NDAs should attach to DOE.E, Inc., Omni Engineering, Inc., and Omni Engineering of Ohio, Inc. In this regard, other than evidence that the two Omni entities are one and the same, the record lacks any evidence whatsoever concerning these three entities, and judgment as to Count I is accordingly granted to them.

Turning to ECON, its potential liability derives from that of RLP and ECON's status as having been substituted for Thompson as the general partner of RLP. Pursuant to the Ohio

Revised Code, "a general partner of a limited partnership has the liabilities of a partner in a partnership without limited partners to persons other than the partnership and the other partners." OHIO REV. CODE § 1782.24(B). Partners in an ordinary partnership are generally liable "for all [] debts and obligations of the partnership." *Id.* § 1775.14(A)(2) (applicable to partnerships created before 2010).

Finally, the Court also finds that Plaintiffs have demonstrated an issue of material fact as to the potential liability of Columbus Exploration under the NDAs. While Columbus Exploration was not formed until after the execution of these agreements, the Management Agreement entered between RLP and Columbus Exploration, when construed in a light most favorable to Plaintiffs, as the Court must do in deciding Defendants' motions for summary judgment, can be interpreted as transferring the liabilities of RLP to Columbus Exploration, or potentially placing the individual Plaintiffs in the position of third-party beneficiaries of that agreement. Accordingly, Columbus Exploration's liability is also derives from the prospective liability of RLP.

### ii. The Lease Agreement

Turning to the Lease Agreement between IDSS and RLP, summary judgment is denied as to RLP as it is a contractual party to the agreement. As with the NDAs, ECON is potentially liable as a general partner of RLP and Columbus Exploration is potentially liable derivatively through RLP. Further, as explained in more detail in Part II.D *infra*, potential joint-liability on veil piercing and alter ego theories exists for CADG, Economic Zone, and EZRA, despite the fact that RLP did not purport to enter the Lease Agreement on behalf of any other entity. However, summary judgment on Count II is granted as to DOE.E, Inc., Omni Engineering, Inc.,

and Omni Engineering of Ohio, Inc., as Plaintiffs have failed to produce evidence linking them to the Lease Agreement.

### d. Contractual Liability of Individual Defendants

The Court next considers whether the individual Defendants—Thompson, Kirk, Turner, Ford, and Cullman—have demonstrated that no issues of material fact exist for Counts I and II, and/or if they are otherwise entitled to judgment as a matter of law.

### i. Thompson

Summary judgment is denied as to Thompson, as he is a party to the NDAs and was the general partner of RLP, which is a party to the Lease Agreement with IDSS.

### ii. Kirk, Turner, Ford, and Cullman

Kirk, Turner, Ford, and Cullman, whose only connection to the salvage of the Central America on record in this case is through their role as directors of Columbus Exploration, argue that they are shielded from contractual liability. As was stated in Part II.B.1.c.i, construing the record in favor of Plaintiffs, Columbus Exploration can be viewed as having assumed responsibility for the liabilities of RLP. However, whether the directors of Columbus Exploration can be held personally liable for those liabilities presents a distinct question.

Under Delaware law, the managers and members of a limited liability company are generally shielded from personal liability arising from the obligations of the LLC. The Delaware Code provides that:

> the debts, obligations and liabilities of a limited liability company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the limited liability company, and no member or manager of a limited liability company shall be obligated personally for any such debt, obligation or liability of the limited liability company solely by reason of being a member or acting as a manager of the limited liability company.

24

DEL. CODE tit. 6, § 18-303(a). While a board of directors is not a statutory requirement for such company, in instances where an LLC has adopted that form, Delaware courts have held that directors are similarly shielded from liability. *Lazard Debt Recovery GP, LLC v. Weinstock*, 864 A.2d 955, 974 (Del. Ch. 2004) ("directors-if there be any-are not personally liable for 'debts, obligations and liabilities of [the] limited liability company, whether arising in contract, tort or otherwise.'" (quoting § 18-303(a)). Plaintiffs' theory of liability against the directors is that they so dominated Columbus Exploration's operations that the veil of corporate protection should be pierced, allowing them to be individually liable for the company's obligations. The Parties disagree as to whether the veil piercing law of a particular state or standards developed in federal common law should apply. However, the Court need not decide this question, as the Court finds that Plaintiffs have not produced sufficient evidence to create material issues of fact as to their veil piercing theories.

When confronted with a motion for summary judgment, the burden is on a plaintiff to come forward with evidence from which a reasonable trier of fact could find in the plaintiff's favor. A mere scintilla of evidence is not sufficient. Plaintiffs' contend that the following veil piercing standard from the Second Circuit is the applicable standard for their claims against Kirk, Turner, Ford, and Cullman: "the party sought to be charged must have used its alter ego 'to perpetrate a fraud or have so dominated and disregarded [its alter ego's] corporate form' that the alter ego was actually carrying on the controlling party's business instead of its own." *In re Arbitration between Holborn Oil Trading LTD. and Interpetrol Berm. LTD.*, 774 F. Supp. 840, 844 (S.D.N.Y. 1991) (quoting *Kirno Hill Corp. v. Holt*, 618 F.2d 982, 985 (2d Cir. 1980)).

Here, the only evidence cited by Plaintiffs' concerning the activities of Kirk, Turner, Cullman, and Ford with regard to their positions as directors of Columbus Exploration is Kirk's

deposition testimony that elections to replace the directors named in Columbus Exploration's operating agreement were not held and certain evidence of unexplained transactions carried out by Columbus Exploration. Kirk testified that elections were not held because:

> We didn't think we could find anybody to serve based on our vast knowledge of the partnership, conversations we had with people, and we're so busy that we didn't think we could teach anybody the amount of information that was necessary to make proper decisions. And essentially we couldn't find anybody, so we agreed to continue our service at the request of Mr. Thompson under the assumption that we had the right under Delaware law to do that.

(Doc. 362-4 at 3.) The record contains a letter written by KPMG auditors in connection with this action's former companion case requesting information concerning certain transactions of RLP and Columbus Exploration, including transactions with Kirk. (*See* Doc. 362-2 at 109.) This evidence, however, is not sufficient for a reasonable trier of fact to conclude that Kirk, Turner, Cullman, and Ford dominated Columbus Exploration's operations, used Columbus Exploration as a vehicle for committing fraud, or used Columbus Exploration to advance their own business interests. If anything, Kirk's testimony suggests that Thompson, and not the other directors of Columbus Exploration, dominated and controlled that entity. (*See* Doc. 362-4 at 3 ("Thompson made all the decisions, but we agreed with almost everything he did. There was some contentious language over the years. But essentially the board went along with Thompson because we thought that was in the best interest of the company and we believed that his decisions were the proper ones after lots of debate.").) Plaintiffs have cited to no evidence that any of the remaining individual Defendants exercised control or dominion over Columbus Exploration. Nor have Plaintiffs cited evidence tending to indicate that the individual Defendants committed fraud, or used Columbus Exploration to advance their own business interests, or even what those interests may have been. While the KPMG letter does suggest that Kirk was engaged in transactions with Columbus Exploration, this evidence, even when

construed in a light most favorable to Plaintiffs, cannot be stretched into evidence of domination and/or fraud on the part of Kirk.

Finally, Plaintiffs assert that the record supports a finding that the individual Defendants other than Thompson acted as de facto general partners of RLP through their positions as directors of Columbus Exploration and the Management Agreement or that these Defendants are potentially liable on the NDAs and Lease Agreement as those obligations were entered prior to the conversion of Columbus Exploration into an LLC. Plaintiffs have cited case law standing for the proposition that § 18-303(a) does not shield members of an LLC for liabilities created prior to the formation of the LLC. *See Pepsi-Cola Bottling Co. v. Handy*, No. 1973-S, 2000 WL 364199 (Del. Ch. Mar. 15, 2000). However, in support of their position, Plaintiffs have offered no evidence from which a reasonable trier of fact could conclude that the individual Defendants, other than Thompson, should be personally liable under the NDAs or Lease Agreement.

Further, Plaintiffs' theory that Kirk, Turner, Cullman, and Ford should be considered de facto general partners of RLP also fails for the same reasons as Plaintiffs' veil piercing theory against these Defendants. While, the Management Agreement could potentially be viewed as placing Columbus Exploration itself in the position of de facto general partner of RLP, it does not follow that the directors of Columbus Exploration, shielded from liability by § 18-303(a), could then be held personally liable for the obligations of RLP as would a general partner absent some showing that they dominated Columbus Exploration as required before alter ego liability can attach to corporate managers. Plaintiffs have cited no authority to the contrary.

For the above-stated reasons, summary judgment on Counts I and II is denied as to Thompson, but granted as to Kirk, Turner, Cullman, and Ford.

## 2. Conversion Claim

Count III of the amended complaint alleges that Defendants have converted Plaintiffs' property by failing to disburse to them the amounts owed under the NDAs and Lease Agreement. Defendants assert that summary judgment should be granted to them as to Count III on grounds that this claim is time-barred or otherwise precluded by the contractual nature of the rights asserted by Plaintiffs. The Court does not consider the statute of limitations issue, as it holds that summary judgment should be granted on this claim, because Plaintiffs' have failed to provide evidence of conversion independent of their breach of contract claims.

The tort of conversion has been defined by Ohio courts as "an exercise of dominion or control wrongfully exerted over property in denial of or under a claim inconsistent with the rights of another." *Dice v. White Fmaily Cos.*, 878 N.E.2d 1105, 1108–09 (Ohio Ct. App. 2007). In order to make out a claim for conversion, a plaintiff must establish "(1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages." *Id.* at 1109 (internal quotations omitted). However, "[i]n general, a conversion action cannot be maintained where damages are merely being sought for breach of a contract." *Geler v. Nat'l Westminster Bank USA*, 770 F. Supp 210, 214 (S.D.N.Y. 1991). *See also Winslow v. Corp. Express, Inc.*, 834 A.2d 1037, 1046 (N.J. Super. Ct. App. Div. 2003) ("The failure of a party to a contract to pay the full contract price is simply a breach of the contract and thus does not constitute a conversion of the property of the other party to the contract."); *Hodges v. Byars*, No. 12839, 1992 WL 113027, at *4 (Ohio Ct. App. May 28, 1992) ("A failure or refusal to pay for materials and services provided by one party to another in fulfillment of a contractual agreement gives rise to a cause of action for breach of contract; it does not give rise to a cause of action for tortious conversion.").

28

An exception to the general rule that money is intangible property that cannot be subject to conversion lies in cases where specifically identified monies are at issue. For instance, "[i]n Ohio, an action for conversion of money will only lie 'if identification is possible and there is an obligation to deliver the specific money in question.'" *ATD Corp. v. DaimlerChrysler Corp.*, 261 F. Supp. 2d 887, 898 (E.D. Mich. 2003) (quoting *Sec. Fed. Sav. and Loan Ass'n of Cleveland v. Keyes*, No. 89-G-1524, 1990 WL 93135, at *2 (Ohio Ct. App. June 29, 1990)). More specifically,

> An action alleging conversion of cash lies only where the money involved is "earmarked" or is specific money capable of identification, e.g., money in a bag, coins or notes that have been entrusted to the defendant's care, or funds that have otherwise been sequestered, and where there is an obligation to keep intact and deliver this specific money rather than to merely deliver a certain sum.

*Haul Transport of VA, Inc. v. Morgan*, No. CA 14859, 1995 WL 328995, at *4 (Ohio Ct. App. June 2, 1995) (quoting *Gray v. Liberty Nat'l Life Ins. Co.*, 623 So. 2d 1156, 1160 (Ala. 1993)).

Here, the rights to a share of the Central America's recovery asserted by Plaintiffs arise purely from the NDAs and the Lease Agreement. The record before the Court does not reflect any promise on behalf of Defendants to compensate Plaintiffs with specific artifacts obtained from the Central America's wreck. Rather, the terms "net recovery" and "recovery profits" strongly imply an intent to pay Plaintiffs with cash generated through the sale of any treasure recovered. As stated above, claims for conversion cannot ordinarily be predicated on a refusal to pay funds owed under a contract. In this regard, the record is also lacking any evidence that specific funds were ever identified as belonging to Plaintiffs under the agreements and then were wrongfully withheld by Defendants. Accordingly, as Plaintiffs have failed to create material issues of fact support their conversion claim, summary judgment is granted on Count III of the amended complaint as to all Defendants.

### 3. Breach of Fiduciary Duty

The Court also grants summary judgment to Defendants on Count VI of the amended complaint, which states a claim for breach of a fiduciary duty. "In order to succeed on a claim of breach of a fiduciary duty, a plaintiff must prove the existence of a duty arising out of a fiduciary relationship, failure to observe that duty, and injury resulting proximately therefrom." *Culberston v. Wrigley Title Agency, Inc.*, No. 20659, 2002 WL 219570, at *3 (Ohio Ct. App. Feb. 13, 2002) (citing *Strock v. Pressnell*, 527 N.E.2d 1235, 1243 (Ohio 1988)). "A 'fiduciary relationship' is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *In re Termination of Emp't of Pratt*, 321 N.E.2d 603, 609 (Ohio 1974). Fiduciary relationships can be formed through formal agreements or informally. *Culberston*, 2002 WL 219570 at *4. In instances where no formal agreement exists, a fiduciary relationship cannot arise unilaterally, but "only when both parties understand that a special trust or confidence has been reposed." *Umbaugh Pole Bldg. Co. v. Scott*, 390 N.E.2d 320, 321 (Ohio 1979) (syllabus of the court). Further, "[t]he relationship of debtor and creditor without more is not a fiduciary relationship." *Id.*

Here, a grant of summary judgment as to Count VI is appropriate because Plaintiffs' have failed to produce evidence from which a reasonable trier of fact could conclude that a fiduciary relationship existed between Plaintiffs and any of the Defendants. As stated in Part II.B.2 *supra*, the record here reflects arms-length contractual relationships between Thompson and the individual Plaintiffs and between RLP and IDSS. There is no indication from the language of the NDAs or the Lease Agreement that the parties to those agreements intended to create fiduciary relationships. Plaintiffs contend that a fiduciary relationship arose between them and

Columbus Exploration by virtue of the Management Agreement entered between Columbus Exploration and RLP.  However, Plaintiffs have offered no evidence tending to demonstrate a bilateral understanding between the Parties as to this relationship, or tending to demonstrate that the Management Agreement placed Columbus Exploration in the position of fiduciary to RLP's creditors.  Absent any such showing, Plaintiffs have failed to produce evidence to prove the existence of a fiduciary relationship.

Finally, Plaintiffs' reliance on *Zim Israel Navigation Co. v. 3-D Imports, Inc.*, 29 F. Supp. 2d 186 (S.D.N.Y. 1998) is inapposite, as the case is readily distinguishable from the present controversy.  In that case, the court granted summary judgment on a counterclaim for breach of fiduciary duty arising from Zim Israel's role as trustee of a general average fund, which was collected after a fire on Zim Israel's ship damaged the counterclaim-plaintiff's property.  *See id.* at 191–93.  However, *Zim Israel* involved a trust fund created pursuant to the maritime-equitable doctrine of general average.  Zim Israel's fiduciary obligations arose from its position as trustee of the fund, and it did not contest that those obligations existed.  *See id.* at 192–93.  In the present case, Plaintiffs have not demonstrated that a similar fiduciary relationship was ever created or that any of the Defendants, including Columbus Exploration, served as a trustee of a fund of which the Plaintiffs were clear beneficiaries.

### 4. Accounting

Because the Court dismisses Plaintiffs' claim for breach of fiduciary duty, a grant of summary judgment to Defendants is also appropriate on Count VII of the amended complaint, which seeks an accounting.  Accounting is a remedy for the breach of a fiduciary duty, and as Plaintiffs have failed to offer evidence to establish that Defendants owed them a fiduciary duty, the accounting claim must also fail.  *See George v. Kraft Foods Global, Inc.*, No. 10-1469, 2011

31

WL 1345463, at *15 n.12 (7th Cir. Apr. 11, 2011) ("an accounting of the type plaintiffs seek is a remedy for breach of fiduciary duty"). However, the Court's ruling as to Count VII should not be interpreted as precluding Plaintiffs from offering evidence at trial concerning the financial state of Thompson's group and profits obtained from the recovery of the Central America's treasure. As payment under the Lease Agreement and NDAs was contingent upon some net recovery or profit, proving that Thompson's group profited from the recovery is essential to Plaintiffs' contract claims.

### 5. Constructive Trust

"Imposition of a constructive trust is an equitable remedy. In determining whether to impose a constructive trust, the trial court must necessarily weigh the equities to prevent injustice in a particular case." *Cent. States, Se. & Sw. Areas Pension Fund v. Howell*, 227 F.3d 672, 676 (6th Cir. 2000). The Supreme Court of Ohio has stated that:

> A constructive trust is, in the main, an appropriate remedy against unjust enrichment. This type of trust is usually invoked when property has been acquired by fraud. However, a constructive trust may also be imposed where it is against the principles of equity that the property be retained by a certain person even though the property was acquired without fraud.

*Ferguson v. Owens*, 459 N.E.2d 1293, 1295 (Ohio 1984). At trial, Plaintiffs will be able to recover legal damages should they prevail on their contract claims. However, the Court has dismissed each of Plaintiffs' equitable claims and Plaintiffs have failed to establish that their property was wrongfully acquired by Defendants or that Defendants are wrongfully withholding specific items of treasure promised to Plaintiffs as would necessitate the establishment of a constructive trust. Accordingly, summary judgment is also granted to Defendants as to Count VII of the amended complaint.

### C. Plaintiffs' Partial Motion for Summary Judgment

The Court next considers Plaintiffs' motion for partial summary judgment (Doc. 549), which seeks rulings in Plaintiffs' favor on the issues of: 1) whether Plaintiffs have performed their obligations under the NDAs and the Lease Agreement and are entitled to payment; and 2) whether Thompson, RLP, Columbus Exploration, and possibly Economic Zone are all directly liable for Plaintiffs' claims. The Court has already concluded that summary judgment should be granted in favor of Defendants on all of Plaintiffs claims except Counts I and II—the claims for breach of contract. Accordingly, the Court's analysis of Plaintiffs' motions for partial summary judgment and supplemental motion for partial summary judgment will be limited to whether partial summary judgment should be granted to Plaintiffs on the identified issues arising from their contract claims.

As explained below, Plaintiffs' motion for partial summary judgment will be granted in part and denied in part.

### 1. Plaintiffs' Performance of Their Contractual Obligations

Defendants do not contest the validity of the NDAs and Lease Agreement. Plaintiffs invoke the doctrine of judicial estoppel and request the Court to make a legal ruling that the fact of Plaintiffs' successful performance of their contractual obligations has been argued by Defendants in previous salvage litigation and affirmatively decided by the Fourth Circuit, precluding Defendants from now asserting the contrary.

Aside from the confidentiality obligations, the operative provision of the NDAs signed by Williamson, Lettow, and Craft provided as follows:

> Thompson agrees to give Confidant .45 (45/100) of One Percent (1%) of the net recovery, provided the target Shipwreck site(s) is found as a result of Confidant having participated in the search operations effort and providing that subsequent recovery operations are successful, regardless of when the recovery operation is

performed and provided that Confidant employs his best efforts to complete his
assigned tasks in connection with the search operations.

(Doc. 546-2 at 32.) Accordingly, entitlement to a share of the recovery by those Plaintiffs

required the following: the target shipwreck must be found as a result of Plaintiffs' participation;

and best efforts must have been used to complete assigned tasks.

The operative provision of the NDAs signed by McGinnis, O'Donnell, and Newton

provides the following:

> Thompson agrees to give McGinnis One-Fortieth (1/40) of One Percent (1%) of
> the recovery profits, provided the target Shipwreck site(s) is located in June-July
> of 1986 regardless of when the recovery operation is performed and provided that
> McGinnis employs his best efforts to complete his assigned tasks in connection
> with the search operations.

(*See* Docs. 546-6 at 29; 546-8 at 28, 546-7 at 28.) Accordingly, recovery is contingent on

locating the target in June and July 1986 and employment of best efforts.    Schoeneman and

Hancock believed that they executed NDAs similar to the above.

Finally, the Lease Agreement signed by IDSS provided as follows:

> In the event that Lessee is successful in locating and verifying the target sought by
> Lessee through the Equipment and Services provided by IDSS, in addition to the
> compensation to IDSS as provided in this Agreement, Lessee agrees to pay IDSS
> 0.9% of the net recovery of any salvage operation conducted by Lessee on the
> target.

(Doc. 546-2 at 36.) Thus, IDSS's recovery is contingent upon RLP's success in locating and

verifying the target using the equipment provided by IDSS.

"Judicial estoppel is an equitable doctrine that preserves the integrity of the courts by

preventing a party from abusing the judicial process through cynical gamesmanship, achieving

success on one position, then arguing the opposite to suit an exigency of the moment." *Teledyne*

*Indus., Inc. v. NLRB*, 911 F.2d 1214, 1217–18 (6th Cir. 1990). The Supreme Court has identified

several factors that a Court may consider in determining whether to exercise that discretion. The

Court, however, emphasized that these factors are not to be considered inflexible or to establish

an "exhaustive formula." *New Hampshire v. Maine*, 532 U.S. 742, 751 (2001). The factors

include whether a party's previous position is clearly inconsistent with its current position,

"whether the party has succeeded in persuading a court to accept that party's earlier position, so

that judicial acceptance of an inconsistent position in a later proceeding would create the

perception that either the first or the second court was misled," and "whether the party seeking to

assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on

the opposing party if not estopped." *Id.* at 750–51 (internal citations and quotations omitted).

Plaintiffs ask the Court to look to the litigation in the Eastern District of Virginia and

Fourth Circuit to hold that Defendants are now barred from asserting non-performance as a

defense to their alleged breach of the NDAs and the Lease Agreement.

The Fourth Circuit's 1995 decision indicates that an anomaly imaged by Williamson and

his team during the Pine River's 1986 voyage was confirmed in 1988 to be the Central America.

*Columbus-Am. Discovery Grp.*, 56 F.3d at 565. The sequence of events leading to the

identification of the Central America's wreck was described in detail by Judge Kellam in his

Opinion and Order awarding 90% of the recovery to Thompson's Group:

> The sea search by CADG for the Central America commenced in 1986. The
> search followed the comprehensive and detailed research plan developed from the
> probability map. A search plan was prepared by Fred Newton and Triton
> Technology to cover the area of the probability map, with track lines for the sonar
> to follow. The search was conducted by Mike Williamson of Williamson and
> Associates. The track lines were followed as closely as reasonably possible, and
> an extra track line numbered 9-A added to avoid any gaps or what was called
> "holidays". Though lines numbered 10 and 11 shown on the search plan were not
> actually run, the survey in fact actually ran 12 lines to insure that there was
> sufficient overlapping to avoid gaps or "holidays." The 13th run on line 10 was
> started, but bad weather prevented its completion. The image of the Central
> America was one of those shown on the 1986 survey.

Exhibits introduced in evidence showing the track lines actually run during the 1986 survey as recorded by the navigational data stored on computer, compared with the track lines of the search plan shown on the overlay, establish the search lines were closely followed. Line numbered 9-A was an added line to the plan to avoid a chance of "holidays". During a run on this line, on the broad swath survey near the end of line 9-A, the Central America was imaged and recorded as Target F, to be considered with the other images recorded. Of course, it was not then known to be the Central America. As with other recorded images, it was only an image of an object. As shown by the Exhibit, the image was taken while running the lines shown on the search plan with the new added line 9-A. The survey started its 13th run on line 10, but conditions prevented completion of lines 10 and 11. This was the end of the 1986 survey.

At the end of the 1986 survey, there were several targets which were good candidates for the Central America. Some 8 of them were selected for further study which included Target F. The images, as they appeared on the computer, were small and often difficult to interpret and even more difficult to determine if the object was a shipwreck and particularly a wooden hull. Even the taking of additional images and taking pictures was at times of little or no help.

When the search party returned to sea in 1987, it spent much time at site A-2 and site H as prime targets. They took numerous photos of each of those sites and definitely established them as shipwrecks. They were thought to have many features which they expected the Central America to exhibit. They found a large pile of anthracite coal. They knew that the steam vessels of that day usually burned that type of coal. They also found types of artifacts expected to have been aboard a vessel carrying ladies and children. While they had not found any gold, they thought it must be below the coal. However, they did not have the equipment to move the large pile of coal to see if the gold was stored below it. In an effort to obtain more information which might be shown at a shipwreck, they visited sites D-2 and D-3 and investigated them to get more information of what a wooden hull ship would look like on the ocean floor. At the end of 1987, they believed they had located the Central America. CADG then sought and obtained the first injunction.

In September 1988, CADG was preparing to return to its search area. It had obtained new computer software that improved its image processing capabilities, along with additional equipment and the NEMO. During the time in port, while new equipment was being installed, Robert Evans was using the image processing program to review sonar data and checking on targets imaged in the 1986 survey. In reviewing some of the images with the new equipment, he noted that one image which had been taken in 1986 and that had been suggested to be a geological formation appeared to closely resemble the sonar image of Target H.

Evans was the person responsible for conducting image processing of data gathered during the 1986 survey, and continued in that position. He described the

equipment he was using as a computer on which, in addition to the floppy disk drive, has a computer laser disk drive into which you can put the computer laser disk, which is how the information is stored. The sonar information was digitally stored in such a file. He said it was the first real-time an on-board image-processing system was ever used on a sonar cruise. He, at that time, had an upgrade to his system. With the upgrade, he undertook to review all of the 1986 sonar records. In this review, he determined that in the 1986 survey, the sonar had imaged a target which resembled Target H. Evans said that having spent quite some time at site H, they had developed a lot of ground truth in making comparison of sonar images, and this increased his ability to recognize sonar images. He said Target F was larger than Target H. He passed the information to Thompson and suggested that since site F was on their way to site H, to which they were to return, they should test out their crane and improved equipment on site F. Thompson agreed. Alan Scott testified that the ship went from Jacksonville to Site F the end of August 1988 and that on the way, Evans asked him to check the navigational information on Target F and that Thompson told him they were going to test the equipment at Site F on their way to Site H. He testified testing started September 2nd, 1988 and that the image of Site F had features similar to Site H. He said they also discussed the fact the image had occurred while the ship was in a turn. The test was successful. The video from the underwater camera showed side-wheels and massive iron works. They recovered the ship's bell and located gold. The target was the Central America.

*Columbus-Am. Discovery Group, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel, Its Engines, Tackle, Apparel, Appurtenances, Cargo, Etc.*, No. 87-363-N, 1993 WL 580900, at *7–*9 (E.D. Va. Nov. 18, 1993) (footnotes and citations omitted).

The terms of the Lease Agreement and the NDAs are undoubtedly open to a variety of interpretations. For instance, was the wreck of the Central America actually "located" in 1986 despite the fact that it was not formally identified until 1988? Was the ship "found as a result" of the efforts of Williamson, Craft, and Lettow? Additionally, was the wreck of the ship "located and verified" using equipment provided by IDSS? What is not open to interpretation, however, is the fact that, in the salvage litigation, Defendants frequently represented that Plaintiffs were entitled to receive their "share" of the recovery. According to Plaintiffs, during the salvage litigation, Thompson's group consistently represented to the court that the "independent contractors'" share of the recovery should be included in the total costs expended

by the group.  The right to recovery of the independent contractors, including Plaintiffs in this

action, only arose if they had performed their contractual obligations.

Plaintiffs cite to three instances in the record of proceedings before the Eastern District of

Virginia as evidence of Defendants' prior position.  First, at a hearing on April 27, 1993, counsel

for CADG stated that:

> Your honor raises a point that we have been struggling with, which is in reality
> we think we are entitled to salvage credit for these percentages that we have given
> to independent contractors. . . . [W]e have given up a considerable number of
> percentages across the host of people who have devoted the last ten years,
> interrupted careers to do this.

(Doc. 580-5 at 11.)  The "Williamson percentage" was specifically mentioned during the

hearing.  (Doc. 580-5 at 13.)  Second, at the 1993 trial, Williamson himself was specifically

asked by counsel for CADG what interest Williamson & Associates had in the recovery, to

which Williamson replied "approximately 1 percent."  (Doc. 580-4 at 44.)  Finally, at the 1990

trial, Thompson indicated that Williamson had a very small financial interest in the recovery

efforts.  (*See* Doc. 580-5 at 18–19.)

In applying the three factors identified by the Supreme Court in *New Hampshire v.*

*Maine*, the Court concludes that an invocation of the doctrine of judicial estoppel is appropriate

in this case.  First, if Defendants take the position that Plaintiffs did not perform their contractual

obligations, it would clearly be inconsistent with their position in the salvage litigation that

amounts owed to private contractors should be included in the costs of the salvage.  As stated

above, the implication of that position is that Defendants believed that they had contractual

obligations to pay the independent contractors, including Plaintiffs.  Such contractual obligations

could not arise unless Plaintiffs met the conditions of their contracts.  As noted by Plaintiffs,

Defendants have offered no substantial evidence that any of the individual Plaintiffs violated the

confidentiality and non-compete provisions of the NDAs in the period since the litigation in the Eastern District of Virginia concluded.

As to the second and third factors, Judge Kellam accepted CADG's position that the shares owed to the independent contractors should be included in the costs of salvage. *See Columbus-Am. Discovery Group, Inc.*, 1993 WL 580900 at *15 ("Additional items of costs are the value of the shares promised to certain persons and firms who furnished service and materials with the agreement they would receive a percentage of any award. The evidence shows this would amount to some 2 or 3 percent.")  While this Court makes no finding of bad faith or nefarious motives on behalf of Defendants' on this issue, allowing Defendants to maintain the seemingly inconsistent positions would create the impression that one of the two Courts involved was misled.  Additionally, and also as to the third factor, Defendants would obtain an unfair advantage if they are not estopped from asserting failure to perform as a defense in this action.  If they were permitted to do so, they would have benefitted by inflating their claimed salvage costs in the Eastern District of Virginia, while at the same time avoiding liability in this Court with a contrary position.  Accordingly, Defendants are judicially estopped from asserting failure to meet contractual obligations as a Defense on Counts I and II at trial.

### 2. Entitlement to Compensation Under the Agreements

Another fact, however, must be established before Plaintiffs can prove that Defendants breached the NDAs and/or Lease Agreement.  Each of the agreements provides for payment from the "recovery profits" or the "net recovery."  While there is nothing in the record to illuminate the Parties' intentions regarding the precise meaning of these phrases, in the Court's view, the terms clearly suggest that an obligation to pay Plaintiffs is conditioned on there having been a profit made by Thompson's group in salvaging the Central America.  As to that issue,

there is a material dispute of fact. On one hand, Defendants have produced the declaration of Stephen Alexander, the accountant of the Entity Defendants, in which he declares that no profit from the recovery operations was ever realized. (Doc. 562.) On the other, Plaintiffs have provided Robol's letter of March 2, 2000, which indicates that the gold was sold for approximately $43 million. Plaintiffs also cite representations made by counsel for Defendants in argument before the Sixth Circuit that the treasure had been sold for over $50 million. (*See* Doc. 580-1 at 62.) As to costs incurred by Thompson's group in salvaging the treasure, Plaintiffs cite Judge Kellam's Opinion and Order, which includes a finding that costs of recovery of the treasure totaled $23.5 million. *Columbus-Am. Discovery Group, Inc.*, 1993 WL 580900 at *15. The Court also notes that the record includes evidence of disbursements made to Kirk and others after the treasure was sold. (*See* Doc. 362-2 at 109.)

Plaintiffs request the Court to disregard Alexander's declaration as containing mere conclusory statements concerning the financial results of the recovery operation. However, there is no indication that Alexander's declaration is inconsistent with previous evidence offered by Alexander, such as a deposition, or that Defendants are using the declaration to otherwise "manufacture" a genuine issue of fact where none exists. Alexander, as the purported accountant for the Entity Defendants, is logically in a position to offer evidence concerning their financial picture. Issues as to the credibility and weight of Alexander's testimony must ultimately be resolved at trial.

### 3. Direct Liability of the RLP, Economic Zone, Thompson, and Columbus Exploration

There is no genuine issue of material fact as to Thompson's potential liability under the NDAs or to RLP's potential liability under the lease agreement. Thompson was a party to the

40

NDAs and RLP was a party to the Lease Agreement. Further, there is no issue of material fact as to Thompson's potential liability under the Lease Agreement as the general partner of RLP.

The Court concludes, however, that there are material issues of fact regarding the direct contractual liability of RLP, Economic Zone, and Columbus Exploration on the NDAs and of Economic Zone and Columbus Exploration on the Lease Agreement. The record reflects that Thompson executed the NDAs on behalf of himself and certain entities. At the time the NDAs were formed, Economic Zone and RLP were the only Entity Defendants in existence. However, if these facts are construed in favor of Defendants, the inference that Economic Zone and RLP were the entities whose interests Thompson represented disappears. Similarly, when construed in light most favorable to Defendants, the heavily-redacted Management Agreement between RLP and Columbus Exploration cannot conclusively be determined to have transferred RLP's liabilities to Columbus Exploration. For these reasons, a grant of summary judgment on the issue of the direct liability of RLP, Economic Zone, and Columbus Exploration is not warranted.

Summary judgment is also not warranted on the issue of the direct liability of Columbus Exploration and Economic Zone on the Lease Agreement. For Columbus Exploration, the same rationale for denying summary judgment on the issue of direct liability under the NDAs is applicable. For Economic Zone, RLP did not purport to execute the Lease Agreement on behalf of any other entity and the record otherwise does not support any other theory of direct liability for Economic Zone.

### D. Plaintiffs' Supplemental Motion for Partial Summary Judgment on Certain Joint Liability Claims

Plaintiffs' Supplemental Motion for Partial Summary Judgment on Certain Joint Liability Claims (Doc. 588) seeks summary judgment on three issues, some of which are related to the issues discussed in Part II.C.3 *supra*. First, Plaintiffs ask the Court to rule that EZRA of Ohio,

41

Inc. should be considered the same entity as EZRA; that Omni Engineering of Ohio, Inc. should be considered the same entity as Omni Engineering, Inc; that Economic Zone Resource Associates, Ltd. should be considered the same entity as Economic Zone; and that Columbus Exploration Limited Partnership and Columbus Exploration should also be considered the same entity. Such a ruling with regard to the Omni entities is unnecessary as all claims against those entities have been dismissed. However, there is undisputed evidence on the record indicating that the other "pairs" of entities should be considered one and the same. Thus, these entities will be considered identical should a judgment be entered against at least one member of each pair at trial.

Second, Plaintiffs ask the Court to grant them summary judgment on the issue of whether RLP, CADG, Economic Zone, and EZRA should be jointly liable on Plaintiffs' claims under veil piercing theories, as opposed to the direct liability theories discussed in Part II.C.3 *supra*. Third, Plaintiffs seek summary judgment on the issue of whether Columbus Exploration should be liable as the successor of RLP. The Court denies Plaintiffs' motion with regard to these issues.

Turning first to the issue of whether Columbus Exploration should be liable as the successor of RLP, Plaintiffs' argument is based in part on an interpretation of the Management Agreement that Columbus Exploration assumed the liabilities of RLP. However, as stated in Part II.C.3, when construed in light most favorable to Defendants, the Management Agreement does not necessarily support that conclusion. Moreover, the record is murky at best as to whether Columbus Exploration could even be considered the legal successor of RLP under doctrines of successor liability. For these reasons, issues of the exact relationship between Columbus Exploration and RLP are best resolved at trial.

42

The Court next considers the joint liability of RLP, CADG, Economic Zone, and EZRA under alter ego and veil piercing theories. According to Plaintiffs, RLP, CADG, Economic Zone, and EZRA should be legally considered one "group" for purposes of liability in this case. While Plaintiffs state that they seek to pierce the corporate veil, in the Court's view, the theory of liability they espouse between RLP, CADG, Economic Zone, and EZRA is best characterized as reverse veil piercing. As summarized by the Tenth Circuit:

> In a classic veil piercing scenario, of course, a court pierces the corporate form to hold an individual responsible for acts done in the name of the corporation because the court finds that the individual and corporation are one and the same, no more than alter egos. Analogously, in a reverse veil piercing case, a court permits a creditor to recover a debt from the assets of a corporation determined to be the alter ego of an individual debtor, the two being so intermixed as to be essentially indistinguishable.

*In re Krause*, 637 F.3d 1160, 1165 (10th Cir. 2011).

In other words, veil piercing allows corporate principals to be held liable for acts of the corporate entity. In reverse veil piercing, an injured party is allowed to recover against corporate assets on the liability of the corporate principal. Here, Plaintiffs' only remaining claims are their contract claims. As the Court has already determined, as parties, Thompson and RLP are potentially liable on the Lease Agreement. RLP is potentially directly liable and Thompson is directly liable on the NDAs. While Economic Zone is also potentially directly liable on the NDAs, CADG and EZRA are not. Plaintiffs do not allege that Economic Zone, CADG, and EZRA controlled or dominated Thompson or RLP, the sources of direct liability in this case as would be necessary under a normal veil piercing theory. Rather, Plaintiffs seek recovery from associated corporate bodies based on the theory that they were controlled or dominated in part by the sources of the liability, which is more akin to a reverse veil piercing theory.

The Court, however, need not decide today whether it must apply the doctrine of veil piercing or reverse veil piercing to Plaintiffs' theory of joint liability among the Entity Defendants. The evidence produced by Plaintiff, when construed in light most favorable to Defendants, does not support an award of summary judgment to Plaintiffs on these issues. Piercing the corporate veil is appropriate when corporate principals have either used the corporate form to commit fraud or so dominated the corporation that the corporation was actually carrying out the business of the principals instead of its own. *In re Arbitration between Holborn Oil Trading LTD. and Interpetrol Berm. LTD.*, 774 F. Supp. at 844. The Sixth Circuit has stated that:

> Although there is no one test for deciding when to disregard the corporate form and bind the owner-operators of a closely held corporation, most cases can be decided by reference to three factors first enunciated by a panel of the Ninth Circuit:
>
>> Viewing the jumble of federal decisions together, we find a sort of generalized federal substantive law on disregard of corporate entity which concentrates on three general factors: the amount of respect given to the separate identity of the corporation by its shareholders, the degree of injustice visited on the litigants by recognition of the corporate entity, and the fraudulent intent of the incorporators. . . .
>
> When fraud is shown, we do not believe that it is always necessary to show the other two factors. Similarly, if both injustice and little respect for the corporate entity are shown, we do not believe it necessary to show fraud. Where extraordinary injustice is shown, it may alone be a sufficient predicate to liability.

*NLRB v. Fullerton Transfer & Storage, Ltd.*, 910 F.2d 331, 340 (quoting *Seymour v. Hull & Moreland Eng'g*, 605 F.2d 1105, 1111 (9th Cir. 1979).

Plaintiffs have identified factors that other federal courts have relied upon in admiralty veil piercing situations. These include

> (1) common or overlapping stock ownership between parent and subsidiary; (2) common or overlapping directors and officers; (3) use of same corporate office; (4) inadequate capitalization of subsidiary; (5) financing of subsidiary by parent;

(6) parent exists solely as holding company of subsidiaries; (7) parent's use of subsidiaries' property and assets as its own; (8) informal intercorporate loan transactions; (9) incorporation of subsidiary caused by parent; (10) parent and subsidiary's filing of consolidated income tax returns; (11) decision-making for subsidiary by parent and principals; (12) subsidiary's directors do not act independently in interest of subsidiary but in interest of parent; (13) contracts between parent and subsidiary that are more favorable to parent; (14) non-observance of formal legal requirements; (15) existence of fraud, wrongdoing or injustice to third parties.

*Bergesen d.y. A/S v. Lindholm*, 760 F. Supp. 976, 987 (D. Conn. 1991). Veil piercing is a highly fact intensive exercise, and there are no set rules as to which of the above factors must be present before liability can attach to a corporate principal for acts of the corporation. The Second Circuit has stated that "the general principle guiding courts in determining whether to pierce the corporate veil has been that liability is imposed when doing so would achieve an equitable result." *Williamson*, 542 F.3d at 53 (2d Cir. 2008) (quotation omitted).

Plaintiffs have offered, *inter alia*, the following evidence in support of their veil piercing claims concerning RLP, CADG, Economic Zone, and EZRA: Thompson's heavy involvement with all of the entities, as former general partner of RLP, as the sole shareholder of Economic Zone (Doc. 580-3 at 49), as the sole shareholder of CADG, and as an officer of EZRA (Doc. 588-2 at 33); Mr. Robol's position as an attorney and officer for several of the entities; the address of 433 W. Sixth Avenue, Columbus, which is allegedly Thompson's former residence and Robol's current law office, is common to each of the entities (see Doc. 588-2 at 37–46); the entities share a common telephone number; common stock ownership of the corporate entities by Thompson, the general partner of RLP; common and overlapping directors; the agency relationships between RLP and Economic Zone, EZRA, and CADG; testimony that CADG was in essence the public relations face of RLP (see Doc. 588-1 at 17, 22); RLP's characterization as a "holding company" by Thompson (Doc. 362-3 at 3); the representation that CADG had

purchased the vessel Arctic Discoverer when it had been in fact purchased by Economic Zone; and evidence tending to show that RLP, EZRA, Economic Zone, and CADG were generally conflated and treated as one by Thompson.

If the evidence offered by Plaintiffs is construed in their favor, some evidence supports the claim that RLP, CADG, Economic Zone, and EZRA were so dominated and controlled by Thompson as to give rise to joint liability under the NDAs and Lease Agreement. However, if that same evidence is construed in light most favorable to Defendants, the record lacks the specific details required for the Court to conclude as a matter of law that alter ego liability should attach to CADG, Economic Zone, EZRA, and RLP. As the record must be construed in light most favorable to Defendants for purposes of a motion for summary judgment by Plaintiffs, summary judgment as to Plaintiffs on this issue must be denied. The matter involves genuine issues of material fact. Issues regarding the exact relationships and degree of control exercised among and between these entities are best resolved with testimony at trial.

### E. Plaintiffs' Motion for Summary Judgment as to Entity Defendants' Counterclaims

Defendants RLP, CADG, and Columbus Exploration have brought counterclaims against Plaintiffs for breach of contract (Count I), civil conspiracy (Count II), and unfair competition (Count III). These claims are generally supported by allegations that Plaintiffs did not comply with the terms of the NDAs and the Lease Agreement, several of the Plaintiffs made false statements in interviews with various publications, and that Plaintiffs, acting in bad faith, attempted to attach the property of various Defendants. Plaintiffs move for summary judgment as to each of these counterclaims on the grounds that RLP, CADG, and Columbus Exploration have not produced evidence to support the claims. The Court agrees and will grant summary judgment to Plaintiffs on the counterclaims. As stated in Part II.A *supra*, a party may be

awarded summary judgment by establishing that the other side lacks evidence to support claims as to which the non-moving party carries the burden of proof.  In such a situation, the non-moving party must come forward with some evidence from which a reasonable trier of fact could find for the non-moving party as to its claims.  This necessarily requires evidence, which if credited, would establish each of the required elements of the non-movant's causes of action.

Here, the only evidence cited by RLP, CADG, and Columbus Exploration in support of their counterclaims are the declaration of Plaintiff McGinnis (Doc. 546-6), and declarations of attorneys Richard Robol and David Douglas (Docs. 563-1 & 563-2).  A newspaper article in which McGinnis is quoted, which is attached as an exhibit to his declaration, is cited by RLP, CADG, and Columbus Exploration as evidence that McGinnis violated the NDA he executed.  The relevant portion of the article is apparently the statement that "McGinnis has collected everything he could about the U.S. [sic] Central America since the recovery began.  There are 17-year-old records and folded handwritten notes about the sunken ship organized in a pile of manila folders he keeps in his home."  (Doc. 546-6 at 42.)  The declarations of Robol and Douglas generally refute statements made in a declaration of James Shirley, a former attorney for Plaintiffs.  However, these declarations do not offer evidence tending to establish the elements of any of the three counterclaims.  Additionally, even construed in a light most favorable to CADG, RLP, and Columbus Exploration, the statement about McGinnis having "records" is far too vague to support a finding that McGinnis breached provisions of the NDA.  In this regard, there is no indication what these records are or if they have any relation whatsoever to Defendants.  Accordingly, as RLP, Columbus Exploration, and CADG have failed to meet their burden of demonstrating a material issue of fact as to their counterclaims, summary judgment is granted to Plaintiffs on these claims.

Additionally, the Entity Defendants' motion to permit supplementation of their counterclaims with post-filing facts (Doc. 603), which requests permission for leave to supplement the Entity Defendants' counterclaims with evidence of new attachment actions filed by Plaintiffs in other jurisdictions, is also denied. In the Court's view, any claims arising from the actions described in the Entity Defendants' motion are not compulsory counterclaims. As this case has already been pending for over five years and trial is rapidly approaching, the Court will not now permit supplementation to add independent claims which may have arisen in the last several months. Entity Defendants are not precluded, however, from filing a separate lawsuit with any claims arising from the activities of Plaintiffs described in the motion.

### III. Trial by Jury

Plaintiffs' motion to strike the Entity Defendants' jury demand on the Entity Defendants' counterclaims (Doc. 628) is rendered moot by the Court's decision in Part II.E *supra*, as the Court has granted Plaintiffs' motion for summary judgment on the counterclaims. However, despite Plaintiffs' representations to the contrary,[5] Plaintiffs' amended complaint itself contains a demand for a jury trial. (*See* Doc. 176 at 1, 30.) Accordingly, the Court will also consider Document 628 in conjunction with Document 644 as a motion by Plaintiffs to withdraw their jury demand. As explained below, because Plaintiffs would not otherwise be entitled as a matter of right to a trial by jury on their remaining claims, Plaintiffs' motion to withdraw will be granted.

No right to a jury trial arises under the Seventh Amendment in situations where a district court's jurisdiction over a claim arises solely in admiralty. *See In re Muer*, 146 F.3d 410, 417

---

[5] A review of the proposed amended complaint attached to Plaintiffs' motion for leave to amend reveals that no jury demand was included on that document. (*See* Doc. 157-1.) The Court however, avoids resolution of Plaintiffs' motion to strike the amended complaint (Doc. 644) on grounds it was erroneously filed, as the Court concludes that even if the jury demand in Document 176 is deemed to control, Plaintiffs are permitted to unilaterally withdraw that demand.

(6th Cir. 1998) (citing *Waring v. Clarke*, 46 U.S. (5 How.) 441, 459 (1847)). Pursuant to Federal Rule of Civil Procedure 38(d), "[a] proper demand [for a jury trial] may be withdrawn only if the parties consent." FED. R. CIV. P. 38(d). However, Rule 39(a) provides that:

> When a jury trial has been demanded under Rule 38, the action must be designated on the docket as a jury action. The trial on all issues so demanded must be by jury unless . . . the court, on motion or on its own, finds that on some or all of those issues there is no federal right to a jury trial.

FED. R. CIV. P. 39(a). Several courts have held that Rule 38(d)'s requirement that both parties consent to the withdrawal of a jury demand is only applicable to cases wherein parties have a statutory or constitutional right to a jury trial. *See Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 968 (7th Cir. 2004) ("But Kramer had no right to a jury trial and there is no restraint in the text of Rule 39 on the ability of a party to withdraw its consent to a jury trial that is not of right."); *Alexander v. Chattahoochee Valley Cmty. Coll.*, 303 F. Supp. 2d 1289, 1291 (M.D. Ala. 2004) ("Thus, if Alexander is entitled to a jury trial, then she cannot withdraw her request for a jury trial in the face of the defendants' objection. However, if she is not entitled to a jury trial, then the court may grant her motion to withdraw her request for a jury trial.") (citing *Kramer*); *Thaler v. PRB Metal Prods., Inc.*, 810 F. Supp. 49, 49–50 (E.D.N.Y. 1993). In cases where no statutory or constitutional right to a jury trial is present, Rule 39(a) allows the Court, by motion or on its own initiative, to hold bench trials instead of jury trials. Further, by the plain language of Rule 39(a), the party initially demanding the jury trial is not precluded from filing a motion to withdraw that request. *See Gen. Instrument Corp. of Del. v. Nu-Tek Elecs. & Mfg., Inc.*, No. 93-CV-3854, 1996 WL 184794, at *1 (E.D. Pa. Apr. 12, 1996). Accordingly, as the Court finds that no constitutional or statutory right to a jury trial exists for Plaintiffs' contractual claims founded in admiralty, Plaintiffs may unilaterally withdraw their request for a jury trial and the Court will permit them to do so.

### IV. Motions to Disqualify Robol and Frevola

Also present before the Court are Plaintiffs' motion to disqualify Mr. Robol as trial counsel for the Entity Defendants (Doc. 599), Defendants' motion to disqualify Mr. Frevola (Doc. 621), and Mr. Robol's conditional motion to withdraw as counsel (Doc. 622). Given that the Court's decision on the Parties' respective motions for summary judgment has somewhat limited the scope of issues to be tried, the Court will hold the disqualification motions in abeyance at present, and direct the Parties to appear for oral argument on these motions approximately one week from the date of this Opinion and Order.

### V. Summary and Conclusion

#### A.

As the dust clears, a detailed summary describing what has just happened is in order. Summary judgment on Counts III, V, VI, and VII of the amended complaint is granted to all Defendants. Further, summary judgment as to Counts I and II is granted as to Defendants Omni Engineering, Inc., Omni Engineering of Ohio, Inc., DOE.E, Inc., Gilman Kirk, James Turner, Michael Ford, and Arthur Cullman. As no claims remain against these Defendants, they are dismissed from this action.

Summary judgment is granted to Plaintiffs as to all of the Entity Defendants' counterclaims. Summary judgment is also granted in favor of Plaintiffs on the issue of whether Columbus Exploration, LLC and Columbus Exploration Limited Partnership; EZRA, Inc. and EZRA of Ohio, Inc.; and Economic Zone Resource Associations, Inc. and Economic Zone Resource Associates, Ltd. should be treated as identical entities for liability purposes. Additionally, at trial, Defendants will be estopped from claiming that Plaintiffs did not perform their contractual obligations.

50

The Court has determined that these remaining issues will be tried to the Court:

1) Under the doctrine of laches, have Defendants been prejudiced by Plaintiffs' delay in filing suit or was any delay unreasonable?

2) Should the remaining Defendants be held jointly liable on the Lease Agreement and NDAs either on a theory of direct liability or through alter ego/veil piercing/ reverse veil piercing theories?

3) Did Columbus Exploration assume the liabilities of RLP or should it be otherwise liable for the obligations of RLP as RLP's successor?

4) Did Thompson's group earn profits or a net recovery (as those terms are used in the NDAs and Lease Agreement) from the salvage of the Central America?

5) What was the amount of profit, if any?

6) To what contractual damages are Plaintiffs entitled?

### B.

For the reasons set forth herein, Defendants' motions for summary judgment (Docs. 547 & 548) are **GRANTED in PART** and **DENIED in PART**; Plaintiffs' Motions for Partial Summary Judgment (Docs. 549 & 588) are **GRANTED in PART** and **DENIED in PART**; Plaintiffs' motion for summary judgment on the Entity Defendants' counterclaims (Doc. 546) is **GRANTED;** the Entity Defendants' motion to supplement their counterclaim (Doc. 603) is **DENIED**; the motions to disqualify Mr. Robol (Doc. 599), Mr. Frevola (Doc. 621) and Mr. Robol's conditional motion to withdraw (Doc. 622) are **HELD in ABEYANCE** pending oral argument before the Court on June 9, 2011 at 9 a.m.; and Plaintiffs' motion to strike the Entity Defendants request for a jury trial on their counterclaims (Doc. 628) is **GRANTED**.  Plaintiffs' motion to strike the amended complaint (Doc. 644), which the Court construes as a motion to

withdraw Plaintiffs' jury demand, is also **GRANTED**.  Defendants Omni Engineering, Inc.,

Omni Engineering of Ohio, Inc., DOE.E, Inc., Gilman Kirk, James Turner, Michael Ford, and

Arthur Cullman are dismissed from this action.

**IT IS SO ORDERED**


_____6-3-2011_____
**DATED**

_____
**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**