## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL H. WILLIAMSON, et al.,** | : | |
| | : | **Case No. C2-06-292** |
| Plaintiffs, | : | |
| | : | **Judge Marbley** |
| -vs- | : | |
| | : | **Magistrate Judge Kemp** |
| **RECOVERY LIMITED PARTNERSHIP, et al.** | : | |
| | : | |
| Defendants. | : | |
| | : | |

| | | |
|---|---|---|
| **THE DISPATCH PRINTING COMPANY, et al.,** | : | |
| | : | **Case No. C2-06-292** |
| | : | |
| Plaintiffs, | : | **Judge Marbley** |
| | : | |
| -vs- | : | **Magistrate Judge Kemp** |
| | : | |
| **RECOVERY LIMITED PARTNERSHIP, et al.,** | : | |
| | : | |
| Defendants. | : | |
| | : | |

| | | |
|---|---|---|
| **THE DISPATCH PRINTING COMPANY, et al.,** | : | |
| | : | **Case No. C2-06-292** |
| | : | |
| Plaintiffs, | : | **Judge Marbley** |
| | : | |
| -vs- | : | **Magistrate Judge Kemp** |
| | : | |
| **GILMAN D. KIRK, et al.,** | : | |
| | : | |
| Defendants. | : | |

## MOTION OF PLAINTIFF THE DISPATCH PRINTING COMPANY FOR ORDER OF SANCTIONS AGAINST DEFENDANTS THOMAS THOMPSON, GILMAN KIRK AND MICHAEL FORD AND ATTORNEY RICHARD ROBOL

## MOTION OF PLAINTIFF THE DISPATCH PRINTING COMPANY
## FOR ORDER OF SANCTIONS AGAINST DEFENDANTS
## THOMAS THOMPSON, GILMAN KIRK AND MICHAEL FORD
## AND ATTORNEY RICHARD ROBOL

Plaintiff The Dispatch Printing Company moves the Court for (1) an order of sanctions against Richard Robol, former attorney for Defendants Recovery Limited Partnership ("RLP") and Columbus Exploration LLC ("CX"), for making fraudulent misrepresentations to the Court regarding Defendants' possession of original inventories of the gold treasure at issue in this litigation, and (2) an order of sanctions against Defendants Thomas Thompson, Gilman Kirk and Michael Ford, former directors of CX and managers of RLP (the "Director-Defendants"), for their purposeful failure to take any action to prevent or correct Robol's fraudulent misrepresentations. Plaintiff requests an award of sanctions equal to the entire cost of these proceedings, in the amount of $1,717,388, or, in the alternative, an award of the cost of the receivership proceedings that were necessary to uncover Defendants' fraud on the court, in the amount of $325,613.00. The grounds supporting this motion are set forth in the attached memorandum and the exhibits and other evidentiary materials filed under separate cover.

Respectfully submitted,


/s/ Steven W. Tigges_____
Steven W. Tigges, Trial Attorney (0019288)
John W. Zeiger (0010707)
Bradley T. Ferrell (0070965)
ZEIGER, TIGGES & LITTLE LLP
41 South High Street, Suite 3500
Columbus, Ohio 43215
Telephone: (614) 365-9900
Facsimile: (614) 365-7900

Attorneys for Plaintiff
The Dispatch Printing Company

<u>**TABLE OF CONTENTS/SUMMARY OF POINTS AND AUTHORITIES**</u>

I.      <u>Introduction</u>..........................................................................................................................1

II.     <u>Statement Of Facts</u>............................................................................................................4

        A.      <u>Historical Background Of RLP, CX And
                The *Central America* Treasure</u>...............................................................................4

        B.      <u>Defendants Go "Radio Silent" On Their Investors</u> .............................................5

        C.      <u>Procedural History Of This Litigation</u>.................................................................6

        D.      <u>Inventory Misrepresentations</u>................................................................................8

        E.      <u>History Of The Receivership Proceedings</u>..........................................................14

        F.      <u>Receiver Kane Finds The Missing Inventories
                in Robol's Office</u>.................................................................................................16

III.    <u>Law And Argument</u> ........................................................................................................18

        A.      <u>Defendants And Their Lawyer Should Be Sanctioned For Their Bad Faith
                Refusal To Obey Judge Sargus' Inventory Orders And Then Repeatedly
                Lying About It</u>.......................................................................................................18

"A district court may award sanctions pursuant to its inherent powers when bad faith occurs." <u>First Bank of Marietta v. Hartford Underwriters Ins. Co.</u>, 115 F.Supp. 2d 898, 904 (S.D. Ohio 2000).  Examples of bad faith include "withhold[ing] material evidence" that would otherwise be adverse to the litigant's cause, "'delaying or disrupting the litigation,'" and "'hampering enforcement of a court order." <u>Metz v. Unizan Bank</u>, 655 F.3d 485, 489 (6th Cir. 2011), quoting <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 46 (1991).

In this case, Defendants and their attorney, Richard Robol, clearly acted in bad faith.  On July 20, 2006, this Court entered a Consent Order requiring Defendants to disclose books and records for the purpose of allowing The Dispatch's accountant, KPMG, to perform an accounting of the finances and affairs of Columbus Exploration, LLC ("CX") and Recovery Limited Partnership ("RLP").  In order to perform its accounting, KPMG needed copies of any original inventories that Defendants possessed of the treasure recovered from the shipwreck of the *S.S. Central America*.  Robol had multiple copies of those original inventories in file cabinets at his offices, yet he repeatedly made false representations to this Court and to the Sixth Circuit Court of Appeals that Defendants did not possess those inventories.

The only conceivable explanation for Robol's misrepresentations is that Defendants wanted to sabotage KPMG's accounting. And Defendants unquestionably achieved their bad faith objective, inasmuch as KPMG was unable to complete its accounting.

**B.**      **Sanctions Should Be Assessed Against The Director-Defendants As Well As Their Lawyer** ........................................................................................................**19**

Sanctions should be assessed not only against Mr. Robol, the attorney who voiced Defendants' misrepresentations, but also against the Director-Defendants themselves: Tommy Thompson, Gil Kirk, and Michael Ford.

**1.**      **This Court And The Court Of Appeals Already Ruled That The Director-Defendants Are Accountable For Violations Of The Consent Order By Their Companies And Their Lawyer, And This Ruling Is Now Law Of The Case** ........................................................................**20**

Judge Sargus already found that the Director-Defendants are personally accountable for violations of the Consent Order by the companies and their lawyer, and that finding was expressly affirmed by the Sixth Circuit Court of Appeals. As such, it is now law of the case and cannot be relitigated. Brunet v. Columbus, 58 F.3d 251, 254 (6th Cir. 1994); Green v. Nevers, 196 F.2d 627, 632 (6th Cir. 1999).

**2.**      **The Record Before This Court Also Demonstrates The Director-Defendants' Purposeful Inaction and Willful Blindness To Compliance With Judge Sargus' Orders** ........................................**23**

In addition to law of the case, the record before this Court amply demonstrates that the Director-Defendants did absolutely nothing to cause their lawyer to comply with Judge Sargus' orders. The undisputed evidence shows that the Director-Defendants (i) never established any process or procedure for monitoring the collection and production of documents required by the Consent Order, (ii) never met to discuss whether they were complying with the Consent Order, (iii) did not know who was responsible for collecting the documents required by the Consent Order, and (iv) did nothing at all to ensure compliance with the Consent Order.

Defendant Thompson's purposeful inaction was perhaps most troubling of all. As RLP's general partner and CX's chairman, he knew that detailed inventories of each piece of treasure were prepared when the treasure was recovered. Yet, despite Judge Sargus' repeated orders to find and produce these original inventories, Thompson never looked for them, nor did he even bother to ask anyone else to look for them. Why? Because, according to Thompson himself, he was too busy doing other things.

This record more than justifies assessment of sanctions against the Director-Defendants. As the Sixth Circuit explained when it affirmed the prior contempt judgment in this case, corporate directors such as Thompson, Kirk and Ford are responsible for the corporation's compliance with court orders, and thus can be sanctioned personally if they fail to take appropriate action to ensure that the corporation complies. Williamson v. Recovery Limited

<u>Partnership</u>, 467 Fed. Appx. 382 (6th Cir. 2012). <u>Accord</u>: <u>Electrical Workers Pension Trust Fund v. Gary's Electric Service Co.</u>, 340 F.3d 373, 382-83 (6th Cir. 2003) ("if a corporate officer avoids a court's order to the corporation by failing to take action or attempt compliance, 'they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt'").

C.      **The Dispatch Should Be Awarded Sanctions Against Defendants And Their Counsel Equal To The Entire Costs Of These Proceedings** ...................................................................28

Where a litigant's bad faith rises to the level of fraud on the court, "the entire costs of the proceedings" can be assessed as a sanction. <u>Universal Oil Products Co. v. Root Refining Co.</u>, 328 U.S. 575, 580 (1946). <u>Accord</u>: <u>Chambers</u>, <u>supra</u>, 501 U.S. at 47. Here, without question, the actions of Defendants and their attorney rise to the level of a fraud on the court. Robol's repeated misrepresentations regarding the original inventories were made by an officer of the court. In addition, Robol's misrepresentations were directed to the judicial machinery itself. By refusing to obey Judge Sargus' orders to turn over all original inventories, and then repeatedly lying to the Court about it, Defendants effectively prevented the judicial machinery – specifically, the Consent Order – from achieving the objectives for which it was entered. Under these circumstances, the appropriate sanction should equal the entire cost of these proceedings. <u>Eppes v. Snowden</u>, 656 F. Supp. 1267, 1281 (E.D. Ky. 1986) ("To award plaintiff's costs, expenses and attorney fees incurred to defend the entire action would seem to be an appropriate sanction in response to the theatrics we have witnessed here."); <u>United States ex. rel. Scott v. Metropolitan Health Corp.</u>, 2005 WL 3434830 (W.D. Mich. 2005) (where plaintiff withheld material evidence that would have disclosed her case to be frivolous, the court awarded defendant all of its defense costs).

The Dispatch respectfully requests that the Court award it the entire cost of these proceedings pursuant to the Court's inherent power to sanction Defendants for their fraudulent misrepresentations. To date, The Dispatch's cost of these proceedings has been $1,717,388.

D.      **In The Alternative, The Court Should Assess Sanctions Against Defendants And Their Counsel In The Amount Of The Cost Of The Receivership Proceedings** ...................................................................32

Alternatively, if the Court chooses not to award the entire cost of these proceedings, The Dispatch respectfully submits that the sanctions should at least be equal to the $325,613 that The Dispatch incurred to successfully prosecute the receivership proceedings in this case. But for The Dispatch's persistence in pursuing and obtaining appointment of a receiver, Defendants would have gotten away with their fraud. So, at a minimum, The Dispatch should be awarded its costs to prosecute the receivership and thereby unearth the truth. <u>See, e.g.</u>, <u>Laukus v. RIL Brands, Inc.</u>, 2013 WL 978215, at *21 (N.D. Ohio 2013) (where plaintiff's counsel withheld a critical piece of evidence, thereby causing defendant to incur substantial additional litigation expenses that otherwise would have been avoided, the court awarded defendant all such expenses as a sanction for plaintiff's fraud).

## MEMORANDUM IN SUPPORT

## I.    Introduction

Recovery Limited Partnership ("RLP") was formed in the mid-1980s to find and recover the shipwreck of the *S.S. Central America*, a U.S. Mail steamship that sank in 1857 carrying several tons of gold. Several prominent Columbus businesses and business leaders invested in RLP. The Dispatch Printing Company ("The Dispatch") invested $1 million; members of the family that owns The Dispatch individually invested nearly $500,000. RLP found the *Central America* in 1988, and over the next three years, it recovered gold and other treasure worth at least $100 million. But RLP's investors never received a dime.

Defendant Tommy Thompson is the former general partner of RLP and former chairman and director of RLP's affiliate, Columbus Exploration LLC ("CX"). Thompson is also a fugitive from justice on an arrest warrant issued by Judge Sargus.

Defendants Gilman Kirk and Michael Ford are also former managers of RLP and directors of CX.[1]

Attorney Richard Robol represented RLP and CX in this litigation from its inception until he withdrew in February 2013.

This litigation commenced in 2005, when The Dispatch filed two cases against Defendants in Common Pleas Court for breach of fiduciary duty and an accounting. In 2006, after the Dispatch cases were consolidated with an admiralty case (the "Williamson" case), Defendants removed all three cases to this Court, where they were assigned to Judge Sargus.[2]

---

[1]    Two other Defendants, Arthur Cullman and James Turner, are also former directors of CX, but they resigned from CX's board prior to the occurrence of the misrepresentations that are addressed by this motion.

[2]    In 2009, Judge Sargus remanded the Dispatch cases back to Common Pleas Court, but he retained jurisdiction in this Court to adjudicate all proceedings arising out of the July 20, 2006 Consent Order that is the subject of this motion.

On July 20, 2006, Judge Sargus entered a Consent Order that was intended to resolve The Dispatch's claim for an accounting. As it turned out, the Consent Order proved to be an exercise in futility because of Defendants' "sandbagging" (Judge Sargus' word, not ours), resulting in Defendants twice being held in contempt for violation of the Order. Based on recent discoveries, we now have a third reason to sanction Defendants for violating the Consent Order.

Under the Consent Order, Judge Sargus ordered Defendants to produce all inventories of the treasure that RLP had recovered. At first, Defendants resisted, but after Judge Sargus issued his first contempt order, they finally turned over an inventory of gold they had sold to a third party, California Gold Marketing Group, in 2000. But this inventory only accounted for part of the treasure. When Judge Sargus ordered Defendants to turn over their original inventories of *all* the treasure, Defendants responded that they didn't have any such inventories. Their attorney, Robol, told this Court:

> When the Court subsequently ordered that we search for the inventory, we did so, and we were not able to find any inventories other than the one that, of course, was produced promptly following the Court's [first contempt] order . . . . *We produced the one and only inventory that the company had, which was the inventory relating to the sale to the party that we had spoken about, the California Gold Marketing Group.*

[12/8/08 Hrg. Tr. at 60 (emphasis added)]

Robol made this representation to this Court on seven occasions, and he made it to the Court of Appeals twice.

We now know that Defendants' representation was patently false. In June 2013, after five more years of litigation in the Common Pleas Court, The Dispatch succeeded in having a receiver appointed for RLP and CX. Shortly after his appointment, the receiver took possession

of the companies' assets and records, including 36 file cabinets stored at Robol's office. In these file cabinets, the receiver found the original inventories that Robol said did not exist.

This point bears repeating: Nine times Robol told this Court and the Court of Appeals that Defendants did not have their original inventories, but these documents have now been found in files taken from Robol's office – files he said had been searched. Hundreds of pages of original inventories were found there on eleven-by-fifteen inch "fan-fold" computer paper with hardbound covers labeled "MASTER COIN AND BAR." In view of the oversized nature and thickness of these inventories, they could not possibly have been overlooked.

As Judge Sargus already found, these original inventories were an absolutely essential piece of evidence in this case. Without them, the accounting ordered by Judge Sargus could not be completed – which, of course, is presumably why Defendants hid the inventories in the first place. Defendants would have gotten away with their fraud but for The Dispatch's persistence in prosecuting the receivership motion.

The question presented by this motion is this: When a defendant lies to the court about a fundamental issue in the case, and the plaintiff then incurs substantial additional litigation expense to uncover the defendant's lie, is the defendant (and his lawyer, who articulated the lie) liable for the plaintiff's costs in discovering the truth? Common sense says yes, and so does the case law. As Justice Frankfurter so aptly stated:

> No doubt, if the court finds after a proper hearing that *fraud has been practiced upon it*, or that the very temple of justice has been defiled, *the entire cost of the proceedings could justly be assessed against the guilty parties*.
>
> [Universal Oil Products Co. v. Root Refining Co., 328 U.S. 575, 580 (1946) (emphasis added)]

This reasoning is equally applicable here. The Dispatch's cost of this proceeding has been $1,717,388. Pursuant to <u>Universal Oil</u>, it should be assessed against Defendants for their fraud on the court. Alternatively, Defendants should be assessed at least the cost that The Dispatch incurred to prosecute the receivership motion, $325,613. It was only because of The Dispatch's persistence in prosecuting the receivership that The Dispatch was ultimately able to obtain Robol's files and discover the truth contained therein. Therefore, at minimum, Defendants should be sanctioned for what it cost The Dispatch to bring the truth to light.

## II.  Statement Of Facts

### A.  Historical Background Of RLP, CX And The *Central America* Treasure

RLP was formed in 1986 for the purpose of finding and recovering the shipwreck of the *S.S. Central America*, a U.S. Mail steamship that sank off the Carolina coast in a hurricane in 1857 carrying several tons of gold from the California gold rush. RLP's affiliate, CX, was originally formed to find other shipwrecks, but later, its mission became management of RLP. Defendant Thompson served as RLP's general partner and CX's chairman. Defendants Kirk and Ford were also directors of CX and managers of RLP.

Finding the *Central America* was Thompson's brainchild. In the 1980s, he was working as a research scientist at Battelle, where he developed what was, at that time, an innovative plan to find deep-ocean shipwrecks such as the *Central America*. In order to finance his idea, Thompson formed RLP and promoted it as a Columbus-based venture that would bring fame to the technology assets in central Ohio such as Ohio State and Battelle. He succeeded in raising $12.5 million from Columbus business and community leaders. The Dispatch invested one million dollars; members of the family that owns The Dispatch individually invested nearly $500,000.

RLP found the *Central America* in 1988. From then until 1991, RLP recovered gold and other treasure from the wreck worth at least one hundred million dollars.

RLP's recovery of the treasure led to nearly ten years of admiralty litigation in the Eastern District of Virginia between RLP and insurance companies who paid insurance claims when the ship sank and now claimed to be subrogated to their insureds' rights. The admiralty litigation was finally resolved in 1998 with RLP being awarded approximately 92.5 percent of the treasure that was already recovered (the "Up Treasure"), with the other 7.5 percent going to the insurance companies. RLP also received the exclusive right to salvage the remaining treasure at the shipwreck site (the "Down Treasure"). According to some reports, the Down Treasure may be more than 15 tons of additional gold. This means that, at today's bullion values, the Down Treasure is worth more than $750 million.

## B. Defendants Go "Radio Silent" On Their Investors

By 1998, when the admiralty litigation was finally resolved, many of RLP's investors had become disgruntled with the delay in receiving a return on their investment and, more notably, with RLP's lack of formal, effective management. Certain investors, including representatives of The Dispatch, proposed to establish a more formalized management structure. Thompson responded with his own plan to have CX take over management of RLP, with CX being governed by a board of directors who would stand for re-election each year. Thompson's proposal prevailed, and CX took over management of RLP in 1999. CX's governance documents included Thompson's promise of annual elections of directors and annual financial statements for the investors.

In early 2000, CX sold the Up Treasure to a marketing company, California Gold, for approximately $50 million plus a 25-percent profit participation on all downstream sales in

excess of $50 million. Defendants told their investors: "The agreement with the California Gold Group . . . *will* bring us a return on the Up Treasure . . . " (emphasis added).

What Defendants didn't tell their investors was that Thompson had taken a one million dollar kickback from California Gold's owner for steering the marketing contract to California Gold. Nor did Defendants tell their investors that they gave Thompson an additional $1.2 million for which he was never required to account. In fact, as soon as Defendants sold the treasure, they stopped telling their investors anything at all. They stopped sending annual financial statements. They refused to provide their investors with any information on sales by California Gold. They refused to hold annual meetings for election of new directors. Even after receiving nine certified mail letters from The Dispatch inquiring as to the status of its investment, Defendants refused to respond. And, Defendants' promise to their investors that their deal with California Gold "will bring us a return on the Up Treasure" proved false. To this day, the investors have received nothing.

### C.    <u>Procedural History Of This Litigation</u>

In 2005, The Dispatch filed two cases against Defendants in the Common Pleas Court, asserting claims for breach of fiduciary duty, breach of partnership and LLC agreements, and for an accounting. In April 2006, the Dispatch cases were consolidated with a third case (the "Williamson" case) filed by a group of seamen who claimed entitlement to additional compensation for their work in recovery of the Up Treasure. The Williamson case sounded in admiralty, so after its consolidation with the Dispatch cases, Defendants removed all three cases to this Court on April 24, 2006. [ECF No. 2]

On July 20, 2006, Judge Sargus entered a Consent Order that was intended to resolve The Dispatch's claim for accounting. [ECF No. 84] The Consent Order required Defendants to

provide The Dispatch's forensic accountant, KPMG, with financial and other information regarding the companies' affairs, so that KPMG could account for what happened.

The Consent Order turned out to be an exercise in futility. Defendants "sandbagged" KPMG's work at every turn, causing KPMG ultimately to report that it could not account for the Up Treasure. [KPMG Report, ECF No. 233]

On December 5, 2006, Judge Sargus issued his first contempt order against Defendants, finding "a total lack of good faith of at least CX and RLP in compliance with the July 20, 2006 Order." [ECF No. 145 at pg. 4] At the hearing leading to this order, Judge Sargus offered a "word to the wise" to the Director-Defendants, warning them that they needed to ensure their companies' compliance with the Consent Order. [ECF No. 150 at pg. 6 ("[B]usiness organizations act only through people. So I believe a word to the wise would be in order with regard to the individual defendants")]

Judge Sargus' warning fell on deaf ears, as evidenced by his second contempt order against Defendants on September 30, 2009. [ECF No. 280][3] This time, he found not only the companies but also the Director-Defendants in contempt. [Id.] He sanctioned them approximately $235,000. [Id.] Judge Sargus stated:

> [T[he Court is certain that the Defendants' conduct caused significant delay and expense. *The accounting was sandbagged by the Defendants through a variety of means.* What should have taken several months has taken several years.
>
> [Id. at pg. 15 (emphasis added)]

Defendants appealed. On January 20, 2012, the Sixth Circuit affirmed the contempt judgment. [ECF No. 694] On March 9, 2012, the Court of Appeals denied rehearing and

---

[3]     On March 11, 2009, Judge Sargus remanded the Dispatch cases back to the Common Pleas Court. [ECF No. 469] But he retained jurisdiction in this Court over all proceedings arising out of the Consent Order. [Id.]

hearing en banc.  [ECF No. 699]  On October 15, 2012, the United States Supreme Court denied certiorari.

On June 25, 2013, this Court awarded an additional $135,000 of attorney fees to The Dispatch for the costs incurred in successfully defending the contempt judgment on appeal. [ECF No. 867]

### D.    Inventory Misrepresentations

Much of the misconduct that led Judge Sargus to sanction Defendants was their gamesmanship with production of inventories of the Up Treasure.  We knew Defendants were playing fast and loose with these inventories – indeed, Judge Sargus found as much in his contempt decisions – but until the companies' receiver actually obtained Defendants' files from Robol a few months ago, we had no idea that Defendants' inventory games were actually a much deeper-rooted fraud on the Court.

One of the fundamental purposes of the Consent Order was to determine whether any of the Up Treasure was missing.[4]  To achieve this objective, KPMG needed to have the original inventories of the treasure to serve as the starting point for tracking the gold.  As Judge Sargus stated at a hearing on November 28, 2006, "the inventory of the gold" is "critical to the undertaking the Court contemplated in the Consent Decree." [ECF No. 150 at pg. 144]  "[T]he inventory of the gold recovered" is a "critically important document" that is "basic to the report" to be prepared by KPMG. [Id. at pg. 157] "The report by KPMG can't even begin until the inventory is located." [Id.]

---

[4]    Plaintiffs' suspicions about potential misappropriation of the treasure proved to be well-grounded, as we subsequently learned in the receivership hearing in the Common Pleas Court that for approximately two years in the early 1990s, Thompson had secretly stashed six hundreds pounds of gold coins and ingots under the basement stairs at RLP's offices on West Sixth Avenue in Columbus.  Because of Defendants' obstruction of the accounting process under the Consent Order, we still don't know whether Thompson or others helped themselves to any of this gold while it was hidden in RLP's basement.

Following the November 28, 2006 hearing, Judge Sargus entered his first contempt finding against RLP and CX. [ECF No. 145] Judge Sargus also explicitly ordered Defendants to produce their inventories of the gold. [Id. at pg. 8] He wrote:

> Two sets of key documents have yet to be produced. *The first is an inventory of the gold recovered and sold by the Defendants.* As Defendants concede, the proceeds obtained in the sale of the gold represents the vast majority of income received by Defendants. It is inconceivable that any degree of thorough auditing could commence without such documents.
>
> * * *
>
> Based upon the foregoing, it is the Order of this Court:
>
> 1.      Defendants CX and RLP have violated the express terms of the July 20, 2006 Order. The record in this case shall be kept open regarding this violation. The Court reserves for a later date sanctions or other remedies with regard to such violations.
>
> 2.      *The Defendants shall tender to the Plaintiffs' accountant an inventory of the gold* . . . .
>
> [Id. at pgs. 4, 8 (emphasis added)]

In response to Judge Sargus' order, Defendants provided KPMG with an inventory of the gold that RLP sold to California Gold in 2000. But this only accounted for *part* of the treasure; Defendants still failed to produce an inventory of everything they had recovered. Instead, on April 22, 2007, Defendants submitted a "certification" by Thompson, in which they claimed that the California Gold inventory was the only inventory that Defendants possessed. Thompson's "certification" stated in relevant part:

> I certify that the following documents covered by the Consent Order/KPMG July 11, 2006 lists, or as modified by subsequent Orders, *do not exist*:
>
> * * *

3. *Any inventory of the recovered treasure in entities'*
*possession other than what was already provided to KPMG . . . .*

[Appendix Ex. 1 (Appx. pg. A-1)][5]

Thompson's reference to the "inventory . . . already provided to KPMG" referred to the California Gold inventory, but, as noted above, it only accounted for part of the treasure, not everything that was recovered. As Judge Sargus noted more than once, in view of this treasure being worth at least $100 million, it was extremely difficult to believe that Defendants did not have an original inventory of the entire recovery. But, at a hearing on April 24, 2007 to review Defendants' "certification," Mr. Robol once again told Judge Sargus:

> This is for purposes of Mr. Tigges' understanding. We have produced the inventories, even if they are pre-2000 inventories. I don't want there to be any ambiguity in his mind about that. *We have produced <u>all</u> the inventories.*

[4/24/07 Hrg. Tr. at 49-50, ECF 208 (emphasis added)]

The April 24, 2007 hearing concluded with the following order by Judge Sargus: "[D]efendants shall tender to the accounting firm anything that could be construed as an inventory of any kind regarding assets recovered from the shipwreck that would have been sold during the relevant time of this audit or review. So, in other words, if there were assets recovered in 1980 that were sold in 2001, and there is an inventory that goes with those assets, then that is to be turned over." [<u>Id.</u> at 56 (emphasis added)] Judge Sargus could not have been more clear: "*Anything that could be construed as an inventory*" must be turned over.

Defendants still failed to produce the original inventories. Instead, on June 4, 2007, Defendants submitted another "certification" from Thompson, in which they disclosed for the first time that there was another inventory of the recovered treasure known as the "Holabird

---

[5]      The Dispatch has filed an appendix in support of this motion under separate cover, which includes pertinent evidentiary materials that are not already part of the Court's record in this case.

Inventory," but Defendants said they did not have it and the only copy was filed under seal in the admiralty case in the Eastern District of Virginia. [June 27, 2007 KPMG Letter at pg. 5 (Appendix Ex. 2) (Appx. pg. A-7)][6] Thompson stated in his certification that Defendants "are willing to ask the [Virginia] court for disclosure of that composite inventory to KPMG, if deemed necessary." [Id.]

Although Defendants said they would ask the Virginia Court for leave to disclose the Holabird Inventory to KPMG, they did not do so until five months later, and even then only after Judge Sargus ordered them to. In the meantime, on August 15, 2007, KPMG issued its report. It came as no surprise that KPMG could not account for the Up Treasure, or whether any was missing, because of Defendants' failure to produce the original inventories.

At a hearing on September 7, 2007, Judge Sargus once again expressed his frustration that Defendants had not produced an original inventory of the recovered treasure:

> [T]he crux has to be the inventory here, and I want to be very specific about what has been tendered and what hasn't because I don't know how anyone can do any real accounting without knowing – this is essentially, if not the only, the primary asset of this business. And if that hasn't been forthcoming, it would seem to me this exercise is all futile.

> [Sept. 7, 2007 Hearing Tr., ECF No. 245 at 5]

At this hearing, The Dispatch's attorney openly questioned the veracity of Defendants' assertion that they did not have any inventories of the original recovery. In response, Defendants' attorney, Robol, represented to the Court: "Now let me address the specifics of the inventory. *What you have been told [by Tigges] is false, false, false. The company has no*

---

[6] The inventory that Thompson referred to in this "certification" was actually commissioned by the Virginia Court in 1997 to serve as the basis for splitting the Up Treasure between RLP and the insurance companies. It was prepared by an independent expert named Fred Holabird and thus its name as the "Holabird Inventory."

*inventories of the gold sold other than what has been provided.*" [Id. at pg. 18 (emphasis added)]

The following exchange then occurred between Judge Sargus and Mr. Robol:

| THE COURT: | But fundamentally for an accounting firm to do any sort of reasonable investigation here, the tangible asset of this company that provides the bulk of the value is something that has to be documented. And it seems to me we are still stuck on that point. |
|---|---|
| MR. ROBOL: | *Your Honor, we are not stuck on that point. We provided the inventory that the company had. We provided the inventory of that asset, the treasure that was sold to the California Gold Marketing Group.* |

[Id. at pg. 40 (emphasis added)]

At this hearing, Robol repeated Defendants' offer to obtain the Holabird Inventory from the Virginia Court, so Judge Sargus ordered them to do so. We now know that Robol obtained the Holabird Inventory from the Virginia Court within two weeks of Judge Sargus' September 7, 2007 order, but Defendants did not disclose the fact that they had the Holabird Inventory until August 2008, and they did not actually provide a copy to KPMG until October 2008. [Plaintiffs' Contempt Brief, ECF 365 at 29-30]

On December 3, 2008, Robol filed a brief with this Court, stating: "Defendants, in fact, produced the inventory of every item of gold specie sold to the California Gold Marketing Group shortly after the December 5, 2006 order. . . . We also provided certification that no other gold was sold and that *this was the only inventory in Defendants' possession*." [ECF No. 370 at pg. 17 (emphasis added)] Robol further represented: "*Defendants had produced the only inventory in their possession in late 2006, which was the inventory of the gold items sold to the California Gold Marketing Group . . . . [D]efendants in 2006 produced the only inventory they ever possessed.*" [Id. at pgs. 23, 27 (emphasis added)]

At a hearing on December 8, 2008, Robol repeated this representation to Judge Sargus:

> When the court subsequently ordered that we search for the inventory, we did so, and we were not able to find any inventories other than the one that, of course, was produced promptly following the court's order. . . . *We produced the one and only inventory that the company had, which was the inventory relating to the sale to the party that we have spoken about, the California Gold Marketing Group.*

[12/8/08 Hrg. Tr. at pg. 60, ECF 405 (emphasis added)]

Please note that in Robol's statement, quoted above, he said that when Judge Sargus ordered Defendants to search for the original inventories, "*we did so* . . . ." [Id. at pg. 60 (emphasis added)] If this was true, if Defendants truly did search for the original inventories, then they must have searched the 36 file cabinets belonging to RLP that were stored at Robol's office.[7] Indeed, at the same December 8, 2008 hearing, another of Defendants' lawyers represented to the Court that the companies' employees were specifically instructed by Thompson "*to go through the corporate headquarters at 431 West Sixth Avenue [i.e. Robol's office] to search for anything else that could possibly be construed as an inventory.*" [Id. at pg. 123 (emphasis added)]

As noted previously, in September 2009, Judge Sargus found Defendants in contempt and fined them approximately $235,000. Defendants appealed, and continued their misrepresentations in the Court of Appeals. On March 19, 2010, Mr. Robol filed a brief with the Sixth Circuit, in which he represented: "*The first inventory – the only inventory that Columbus Exploration had in its possession, custody or control – was provided to KPMG shortly after the December 5, 2006 order. . . . [T]his was the only inventory in Columbus Exploration's*

---

[7] Robol's office is located at 431-433 West Sixth Avenue. It originally was the corporate office for RLP and CX. CX conveyed title to the property to Robol in 2004.

*possession.*" [Defendants' 6th Cir. Brief, Case No. 09-4255, filed March 19, 2010, at pg. 24 (Appendix Ex. 3) (Appx. pg. A-42)] Robol repeated this misrepresentation to the Court of Appeals in a reply brief filed on June 1, 2010: "*[T]his was the <u>only</u> inventory in Columbus Exploration's possession.*" [Defendants' 6th Cir. Reply Brief, Case No. 09-4255, filed June 1, 2010 at pg. 9 (Appendix Ex. 4) (Appx. pg. A-106)][8]

So, nine times – seven in this Court, twice in the Court of Appeals – Defendants represented that they did not have any original inventories. Needless to say, we were skeptical of Defendants' assertion, but we didn't have any actual proof to the contrary. Until now.

Earlier this year, the Common Pleas Court granted The Dispatch's motion for appointment of a receiver for RLP and CX, and the receiver then discovered the companies' original inventories sitting in a file cabinet at Robol's office, all the while Defendants were telling this Court and the Sixth Circuit that these inventories didn't exist. Let's turn to the receivership proceedings next.

### E. History Of The Receivership Proceedings

The Dispatch originally moved for appointment of a receiver for RLP and CX on December 23, 2008, while this case was still pending in this Court. [ECF No. 391] When Judge Sargus remanded everything except Consent Order proceedings, the receivership motion went to the Common Pleas Court for adjudication.

The receivership hearing initially began in the Common Pleas Court on March 21, 2012 before the Honorable Patrick E. Sheeran. After Dispatch's counsel gave his opening statement, Defendants' attorney, Robol, stood up and advised Judge Sheeran that CX had just filed a

---

[8] As noted previously, the Court of Appeals affirmed the contempt judgment and, later, denied rehearing and hearing en banc. The United States Supreme Court also denied certiorari.

bankruptcy petition in the United States Bankruptcy Court for the District of Delaware, so the receivership hearing must immediately cease because of the automatic bankruptcy stay.[9]

On May 9, 2012, as the bankruptcy case was approaching a hearing that would have revealed the bad faith in CX's bankruptcy filing, CX obtained leave of the Bankruptcy Court to dismiss its petition. [Appendix Ex. 6 (Appx. pg. A-155)] CX represented to the Bankruptcy Court that the bankruptcy should be dismissed because CX had "*compromised and resolved*" the creditor claims that had supposedly caused it to file the bankruptcy in the first place. [Appendix Ex. 7 at ¶¶ 1, 3, 6 (Appx. pgs. A-156 – A-158)]

Following dismissal of the bankruptcy, the receivership hearing reconvened in Common Pleas Court on October 9, 2012. The hearing proceeded on and off for fifteen days, involving hundreds of exhibits and thousands of pages of transcript.

In late February 2013, based on communications all parties had received from Judge Sheeran, the parties knew that Judge Sheeran's receivership decision was imminent. [Appendix Ex. 8, Trolinger Dep. at pgs. 55-56 (Appx. pg. A-176)] So, on February 26, 2013, Robol and four other alleged "creditors" filed an involuntary bankruptcy petition against CX back in Delaware. The "claims" on which Robol and the other alleged creditors purported to base this bankruptcy filing were the very same claims that, ten months earlier, CX had told the Bankruptcy Court were "*compromised and resolved.*" Robol's admitted purpose in filing the bankruptcy was to beat Judge Sheeran to the punch:

> Q.   Did you want to make sure that you had your bankruptcy filed before Judge Sheeran issued his decision on the pending receivership motion?

[9]   In a decision issued on October 2, 2013 in the <u>Williamson</u> case, the Sixth Circuit found that CX's "bankruptcy filing . . . reeked of fraud." [<u>Williamson v. Recovery Limited Partnership</u>, Case No. 11-3723, October 2, 2013 Decision at pg. 27 (Appendix Ex. 5) (Appx. pg. A-153)]

> A. Before he created a receivership, I wanted a bankruptcy in place.
>
> [Appendix. Ex. 9, Robol Dep. at pg. 155 (Appx. pg. A-255)]

Of course, Robol's bankruptcy filing had the effect of postponing Judge Sheeran's receivership decision because of the automatic stay.

On May 20, 2013, after being apprised of the impending receivership decision from the Common Pleas Court, the Bankruptcy Court granted relief from stay to allow Judge Sheeran to issue his receivership decision. [Appendix Ex. 10 (Appx. pgs. A-317 – A-318)]

On May 23, 2013, Judge Sheeran granted The Dispatch's receivership motion and, on June 14, 2013, appointed Ira Kane as receiver for RLP and CX. [Appendix Ex. 11 (Appx. pgs. A-319 – A-355) and Ex. 12 (Appx. pgs. A-336 – A-340)][10]

On June 25, 2013, the Bankruptcy Court clarified that its relief from stay allowed not only issuance of the receivership decision but also authorized the Ohio receivership to go forward in full force and effect. Mr. Kane then began performing his duties as the companies' receiver. [Appendix Ex. 13 (Appx. pgs. A-341 – A-354)][11]

### F. Receiver Kane Finds The Missing Inventories in Robol's Office

One of Mr. Kane's initial tasks as receiver was to marshal the companies' assets. Towards this end, he served notice on all of the companies' attorneys to turn over all company files and other property in their possession. [Henson Aff. Ex. 1 (Appendix Ex. 15) (Appx. pgs.

---

[10] Judge Sheeran expressly found: "Plaintiffs have proven by clear and convincing evidence that the current state of the Defendant companies is one of great disarray. They are insolvent, and, at this time, are without functional management." [May 23, 2013 Decision at pg. 8 (Appendix Ex. 11) (Appx. pg. A-326)]

[11] In addition to resolving creditor claims, a principal objective of the receivership is to provide a return to the companies' investors, either through recovery of the Down Treasure or sale of its salvage rights. The receivership is being funded by loans from The Dispatch. To date, The Dispatch has loaned $500,000 to the receivership. [Appendix Ex. 14 (Appx. pgs. A-355 – A-360)]

A-366 – A-369)]  Initially, Mr. Robol claimed he had an "attorney's lien," but he eventually agreed to turn the companies' files over to Mr. Kane.

As it turned out, Robol had 36 file cabinets of RLP/CX records stored at his office. [Henson Aff. ¶ 8, 9, 15 (Appendix Ex. 15) (Appx. pgs. A-363, A-365)]  Mr. Kane's staff moved 32 of these to a secure location under the receiver's control on July 25, 2013; they moved the remaining four on August 1, 2013.  [Id. at ¶ 11, 15 (Appx. pgs. A-364 – A-365)]

When Mr. Kane and his staff began searching the file cabinets obtained from Mr. Robol, it didn't take long (only a few hours) before they found what Robol said didn't exist: The original inventories of the treasure.  [Henson Aff. ¶ 13 (Appendix Ex. 15) (Appx. pg. A-364)] [Mearns Aff. ¶ 6 (Appendix Ex. 16) (Appx. pgs. A-375 – A-376)]  These inventories were found in Robol's file cabinets not only in hard copy form (totaling hundreds of pages), but also on computer discs containing the original inventory database.  [Henson Aff. ¶ 14 (Appendix Ex. 15) (Appx. pg. A-364)] [Mearns Aff. ¶ 8 (Appx. pg. A-376)]

Notably, these inventories were on oversized "fan-fold" computer paper, with each page measuring 11.5 inches by 15 inches, bound by a hard cover that stated "MASTER COIN AND BAR."  Thus, anyone who performed even a cursory search of Robol's file cabinets – and Robol said they had been searched – would have found them.  In view of their size and volume, it is inconceivable that they could have been overlooked.

Here's the bottom line:  Nine times Robol told this Court and the Court of Appeals that RLP and CX did not have their original inventories.  He and his co-counsel even went so far as to represent that Defendants had searched the West Sixth Avenue office and the inventories were not there.  It was all a bald-faced lie.

Of course, the net effect of Defendants' fraud was exactly what they wanted: KPMG was never able to account for missing treasure because it never received the starting point for such an analysis. That wasted hundreds of thousands of dollars of The Dispatch's money.

## III.   Law And Argument

### A.   Defendants And Their Lawyer Should Be Sanctioned For Their Bad Faith Refusal To Obey Judge Sargus' Inventory Orders And Then Repeatedly Lying About It

"A district court may award sanctions pursuant to its inherent powers when bad faith occurs." First Bank of Marietta v. Hartford Underwriters Ins. Co., 115 F.Supp. 2d 898, 904 (S.D. Ohio 2000) (Marbley, J.), aff'd, 307 F.3d 501 (6th Cir. 2002); Metz v. Unizan Bank, 655 F.3d 485, 489 (6th Cir. 2011).[12]  "A court has '[i]nherent authority to award attorneys fees when a party litigates in bad faith, vexatiously, wantonly, or for oppressive reasons.'"  First Bank, supra, 115 F.Supp. 2d at 905, quoting Big Yank Corp. v. Liberty Mut. Fire Ins. Co., 125 F.3d 308, 313 (6th Cir. 1997).  Examples of bad faith include "withhold[ing] material evidence" that would otherwise be adverse to the litigant's cause, "'delaying or disrupting the litigation,'" and "'hampering enforcement of a court order.'" Metz, supra, 655 F.3d at 489, quoting Chambers v. NASCO, Inc., 501 U.S. 32, 46 (1991).

In this Circuit, imposition of sanctions pursuant to the Court's inherent authority requires proof of three elements:  (1) "the claims advanced were meritless," (2) "counsel knew or should have known that the claims were meritless," and (3) "the claims were . . . [advanced] for an improper purpose" or "in bad faith" or "tantamount to bad faith."  First Bank, supra, 307 F.3d at

---

[12]      The Court's inherent authority to issue sanctions for bad faith actions can be invoked even after a case has gone to judgment.  See, e.g., Red Carpet Studios Division v. Sater, 465 F.3d 642, 644-45 (6th Cir. 2006).  As the court stated in Universal Oil, supra, 328 U.S. at 580:  "The inherent power of a federal court to investigate whether a judgment was obtained by fraud, is beyond question."

519.  <u>Accord</u>:  <u>Metz</u>, <u>supra</u>, 655 F.3d at 489; <u>Big Yank</u>, <u>supra</u>, 125 F.3d at 313.  Each element is satisfied here.

First, Defendants' assertion – that they did not have their original inventories – was meritless.  Receiver Kane found the documents in the companies' own file cabinets.

Second, Robol knew – or he certainly should have known – that his repeated representations to Judge Sargus and the Court of Appeals were false, since the inventories were found in file cabinets in Robol's physical possession – *cabinets that Robol said were searched*.  Bear in mind, we're not talking about one or two pages that might have been overlooked; these inventories totaled hundreds of bound pages on oversized computer paper, with hard covers bearing the label "MASTER COIN AND BAR."  If a search was done – and Robol said it was – they couldn't possibly have been missed.

Third, by definition, "hampering enforcement of a court order" is "tantamount to bad faith."  <u>Chambers</u>, <u>supra</u>, 501 U.S. at 46; <u>Metz</u>, <u>supra</u>, 655 F.3d at 489.  Indeed, Judge Sargus already found, twice, that Defendants acted in bad faith by "sandbagging" enforcement of the Consent Order.  What we didn't know then, but do now, is that Defendants' "sandbagging" was actually an outright fraud on the Court by (1) refusing to obey Judge Sargus' orders to turn over all original inventories, and (2) then repeatedly lying about it.  The only conceivable explanation for Defendants' defiance of Judge Sargus' orders is that Defendants wanted to sabotage the accounting contemplated by the Consent Order – an objective they unquestionably achieved.

**B.**     **Sanctions Should Be Assessed Against The Director-Defendants As Well As Their Lawyer**

Sanctions should be assessed not only against the attorney who voiced Defendants' misrepresentations, but also against the Director-Defendants themselves:  Thompson, Kirk and Ford.  This is for two reasons.

1. **This Court And The Court Of Appeals Already Ruled That The Director-Defendants Are Accountable For Violations Of The Consent Order By Their Companies And Their Lawyer, And This Ruling Is Now Law Of The Case**

As an initial matter, Judge Sargus already found that the Director-Defendants are personally accountable for violations of the Consent Order by their companies and their lawyer, and this finding was explicitly affirmed by the Court of Appeals. It is now law of the case and cannot be relitigated.

Judge Sargus held that the Director-Defendants are personally liable for their companies' violations of the Consent Order because they failed to take any action to cause the companies and their lawyer to comply with the Order. [ECF No. 480 at pgs. 13-14] According to Judge Sargus:

> The record discloses that no formal meetings were held [by the Director-Defendants] to establish methods of locating or obtaining documents subject to disclosure by the Consent Order. No evidence on follow-up of the delivery of documents was presented. No documentation of steps taken to comply with the Consent Order was made part of the record in this case. No officer or employer was designated to comply with requests, as far as the record indicates.
>
> Instead, the record mainly discloses that . . . the accountant for the entities was directed by counsel for RLP and CX [Robol], with no direction from the officers or directors. The directions given the accountant, following a number of forewarnings from this Court, have resulted in several previous findings of contempt, as well as the findings herein. The officers and directors were aware of the prior findings of contempt by this Court, yet took no affirmative steps to comply with the Consent Order.
>
> The Court concludes that the individual directors and officers are also in willful contempt of this Court's prior orders.

> [Id. at pgs. 13-14]

In affirming Judge Sargus' order, the Court of Appeals was equally explicit that the Director-Defendants' "purposeful inaction" rendered them personally accountable for violations of the Consent Order by their lawyer, Robol. [January 20, 2012 Court of Appeals Decision at pg. 29] The Court of Appeals held:

> Defendant Directors argue that . . . a contempt finding [against them] could not be properly based on conduct and inaction of Defendant Entities' counsel, Robol . . . .
>
> The district court . . . concluded that the individual directors and officers were "in willful contempt" of the court's prior orders because (1) the directors had a clear obligation to comply with the Consent Order; (2) they failed to comply; and (3) *the failure resulted from purposeful inaction.* Ample evidence in the record supports each element of the district court's reasoning.
>
> Multiple sources obliged the Directors to comply with the Consent Order. The Order individually lists the Directors as parties and each Director agreed to be bound by its commands. . . .
>
> Under Delaware law, a corporation's board of directors bears ultimate responsibility for managing the business and affairs of a corporation. . . . CX's charter similarly requires that "[a]ll authority [of CX] . . . be exercised by or under the direction of the board acting by or through the chairman of the board." As appellees correctly maintain, "[t]his language admits of no doubt: All authority for CX was vested in the Directors, including authority to comply with the Consent Order." . . .
>
> That the Directors lacked personal knowledge of the records' whereabouts is no excuse. . . . [T[he Directors' ultimate control over the disputed documents cannot seriously be questioned. . . . *[T]he Directors had the ability to, at the very least, monitor . . . Robol and ensure that the Entities complied with the district court's order.* Indeed, the Directors' fiduciary duties under Delaware law required them to oversee the actions of their officers and employees. . . .
>
> That Directors failed to take meaningful steps to ensure compliance with the court order soundly underpins the contempt judgment of the district court here.
>
> [Id. at pgs. 25, 28-32 (emphasis added)]

This ruling – that the Director-Defendants' "purposeful inaction" renders them personally liable for violations of the Consent Order by their lawyer – is now law of the case and cannot be relitigated.

A specialized version of the law-of-the-case doctrine, known as the "mandate rule," applies here. Under the mandate rule, lower courts must "adhere to the commands of a superior court. . . . [U]pon remand of a case for further proceedings after a decision by the appellate court, the trial court must proceed in accordance with the mandate and the law of the case as established on appeal. The trial court must implement both the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces." Brunet v. Columbus, 58 F.3d 251, 254 (6th Cir. 1994), citing U.S. v. Moored, 38 F.3d 1419, 1421 (6th Cir. 1994). Accord: Green v. Nevers, 196 F.3d 627, 632 (6th Cir. 1999) ("the district court could not, on remand, have taken action inconsistent with the judgment of the appellate court").

This Court already held, and the Sixth Circuit has affirmed, that the Director-Defendants' "purposeful inaction" renders them personally liable for their lawyer's violation of the Consent Order. The effect of this "purposeful inaction" is now law of the case and not subject to relitigation. It means that the Director-Defendants are just as personally liable for Robol's latest violation of the Consent Order – his repeated misrepresentations regarding the original inventories – as they were for his other actions that led Defendants to be sanctioned previously.

2. **The Record Before This Court Also Demonstrates The Director-Defendants' Purposeful Inaction And Willful Blindness To Compliance With Judge Sargus' Orders**

In addition to law of the case, the record before this Court amply demonstrates that the Director-Defendants did absolutely nothing to cause their lawyer to comply with Judge Sargus' orders.

For example, the Director-Defendants never established any process or procedure for monitoring the collection and production of documents required by the Consent Order:

> Q. Did the CX directors ever set up a policy or procedure by which the company would report back to the directors as to the status of the production of documents under the Consent Order?
>
> A. No….
>
> Q. Did the CX board ever take any actions to have the company comply with the subsequent orders [of the Court]?
>
> A. We don't have that power. We didn't have the power to do that, no.
>
> > [Kirk Dep. at 37-38, 41 (Appendix Ex. 17) (Appx. pgs. A-388 – A-389)]
>
> Q. Did the board of CX ever appoint anyone to be the responsible person for ensuring compliance with the July 20, 2006 order?
>
> A. Not that I know of.
>
> > [Ford Dep. at 14 (Appendix Ex. 18) (Appx. pg. A-442)]

In fact, the Director-Defendants never even met to discuss whether they were complying with the Consent Order:

> Q. After the Consent Order was entered, did the CX board ever have any meetings to discuss compliance with the Consent Order?

> A. No.
>
> [Turner Dep. at 18-19 (Appendix Ex. 19) (Appx. pg. A-461)]

Nor did they know who was responsible for collecting the documents required by Judge Sargus' orders:

> Q. Who had the documents that were required to be produced under the Consent Order?
>
> A. The company, I presume. I mean the company. . . . I don't know. There you go.
>
> Q. Who did know where the documents were? . . .
>
> A. I don't know. . . .
>
> Q. Who was principally in charge of collecting the documents? . . .
>
> A. I don't know. . . .
>
> Q. Who was acting on behalf of the company to produce the documents and information required by the subsequent orders of the court? . . .
>
> A. I don't know.
>
> [Kirk Dep. at 22-23, 41-42 (Appx. pgs. A-384, A-389)]
>
> Q. And which specific person was responsible for complying with the July 20, 2006 Order on behalf of the defendants?
>
> A. I do not know that – the answer to that question. . . .
>
> Q. Did you ever ask anyone where the company's financial records were located?
>
> A. No.
>
> [Ford Dep. at 14-15 (Appx. pg. A-442)]

In fact, as Kirk and Ford eventually admitted, they did nothing at all to ensure compliance with Judge Sargus' orders:

Q.      After the Consent Order was issued, Mr. Kirk, what actions did you take to comply with the requirements of the Consent Order? . . .

A.      There was nothing that I could do to produce any of these documents. . . . [W]e didn't have the documents. We weren't the company….

Q.      Did you ever take any actions to comply with any of the subsequent orders that the Court entered?

A.      No, other than having read them.

[Kirk Dep. at 21, 41 (Appx. pgs. A-384, A-389)]

Q.      What did you personally do to provide KPMG with full access and opportunity to review documents?

A.      Well, since I don't have any control or contact of these documents and I've never seen the damn things, I could do nothing.

Q.      And did you do anything?

A.      No.

[Ford Dep. at 12 (Appx. pg. A-441)]

Defendant Thompson's testimony was perhaps most troubling of all. Years earlier, Thompson wrote a book titled "*America's Lost Treasure*," in which he described the "meticulous" process by which he and his crew "catalogued" (i.e. inventoried) each item of gold that was brought up from the shipwreck:

When Nemo surfaces with the gold, the collection trays go to the ship's lab. There, team members are able to examine the coins and ingots closely, *catalogue them in detail*, and prepare them for transport back to labs on shore. . . .

Among Nemo's ingenious fittings are divided plastic trays with up to twenty-four compartments that enable the robot to recover artifacts from the shipwreck systematically and efficiently. *To keep track of every object retrieved*, each tray – and each compartment – receives a number. As the robot picks up artifacts

from the shipwreck, *they are given identification numbers and logged into a computer system.* An object's location on the site at the time of recovery is electronically recorded, along with the identification numbers of the tray and compartment holding it. Once the trays are on the *RV Arctic Discover, each artifact is removed from its compartment, tagged with its computer-generated number, catalogued*, and stored in a way appropriate for the material.

> [Thompson, <u>America's Lost Treasure</u> at pgs. 133, 156 (emphasis added) (Appendix Ex. 20) (Appx. pgs. A-483, A-484)]

When confronted with this excerpt from his book, Thompson admitted that he and his crew kept a written inventory of every item of treasure as it was recovered from the shipwreck:

> Q.    Did anyone working for you catalog each object retrieved from the *S.S. Central America*? . . .
>
> A.    *Yes, of course.*
>
> > [Thompson Dep. at 58 (emphasis added) (Appendix Ex. 21) (Appx. pg. A-500)]

But then, when asked where this inventory was, Thompson claimed that he didn't know. Even more incredulously, he admitted that after the Consent Order was entered, he never bothered to look for the inventory or ask anyone else to:

> Q.    What happened to the list of recovered items prepared at the time of the recovery? . . .
>
> A.    I don't know. . . .
>
> Q.    Who, if anyone, was responsible for keeping the list of recovered items that was made in the late 1980s.
>
> A.    I don't know. . . .
>
> Q.    *In connection with this case, did you ask anyone specifically to look for the list or lists of recovered items*

> *prepared on the ship in the late 1980s? . . . Did you ask anyone to look for those specific items, yes or no?*

A.      *I didn't ask.*

Q.      *Why didn't you ask someone, specifically, to look for the list or lists of recovered items that was prepared on the ship in the late 1980s? Why didn't you do that?*

A.      *I was trying to run the organization and was very busy. . . .*

Q.      *Because you were busy doing other things . . . Is that your testimony, sir?*

A.      Yes.

> [Thompson Dep. at 62-63, 73-74 (emphasis added) (Appx. pgs. A-501, A-503 – A-504)]

Thompson was RLP's general partner and CX's chairman. He knew that detailed inventories of each piece of treasure were prepared when the treasure was recovered. Yet, despite Judge Sargus' repeated orders to find and produce these original inventories, Thompson never looked for them, nor did he even bother to ask anyone else to look for them. Because, as he said, he was too busy doing other things.

This record more than justifies assessment of sanctions against the Director-Defendants themselves. As the Sixth Circuit explained when it affirmed the prior contempt judgment, corporate directors such as Thompson, Kirk and Ford are responsible for their corporation's compliance with court orders, and thus can be sanctioned personally, if they fail to take appropriate action to ensure that the corporation complies:

> *"A command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience and may be punished for contempt." . . .*

[January 20, 2012 Court of Appeals Decision at
pgs. 28-29, quoting <u>Wilson v. United States</u>,
221 U.S. 361, 376 (1911) (emphasis added)]

<u>Accord</u>: <u>Elec. Workers Pension Trust Fund v. Gary's Elec. Serv. Co.</u>, 340 F.3d 373, 382-83 (6th Cir. 2003) ("[I]f a corporate officer avoids a court's order to the corporation by failing to take action or attempt compliance, 'they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt.'").

So too here, the Director-Defendants were responsible to oversee their lawyer, Robol, but they did nothing. One would think that after Judge Sargus' first contempt finding, and especially after his "word to the wise," the Director-Defendants would have been especially vigilant to monitor their companies' compliance with the Court's orders by finding out who was searching for the inventories and what this person discovered. But these Defendants did nothing; they didn't even bother to verify the accuracy of Robol's representations that the original inventories did not exist. Their purposeful inaction and willful blindness to Judge Sargus' orders is no defense. The Director-Defendants, along with their lawyer, should be sanctioned.

C.      **The Dispatch Should Be Awarded Sanctions Against Defendants And Their Counsel Equal To The Entire Costs Of These Proceedings**

Where, as here, a litigant's bad faith rises to the level of a fraud on the court, "the entire costs of the proceedings" can be assessed as a sanction:

> No doubt, if the court finds after a proper hearing *that fraud has been practiced upon it*, or that the very temple of justice has been defiled, *the entire costs of the proceedings could justly be assessed against the guilty parties*. Such is precisely the situation where "for dominating reasons of justice" a court may assess counsel fees as part of the taxable costs.

[<u>Universal Oil</u>, <u>supra</u>, 328 U.S.
at 580 (emphasis added)]

28

Accord:  Chambers, supra, 501 U.S. at 47 ("[I]f a court finds 'that fraud has been practiced upon it, or that the very temple of justice has been defiled,' it may assess attorneys fees against the responsible party.").

Without question, Defendants' actions in the instant case rise to the level of a fraud on the court.  In this Circuit, fraud on the court has five elements:  (1) conduct on the part of an officer of the court, (2) that is directed to the judicial machinery itself, (3) is intentionally false, willfully blind to the truth, or is in reckless disregard of the truth, (4) is a positive averment or a concealment where one is under a duty to disclose, and (5) deceives the court.  Demjanjuk v. Petrovsky, 10 F.3d 338, 348 (6th Cir. 1992).  See also General Medicine, P.C. v. Horizon/CMS Health Care Corp., 475 Fed. Appx. 65, 72 (6th Cir. 2012) (fraud on the court can be predicated on reckless disregard for the truth, when "the actor has . . . knowledge, or reason to know, of the facts," but fails to take reasonable action to ascertain the truth).  Each element exists here.

First, the conduct in question – Robol's repeated misrepresentations regarding the original inventories – was by an officer of the court, inasmuch as a lawyer admitted to the bar of this Court is deemed to be one of its officers.

Second, Robol's misrepresentations were directed to the judicial machinery itself.  "A party commits a fraud on the court when the falsehood mires the 'judicial machinery' such that it 'cannot perform in the usual manner its impartial task of judging cases.'" Ocon v. Equinamics Corp., 2009 WL 405370 at *1 (11th Cir. 2009), quoting Travelers Indemn. Corp. v. Gore, 761 F.2d 1549, 1551 (11th Cir. 1985).  That's precisely what happened here.  By refusing to obey Judge Sargus' orders to turn over all original inventories, and then repeatedly lying to the Court about it, Defendants effectively prevented the judicial machinery – specifically, the Consent

Order – from achieving the objectives for which it was entered. To put it in the words of Chambers, supra, Defendants "hamper[ed] enforcement of a court order."

Third, at the very least, this case involves willful blindness to the truth and reckless disregard for it, inasmuch as the inventories in question were found within the physical possession of the very lawyer who repeatedly represented that they did not exist. Indeed, as noted previously, Robol said his files had been searched; if this was true, then these inventories could not possibly have been missed, in view of their oversized nature and the "MASTER" label on their covers. And, in view of the Director-Defendants' purposeful inaction, they were, at minimum, willfully blind to the true facts regarding these inventories.

Fourth, this case involves both concealment where there was a duty to disclose – mainly, Defendants' failure to disclose and produce their original inventories after being repeatedly ordered by Judge Sargus to do so – as well as a positive averment – Robol's repeated misrepresentations that Defendants supposedly did not have the original inventories.

Finally, Defendants' concealments and misrepresentations undoubtedly deceived the Court. At Defendants' request, Judge Sargus granted them an "order of satisfaction" as to all matters arising under the Consent Order except for the specific issues on which he found them in contempt. In view of the Court's repeated prior orders to produce the original inventories, Judge Sargus clearly would not have granted this order of satisfaction if he had known that the original inventories did, in fact, exist, in Robol's possession, while this same lawyer was telling the Court they did not exist.

Under these circumstances, the appropriate sanction should equal the entire cost of these proceedings. Admittedly, such a sanction is not common, but it has been done where the fraud on the court is comparable to what occurred here. For example, in Eppes v. Snowden, 656

F.Supp. 1267 (E.D. Ky. 1986), defendant sought to support his counterclaim with falsified, backdated documents, and then lied about the documents to cover up his fraud. As a sanction, the court awarded the entire cost incurred by plaintiff to defend the counterclaim:

> The remedy must serve as a deterrent to the defendant and all others that might be similarly tempted to manufacture documentary evidence and attempt to cover it up with perjured testimony. The remedy must be sufficient to serve universal notice that this conduct will not be tolerated. . . . The remedy must reflect the court's zealous concern for the integrity – the absolute and unquestioned integrity – of its orderly procedures. . . .

> The remedy must assure all those who seek the resolution of their disputes in this court . . . that this ill-conceived and poorly executed enterprise shall not be repeated.

> *To award plaintiff's costs, expenses and attorney fees incurred to defend the entire action would seem to be an appropriate sanction in response to the theatrics we have witnessed here.* This sum while substantial is fully justified in the court's mind.

> [Id. at 1281 (emphasis added)]

Accord: United States ex rel. Scott v. Metro. Health Corp., 2005 WL 3434830 at *6-7 (W. D. Mich. 2005) (where plaintiff withheld material evidence that would have disclosed her case to be frivolous, the court awarded defendant all of its defense costs).

So too here, the egregiousness of Defendants' fraud on this Court cries out for the remedy authorized by Universal Oil, supra, 328 U.S. at 580: "*[T]he entire costs of the proceedings could justly be assessed against the guilty parties.*" To date, The Dispatch's cost of these proceedings has been $1,717,388. [Ferrell Aff. ¶ 8 (Appendix Ex. 22) (Appx. pg. A-526)][13] The Dispatch

---

[13] This does not include the attorney fees and costs incurred by The Dispatch in connection with the two Delaware bankruptcy filings, nor the amounts of the two prior sanction awards. [Ferrell Aff. ¶ 5 (Appendix Ex. 22) (Appx. pg. A-525)] [Lindsmith Aff. (Appendix Ex. 23) (Appx. pgs. A-939 – A-944)]

respectfully submits that this entire amount should be assessed against Defendants pursuant to the Court's inherent power to sanction Defendants for their misrepresentations.

**D.** **In The Alternative, The Court Should Assess Sanctions Against Defendants And Their Counsel In The Amount Of The Cost Of The Receivership Proceedings**

Alternatively, if the Court chooses not to award the entire cost of these proceedings, The Dispatch respectfully submits that the sanctions should at least be equal to the $325,613 that The Dispatch incurred to successfully prosecute the receivership. See, e.g., Laukus v. RIL Brands, Inc., 2013 WL 978215 at *21-22, 28 (N.D. Ohio 2013) (where plaintiff's counsel withheld a critical piece of evidence, thereby causing defendant to incur substantial additional litigation expenses that otherwise would have been avoided, the court awarded defendant all such expenses as a sanction for plaintiff's fraud). But for The Dispatch's persistence in pursuing the receivership, Defendants would have gotten away with their fraud. So, at minimum, The Dispatch should be awarded its costs to prosecute the receivership and thereby unearth the truth.

Respectfully submitted,

/s/ Steven W. Tigges
Steven W. Tigges, Trial Attorney (0019288)
John W. Zeiger (0010707)
Bradley T. Ferrell (0070965)
ZEIGER, TIGGES & LITTLE LLP
41 South High Street, Suite 3500
Columbus, Ohio 43215
Telephone: (614) 365-9900
Facsimile: (614) 365-7900

Attorneys for Plaintiff
The Dispatch Printing Company

## CERTIFICATE OF SERVICE

A copy of the foregoing was filed electronically this 16th day of October, 2013.  Notice of this filing and a copy of the pleading will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


/s/ Steven W. Tigges
Steven W. Tigges (0019288)


157-169:462155