IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

MICHAEL WILLIAMSON, *et al.*,      :

                      :       Case No. 2:06-CV-00292

      **Plaintiffs,**      :

                      :       **JUDGE ALGENON L. MARBLEY**

      **v.**                :

                      :       **Magistrate Judge Kemp**

**RECOVERY LIMITED**      :
**PARTNERSHIP, *et al.*,**      :

                      :

      **Defendants.**      :

## OPINION & ORDER

### I.      INTRODUCTION

This matter is before the Court on Plaintiff Dispatch Printing Company's ("DPC")

Motion for Sanctions against Attorney Richard Robol.[1]  (Doc. 871, Doc. 888).  DPC alleges that

Robol acted in bad faith in repeatedly failing to produce the original inventories of gold

necessary for DPC to conduct an accounting of the finances of Defendants Columbus

Exploration, LLC ("CX") and Recovery Limited Partnership ("RLP"), in violation of the Court's

Consent Order (Doc. 84).  Robol counters that sanctions are warranted, if at all, only under Fed.

R. Civ. P. 37, and not the Court's inherent powers.  He also contends that DPC cannot prove a

fraud on the Court, and that the Court's Order of Satisfaction (Doc. 480) bars DPC's Motion.

For the reasons set forth herein, DPC's Motions are hereby **GRANTED IN PART**.

---

[1] DPC's Motion originally also sought sanctions against Defendants Thomas Thompson, Gilman Kirk, and Michael Ford.  In light of Defendant Thompson's disappearance, the Court held DPC's Motion in abeyance with regard to Thompson until such time as he should appear before this Court.  (Doc. 887 at 4).  In addition, before the Hearing on the Motion, DPC and Defendants Kirk and Ford reached a resolution with regard to this Motion. *See infra*, p. 8.

## II.     STATEMENT OF FACTS

The facts giving rise to this action are detailed in a number of this Court's Opinions, as well as those of the Court of Appeals.  (*See, e.g.*, Doc. 870).  The Court need not repeat itself here.  The facts relevant for this Motion, however, implicate this matter's procedural history.

This litigation commenced in 2005, when DPC filed two cases in Franklin County Common Pleas Court against CX, RLP, and the individual Defendants, for breach of fiduciary duty and an accounting.  (Case Nos. 05-CV-4220, 05-CV-11795, Franklin Cnty. Ct. of Com. Pl.).  In 2006, after these cases were consolidated with the Williamson Plaintiffs' admiralty case (Case No. 06-CV-4469), Defendants removed all three cases to this Court.  (Doc. 2).

On July 20, 2006, in an attempt to resolve DPC's claims for an accounting, the Court entered the Consent Order that is the foundation of the current Motion.  (Doc. 84).  Under the Consent Order, the Court ordered Defendants to provide DPC's forensic accountant with "full access and opportunity to review" all documents and materials "regarding the period from January 1, 2000 through the date of entry of this Order, identified in the July 11, 2006 list by [the] Accountant," for the purposes of preparing a report of the financial affairs and condition of CX and RLP.  (*Id.* at 3).  In addition, the Court ordered Defendants to "make available to the Accountant upon request" all documents related to paragraph 25 of the Accountant's letter, regardless of their date.  (*Id.* at 4).  Furthermore, all such documents identified in the July 11, 2006 list by the Accountant were to be produced to the Accountant.  (*Id.*).[2]

Defendants have twice been held in contempt for violations of the Consent Order.  (*See* Doc. 145, 480).  The first time, on December 5, 2006, the Court found "a total lack of good faith" on the part of CX and RLP.  (Doc. 145 at 4).  The Court expressed skepticism "that such

---

[2] On March 11, 2009, the Court remanded the DPC cases to Franklin County Court of Common Pleas, but retained "continuing jurisdiction to administer and enforce [the] terms [of the Consent Order]."  (Doc. 469 at 21).

critically important documents" related to the inventory and sale of the gold at issue could not be located.  (*Id.*).  At that time, however, the Court "reserve[d] for a later date sanctions or other remedies with regard to such violations."  (*Id.* at 8).  Almost three years later, on September 30, 2009, the Court had occasion to answer those questions, when it again found Defendants in contempt of the Consent Order.  (Doc. 480).  The Court sanctioned not only CX and RLP, but also the Director Defendants, finding that the individual Defendants "sandbagged" the accounting "through a variety of means," extending the process and causing "significant delay and expense."  (Doc. 480 at 15).  Defendants appealed this Order sanctioning them, and, on January 20, 2012, the Court of Appeals affirmed.  (Doc. 694).[3]

In its Contempt Orders, this Court directed Defendants to produce the inventories of the gold recovered.  As the Court has emphasized, the original "inventory of gold" is "critical to the undertaking the Court contemplated in the Consent Decree."  (*Nov. 28, 2006 Tr.*, Doc. 150 at 144).  Thus, in its December 5, 2006 Order, this Court ordered that "Defendants shall tender to the Plaintiffs' accountant an inventory of the gold."  (Doc. 145 at 8).

In response to the Court's December 5, 2006 Order, Defendants provided DPC's forensic accountant, KPMG, with an inventory of the gold sold to California Gold Marketing Group, LLC, in 2000.  (*Supp. Aff. of Stephen Alexander*, Doc. 149).  On April 22, 2007, Defendants submitted a "certification," in which they asserted that this inventory was the only one they possessed.  (*DPC Mot. for Sanctions Ex. 1*, Doc. 872-1 at 1).  Attorney Robol repeated this assertion before this Court.  (*Apr. 24, 2007 Tr.*, Doc. 208 at 49-50).

Nevertheless, the Court ordered that Defendants turn over "anything that could be construed as an inventory of any kind regarding assets recovered from the shipwreck that would

---

[3] The Court of Appeals denied rehearing and rehearing *en banc*.  (Doc. 699).  The United States Supreme Court denied *certiorari* on October 15, 2012.  *Columbus Exploration, L.L.C. v. Williamson*, 133 S. Ct. 478 (2012).

have been sold during the relevant time of this audit or review." (*Id.* at 56). In response, on June 4, 2007, Defendants submitted another "certification," disclosing that there existed another inventory, referred to as the "Holabird Inventory," which had been commissioned by the Eastern District of Virginia in 1997, during the earlier litigation that took place in that court. (*See DPC Mot. for Sanctions Ex. 2*, Doc. 872-1 at 3).

On August 15, 2007, before receiving the Holabird Inventory, KPMG issued its report (*see* Doc. 233), in which it stated that it was unable to account for all of the recovered treasure. (*See Defs.' Objs. to Aug. 15, 2007 KPMG Document*, Doc. 242 at 16) (quoting the KPMG Document that "[s]ince no inventory of the Up Treasure has been provided as of the date of this report, we cannot verify the items comprising the Up Treasure at the time of recovery.").

This Court convened another hearing on September 7, 2007, at which the Court again expressed its concern that no successful accounting could be accomplished without an inventory of the gold found. (*Sept. 7, 2007 Tr.*, Doc. 245 at 5). Attorney Robol once more represented that Defendants had "provided the inventory that the company had." (*Id.* at 18, 30). The Court ordered Defendants to obtain the Holabird Inventory from the Eastern District of Virginia, which was finally provided to KPMG in October 2008. (*See* Doc. 365 at 31-32).

Attorney Robol made several other representations to the Court that Defendants had turned over "the only" or "the one and only" "inventory that the company had," including in a filing to the Court on December 3, 2008 (Doc. 370 at 20, 26, 30), at a hearing on December 8, 2008 (*Dec. 8, 2008 Tr.*, Doc. 405 at 60), as well as in a brief to the Court of Appeals (*Defs.' Br.*, Case No. 09-4255, filed March 19, 2010, at 24) and a reply brief in support of the same (*Defs.' Reply*, Case No. 09-4255, filed June 1, 2010, at 9).

4

In its September 30, 2009 Order, this Court reiterated its opinion that the inventory of the recovered treasure is "of critical importance in the accounting process," without which "an analysis of the business' financial status [would be] impossible to prepare." (Doc. 480 at 9). This Court found that Defendants "willfully violated the Consent Order . . . by failing to timely deliver to KPMG documents described in Paragraph 2 of the Order," and that this violation "added significant cost and delay in completing the audit." (*Id.* at 12).

As part of its case, DPC also sought the appointment of a Receiver for CX and RLP, in order to "take control of RLP and CX, dissolve them and liquidate their assets, and wind up their affairs." (Doc. 391 at 8). DPC's request was originally filed in this Court on December 23, 2008; when the bulk of this case was remanded to state court, however, the receivership motion was remanded as well. (*See* Doc. 469 at 6). On March 21, 2012, Franklin County Common Pleas Judge Patrick Sheeran held a hearing on DPC's Motion, but was interrupted by Defendant CX's filing of a bankruptcy petition in the District of Delaware. (*See* Case No.12-10980, D. Del. Bankr. Ct.). CX later dismissed this petition (*id.*, Order dated May 9, 2012), and the receivership motion reconvened in state court. In February 2013, the proceedings were again interrupted by the filing of an involuntary bankruptcy petition by Attorney Robol and four other creditors of CX. (*See* Case No. 13-10347, D. Del. Bankr. Ct.).

On May 20, 2013, however, the bankruptcy court granted relief from the stay (*id.*, Order dated May 20, 2013), and three days later Judge Sheeran issued his order granting DPC's receivership motion. (Case Nos. 05-CV-4220, 05-CV-11795, 06-CV-4469, Franklin Cnty. Ct. of Com. Pl., Order dated May 23, 2013). Judge Sheeran appointed Ira Kane as the receiver for CX and RLP on June 14, 2013. (*Id.*, Order dated June 14, 2013). On June 25, 2013, the bankruptcy

court clarified its order, allowing the receivership to proceed fully with his plan. (Case No. 13-10347, D. Del. Bankr. Ct., *June 25, 2013 Tr.* at 6-10).

To discharge his obligation to collect CX and RLP's assets and organize the companies, on July 15, 2013, the Receiver served notice on all of the companies' attorneys to turn over all company files and other property in their possession. (*Aff. of James Henson*, Doc. 872-1 at 362, ¶4; *id.*, Ex. 1, Doc. 872-1 at 366-69). The Receiver recovered 36 file cabinets of CX and RLP records, which were stored at property owned by Attorney Robol. (*Id.* at 363-64, ¶¶ 8, 9, 15). The Receiver retrieved these file cabinets between July 25 and August 1, 2013. (*Id.*, ¶¶ 11, 15).

According to DPC, within "a few hours" of searching the cabinets, the Receiver discovered the original inventories of the treasure. (*Id.*, ¶ 13; *Aff. of David Mearns*, Doc. 872-1 at 375-76, ¶ 6). The inventories were found on hundreds of 11.5-inch by 15-inch "fan-fold" computer paper, bound by hard cover and labeled "MASTER COIN AND BAR." (*2/25/14 Hr'g. Tr.*, Doc. 290 at 26-27; *see also* Doc. 872-1 at 372-73). The inventories were also found on computer discs. (*Id.* at 15, 28-29; *Mearns Aff.*, Doc. 872-1 at 376 ¶ 8).

In its Supplemental Motion for Sanctions, DPC further alleges that the Receiver was also able to uncover a second category of documents that the Defendants and Attorney Robol denied having in their possession. (Doc. 888 at 3-8). At several points during this litigation, Robol represented to this Court that Defendants did not have documents reporting the "downstream" sales of the gold sold to California Gold Marketing Group, in which RLP maintained a 25% profit participation. Robol denied that Defendants had any documents relating to these sales at a hearing on April 24, 2007 (*Apr. 24, 2007 Tr.*, Doc. 208 at 39-41); on September 7, 2007 (*Sept. 7, 2007 Tr.*, Doc. 245 at 31-33); and on December 8, 2008 (*Dec. 8, 2008 Tr.*, Doc. 405 at 64-65).

6

After taking possession of Defendants' files, however, the Receiver uncovered multiple

documents detailing this information. (*Aff. of Allison McMillin*, Doc. 888-3, ¶¶ 4-5 & attachs.).

### III.    PROCEDURAL POSTURE

DPC filed its Motion for Sanctions on October 16, 2013. (Doc. 871, 872). DPC also

moved for a Scheduling Conference (Doc. 873), which the Court conducted on November 14,

2013. (*See Nov. 14, 2013 Tr.*, Doc. 890). In its resulting Order, the Court directed that the

Motion for Sanctions would be bifurcated, with the matter going forward as to Defendants Kirk

and Ford, as well as Attorney Robol, and the Motion as against Defendant Thompson to be "held

in abeyance until such time as [he] appears before this Court." (Doc. 887 at 4). DPC filed its

Supplemental Motion for Sanctions on November 20 (Doc. 888); this Motion was also bifurcated

and held in abeyance with respect to Thompson (Doc. 892).

On November 27, 2013, with the Court's permission, Attorney Robol filed a Motion to

Dismiss the Motion for Sanctions as to him. (Doc. 893). This matter was fully briefed (*see* Doc.

895, 901), and on January 14, 2014, the Court issued its Order denying Robol's Motion (Doc.

906). The Court found, first, that Robol's arguments relating to the "plausibility" of the

allegations against him went to the merits of the Motion for Sanctions, and were properly

considered as part of the evidentiary hearing on the Motion. (*Id.* at 4). The Court then rejected

Robol's argument that his status as a non-party, and as an individual that had never personally

been the subject of the Court's Orders, precluded liability for the alleged bad faith actions and

fraud on the Court. (*Id.* at 4-8). The Court further concluded that Robol's liability, insofar as

whether he fulfilled his obligation to deal with the Court in good faith, was not derivative of his

clients, and would be settled on the merits after the evidentiary hearing. (*Id.* at 9-10).

Defendants Kirk and Ford timely filed their Response in Opposition to the Motion for Sanctions on January 13, 2014 (Doc. 904) and Attorney Robol filed his the next day (Doc. 907). DPC replied in support of its Motion on January 21, 2014.  (Doc. 908).

During this period of briefing, DPC also filed a Motion to Vacate the Order of Satisfaction.  (Doc. 902).  This Court entered the Order of Satisfaction on September 30, 2009, when it found that Defendants had complied with the Consent Order in all respects, other than those with regard to which the Court held them in contempt.  (Doc. 480 at 16).  DPC's Motion argues that because the Order of Satisfaction was obtained via fraud, it is therefore invalid, and the Court should vacate it.  DPC adds, however, that the Court need not vacate the Order of Satisfaction immediately, since if the Court will have found sanctionable fraud after the evidentiary hearing on the Motion for Sanctions, it could vacate the Order at that time.  (*Id.* at 2). Defendants responded on January 13, 2014, arguing, as more fully articulated in their Response to the Motion for Sanctions, *see infra*, that because DPC failed to demonstrate a fraud on the Court, any violation is at most sanctionable under Fed. R. Civ. P. 37.  (Doc. 905 at 2).  Thus, they conclude that there are no grounds to vacate the Order under Fed. R. Civ. P. 60(d)(3).  (*Id.*).

In its January 14, 2014 Order, the Court reasoned that its decision whether to vacate the Order of Satisfaction necessarily involved factual questions raised by the Motion for Sanctions. (Doc. 906 at 4).  Accordingly, the Court reserved judgment as to the DPC's Motion to Vacate the Order of Satisfaction, and that Motion remains pending.  (*Id.*).

On February 20, 2014, the Parties informed the Court that DPC had reached an agreement with Defendants Kirk and Ford.  Accordingly, DPC withdrew its Motion as against both Defendants.  In the absence of Defendant Thompson, therefore, DPC pursues its Motion only against Attorney Robol.

### IV.    LAW AND ANALYSIS
#### A.  Arguments of the Parties
##### 1.  DPC's Position

DPC asks the Court to sanction Attorney Robol under its inherent powers, on the grounds that he acted in bad faith.  (Doc. 871 at 23).  Specifically, DPC argues that in order to impose sanctions under the Court's inherent powers, it must show three elements:  (1) that the claims advanced were "meritless"; (2) that "counsel knew or should have known that the claims were meritless"; and (3) that "the claims were . . . [advanced] for an improper purpose," in "bad faith," or "tantamount to bad faith."  *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 115 F. Supp. 2d 898, 904 (S.D. Ohio 2000), *aff'd*, 307 F.3d 501 (6th Cir. 2002); *see also Metz v. Unizan Bank*, 655 F.3d 485, 489 (6th Cir. 2011).

DPC argues that all three elements are satisfied here, because the claim that Defendants did not have the original inventories was meritless, because Robol knew or should have known that his representations were false, given the location of the files and the ease with which they were discovered, and because, by definition, according to DPC, "hampering enforcement of a court order" is "tantamount to bad faith."  (Doc. 871 at 24) (citing *Metz*, 655 F.3d at 489).  Indeed, DPC further argues that Robol has perpetrated an "outright fraud" on the Court by refusing to obey the Court's Orders, and "repeatedly lying" about Defendants' possession of the original inventories.  (Doc. 871 at 24).

Lastly, DPC argues that the appropriate sanction for conduct alleged here is an award for the entire cost of these proceedings – that is, $1,717,388.  DPC insists that the Robol's conduct has risen to the level of a fraud upon the Court, because it was:  (1) conduct by an officer of the Court; (2) directed at the judicial machinery itself; (3) intentionally false and/or willfully blind to the truth; (4) made in a positive averment or concealment while under a duty to disclose; and (5)

9

operated to deceive the Court. (Doc. 871 at 34) (citing *Demjanjuk v. Petrovsky*, 10 F.3d 338, 348 (6th Cir. 1992)). In such cases, DPC concludes, the entire costs of the proceedings should be assessed against the guilty party. (*Id.* at 36). In the alternative, DPC asks instead for the costs expended in having the Receiver appointed, since it was the Receiver that uncovered the alleged fraud – that is, $325,613. (*Id.* at 37).

### 2. Attorney Robol's Position

Attorney Robol admits that the recently discovered inventories and sales reports "are among [the] documents that should have been produced pursuant to the Consent Order." (Doc. 907 at 3). He objects, however, to the sanctions requested by DPC.

Robol first argues that he did nothing improper, because he relied, reasonably, on representations from his client, Defendant Thompson. Robol asserts that although an attorney must make "a reasonable inquiry" and "participate[] in and oversee[] the collection process" during discovery, an attorney may still "rely on their clients to gather responsive documents." *In re Porsche Cars N. Am., Inc.*, No. 2:11-MD-2233, 2012 WL 4361430, at *8 (S.D. Ohio Sept. 25, 2012). Robol points to the Advisory Committee's Note to the 1983 Amendments to Fed. R. Civ. P. 26, where the Committee explained that counsel's duty to make a "reasonable inquiry" is satisfied when the attorney relies on the assertions of his client, "as long as that reliance is appropriate under the circumstances." The Committee concluded that as long as a lawyer "has made a reasonable effort to assure that the client has provided all the information and documents available to him that are responsive to the discovery demand," he is in compliance with the Rule. *Id.* Robol argues that his conduct has been in accordance with this guidance.

Robol adds that newly-discovered documents are not "material to the recovery analysis." (Doc. 907 at 3). He claims that neither DPC nor the Receiver (which, he adds, is obligated to maximize the recovery for CX and RLP) have claimed otherwise. (*Id.*). And he insists that the

extreme sanctions sought by DPC are out of proportion with the harm, if any, caused by the failure to produce the documents. (*Id.* at 1-2 & n.2).

Robol further argues that, although the Court *can* use its inherent powers to sanction, it ought to employ the mechanisms of the Federal Rules when available. (*Id.* at 7-9). Robol notes that the Court's previous Contempt Orders directed Defendants to produce the missing inventories, and sanctioned them for failing to do so. (*See* Doc. 145 at 8; Doc. 358 at 1). Failure to produce documents and/or to obey a court order during discovery is typically enforced via Rule 37, and for this reason Robol argues that this is *not* the sort of case where the Federal Rules are "[not] up to the task" because "the bad-faith conduct . . . was beyond the reach of the Rules." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50-51 (1991). Rather, he argues that unlike the situation in *Chambers*, the use of the Court's inherent powers in this case would be "invoke[ing] that power to ease the burden of satisfying the existing Civil Rules," such as "to punish practices exempted by a Rule or that fall short of meeting a Rule's standard for sanctionable conduct," which is an abuse of the Court's discretion to deploy its inherent powers. *United States v. Aleo*, 681 F.3d 290, 307 (6th Cir. 2012) (Sutton, J., concurring). Robol concludes that because Rule 37 governs, and because Plaintiff has failed to show any damages, as required under Fed. R. Civ. P. 37(b)(2)(C), the Motion must be denied. (Doc. 907 at 9-10).

Robol also asserts that, in fact, no fraud on the Court has been committed – at most, he contends, Defendants violated a duty to produce documents, conduct sanctionable under Fed. R. Civ. P. 37, but not of the nature of "the most egregious conduct" that would rise to the level of fraud on the Court. (Doc. 907 at 10). Robol insists that "fraud on the court" typically involves "a corruption of the judicial process itself," *Gen. Med., P.C. v. Horizon/CMS Health Care Corp.*, 475 F. App'x 65, 71 (6th Cir. 2012) (citing 11 Charles Alan Wright *et al.*, FEDERAL PRACTICE &

PROCEDURE § 2870 (West 2011)). While Robol agrees with the five-part test set forth by DPC, he maintains that this test is normally satisfied only by acts of an "extraordinary nature," such as bribery of a judge, forgery of documents, or systematic destruction of evidence. (Doc. 907 at 11) (collecting cases). Because DPC's claim is based solely on Robol's alleged misrepresentations to the Court – in the making of which, he asserts, he relied on sworn certifications by Defendant Thompson – the elements of fraud cannot be satisfied as a matter of law. (*Id.*).

Robol in addition argues that the Motion for Sanctions is barred by the Court's Order of Satisfaction (Doc. 480). He contends that because he reasonably relied on Thompson's statements, DPC cannot prove a fraud on the Court as a matter of law. Without fraud, the Court is without a basis under Fed. R. Civ. P. 60(d)(3) to vacate the Order of Satisfaction; if the Order remains in effect, DPC's Motion is barred. (Doc. 907 at 12).

Finally, Robol asserts in his attached affidavit that his conduct in this case has been in fact appropriate under the Federal Rules and his professional obligations to this Court. Robol admits that the property in which the files were uncovered by the Receiver was conveyed to him by his clients as a way to pay their legal bills. (*Aff. of Richard Robol*, Doc. 907-1, ¶¶ 7-8). He maintains, however, that he leased the property back to CX and RLP, and that the personal property kept there was "under the effective control of the client, subject [only] to [Robol's] right as lessor to conduct reasonable inspections to prevent damage to the property, etc." (*Id.*, ¶ 8). Even after Robol moved his law practice to this property, he insists that he preserved a strict separation between his offices and his clients' rented space, and that he was unaware of the documents kept at that location by his clients. (*Id.*, ¶¶ 24-26). Robol further alleges that throughout his representation, he repeatedly emphasized to Defendant Thompson the importance of his responding to Court Orders and requests for documents, and cautioned him to ensure full

12

compliance at all times. (*Id.*, ¶¶ 15-21). Robol concludes that he relied upon, and believed, Thompson's assurances that all responsive documents had been provided, "to the best of the clients' ability." (*Id.*, ¶ 22).

### B. The Court's Inherent Power to Sanction

A district court may invoke its inherent powers to sanction a litigant, or a lawyer, "when bad faith occurs." *First Bank of Marietta*, 115 F. Supp. 2d at 904. When a party litigates "in bad faith, vexatiously, wantonly, or for oppressive reasons," or when the conduct is "tantamount to bad faith," *Metz*, 655 F.3d at 489, the Court may resort to its inherent authority in order to "manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases," *Chambers*, 501 U.S. at 43 (quotation omitted). That ability is not without limits, and the Court must "exercise caution in invoking its inherent power" in order to "comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees." *Id.* at 50 (citation omitted).

But while a court "ordinarily should rely on the Rules rather than its inherent power," the Court may still invoke its inherent powers if "the Rules are not up to the task." *Chambers*, 501 U.S. at 50. As the Court of Appeals has explained, a district court can still "resort to its inherent authority to sanction bad-faith conduct, even if the court has not expressly considered whether such conduct could be sanctioned under all potentially applicable rules or statutes." *Metz*, 655 F.3d at 491 (internal quotations omitted). Indeed, the Court's inherent power is "an independent basis for sanctioning bad conduct in litigation," *First Bank of Marietta*, 307 F.3d at 511, and it is not the case that "a federal court [is] forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under [a] statute or the Rules." *Chambers*, 501 U.S. at 50. This is particularly true when the Rules "do[] not directly cover" the alleged misconduct, *Metz*, 655 F.3d at 491, or when the wrongful conduct addressed

13

by the Rules is also "intertwined with bad-faith conduct beyond the reach of the Rules that only the inherent power could address." *Aleo*, 681 F.3d at 310 (Sutton, J., concurring) (internal quotation omitted). In such cases, the Court is not required to "separate out the conduct forbidden by the Rules from conduct sanctionable only through the inherent power." *Id.*

For these reasons, this Court denied Attorney Robol's Motion to Dismiss the Sanctions Motion (*see* Doc. 906). For the same reasons, the Court is not limited to remedies of the Rules in addressing the misconduct alleged in these Motions, if the Rules are not "up to the task," or if the conduct addressed by the Rules is "intertwined" with bad-faith conduct beyond their reach.

Critically, the Court must assess whether the misconduct alleged here falls within the ambit of Rule 37, as Attorney Robol maintains. If so, the Court may not use its inherent powers "sidestep" the procedures and limits set by Congress and the Federal Rules. *Aleo*, 681 F.3d at 310 (Sutton, J., concurring).

DPC's Motion for Sanctions arises out of the Court's July 20, 2006 Consent Order (Doc. 84).[4] The Consent Order resolved DPC's claims against Defendants "for injunction to compel production of financial and business records of CX and RLP, and for accounting of the companies' financial affairs." (*Id.* at 3). The Court further ordered that Defendants should "provide Plaintiffs' accountant . . . with full access and opportunity to review the documents at materials [at issue] . . . for the purposes of preparing a report . . . of the financial affairs and condition of CX and RLP." (*Id.* at 3-4). Defendants were also ordered to "make available" all documents requested by DPC's accountant, and to produce to the accountant "[a]ll documents and materials identified" in the accountants July 11, 2006 list. (*Id.* at 4).

---

[4] That DPC must ground its Motion in the Consent Order is clear, since this Court has retained jurisdiction over DPC's cases only "under the terms of the Consent Order as to all outstanding matters governing the audit and settlement agreement between the Dispatch Plaintiffs and Defendants." (Doc. 469 at 22).

The Consent Order was entered in partial resolution of the claims brought by DPC in its original state-court Complaint. There, DPC sought "[a] complete accounting of the finances" of both CX and RLP, as well as "[a]n injunction compelling Defendants . . . to immediately provide Plaintiffs with all records and information relating to [CX and RLP] that Plaintiffs have requested in writing as well as all records and information to which Plaintiffs are entitled under [the corporate operating agreements and state law]." (Doc. 4 at 17).

The Consent Order is not a "discovery order" under the meaning of Fed. R. Civ. P. 37. No part of the Court's Consent Order discussed its decrees in terms of "discovery," and indeed at no time did the Court resort to its authority "under Rule 26(f), 35, or 37(a)," as enumerated in Rule 37(b)(2)(A). Instead, this Court entered the Consent Order as resolution to DPC's substantive claims for relief – that is, for an accounting, and for an injunction requiring Defendants to tender documents to DPC's accountant, and permitting the accountant to inspect such records in order to create a report on CX and RLP's finances and management. *Compare Sokos v. Hilton Hotels Corp.*, 283 F. Supp. 2d 42, 55 (D.D.C. 2003) *dismissed sub nom. Sokos v. Washington Hilton Hotel & Towers*, 03-7159, 2004 WL 502322 (D.C. Cir. Mar. 12, 2004) ("[T]he plaintiff was unable to seek sanctions against the defendants pursuant to Rule 37(b)(2) because the rule only provides a remedy to a party in circumstances when the opposing party fails to comply with a court order to provide discovery. Thus, since the Court had not issued an order to redress a discovery violation committed by the defendants, the plaintiff's counsel could not seek any relief under this rule."); *see also Marie v. Am. Red Cross*, 2:11-CV-474, 2013 WL 1183328 (S.D. Ohio Mar. 20, 2013) (same, citing *Sokos*, 283 F. Sup. 2d at 55).

Furthermore, the subsequent litigation surrounding the Consent Order has also never been couched in terms relating to discovery, Rule 26, or Rule 37. The Court's first Contempt Order

arose from DPC's Motion to Enforce (Doc. 121). There, DPC moved the Court for an Order compelling Defendants "to comply with the Court's Consent Order of July 20, 2006." (*Id.* at 2). On December 5, 2006, the Court found that Defendants had "violated the express terms of the July 20, 2006 Order," reserved the issue of sanctions for "a later date," and ordered Defendants to tender "all the document set forth in [the accountant's] letter," including "an inventory of gold." (Doc. 145 at 8). On October 16, 2007, DPC sought sanctions for Defendants' failures to comply with the Court's Orders. (Doc. 254). DPC argued that Defendants had "repeatedly violated" the Consent Order, "engaged in gamesmanship, misdirection and delay," and increased Plaintiffs' costs and legal fees. (*Id.* at 2-3). The Court agreed, in part, and found that Defendants had "willfully violated the Consent Order by failing to timely deliver to [the accountant] documents described in . . . the Order." (Doc. 480 at 12).

DPC's present Motion seeks an Order of sanctions against Robol "for making fraudulent misrepresentations to the Court regarding Defendants' possession of original inventories of the gold treasure at issue in this litigation." (Doc. 871 at 2). Moreover, DPC's request for sanctions targets Robol's *conduct* in misrepresenting to the Court the existence and location of the missing inventories. (*Id.* at 2, 7, 9-14, 19, 29-30). This is not a case where the Court "ha[s] . . . issued an order to redress a discovery violation committed by the defendants," *Sokos*, 283 F. Supp. 2d at 55, from which DPC is able to seek relief under Rule 37 for Defendants' failure to comply.[5]

Accordingly, DPC's claims against Robol allege precisely the sort of misconduct which the Federal Rules "do[] not directly cover," *Metz*, 655 F.3d at 491, and indeed the wrongful

---

[5] It is disingenuous for Attorney Robol to argue that DPC's "motion for the discovery order for which it now seeks sanctions was itself made pursuant to Rule 37, and not the Court's inherent power." (Doc. 907 at 7 n.4). Robol cites DPC's Motion to Compel and for Imposition of Sanctions (Doc. 429), which was filed under Rule 37. (*See id.* at 2). That motion, however, sought an order compelling Defendants "to produce all documents that are responsive to [DPC's] first request for production of documents," explicitly separate and apart from the Consent Order. (*Id.* at 3). Furthermore, it was denied as moot by the Court. (*See* Doc. 480). In imposing contempt sanctions, the Court granted in part DPC's Motion for Damages (Doc. 254), which is not a request for discovery and made no reference to Rule 37.

conduct that does fall within the Rules' ambit is so "intertwined with bad-faith conduct beyond the reach of the Rules that only the inherent power [can] address [it]," *Aleo*, 681 F.3d at 310 (Sutton, J., concurring) (quotation omitted).  This Court is not required to "separate out the conduct forbidden by the Rules from conduct sanctionable only through the inherent power."  *Id.*  It is therefore appropriate for the Court to consider the Motions under its inherent power.

### C.  Robol's Conduct

Before imposing sanctions under the Court's inherent powers, an attorney must receive "fair notice and an opportunity for a hearing on the record."  *Metz*, 655 F.3d at 491 (citing *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 767 (1980)).  There is "no requirement that a full evidentiary hearing be held before imposing sanctions."  *Id.* (citation omitted).  Regardless, the Court must still make "actual findings of fact."  *Big Yank Corp. v. Liberty Mut. Fire Ins. Co.*, 125 F.3d 308, 314 (6th Cir. 1997).

The Court hereby finds that Attorney Robol knew, or should have known, that his clients possessed other inventories relating to the recovered treasure, as evidenced by his participation in the Eastern District of Virginia admiralty litigation, and as shown by his mailing of one such inventory to Bank One on October 28, 1991.

The Court further finds that Robol should have known in 2007, when questioned by this Court, of the existence of such other inventories, when he informed the Court that his clients had produced "all inventories they ever possessed."  (Pl.'s Ex. 10 at 27; *2/24/07 Hr'g Tr.*, Doc. 208 at 49-50; *9/7/07 Hr'g Tr.*, Doc. 245 at 17-18; *9/7/07 Hr'g Tr.*, Doc. 245 at 30).  The Court also finds that Robol relied on his clients to search for other inventories during the pendency of this case, and himself undertook only limited searching of the records kept at 431-433 W. 6th Avenue, Columbus, Ohio, over which he had control and to which he had access.

17

### D.  Analysis under Inherent Powers and Fraud on the Court

Sanctions under the Court's inherent powers requires that the Court find "bad faith." *Chambers*, 501 U.S. at 45-46.  Specifically, a court must make "actual findings of fact" that "[1] that the claims advanced were meritless, [2] that counsel knew or should have known this, and [3] that the motive for filing the suit was for an improper purpose."  *Metz*, 655 F.3d at 489.

But the "mere fact that an action is without merit does not [alone] amount to bad faith." *BDT Products, Inc. v. Lexmark Int'l, Inc.*, 602 F.3d 742, 753 (6th Cir. 2010) (citation omitted). Rather, "the court must find something more than that a party knowingly pursued a meritless claim or action at any stage of the proceedings." *Id.*  Examples of "something more" include: "a finding that the plaintiff filed the suit for purposes of harassment or delay, or for other improper reasons, a finding that the plaintiff filed a meritless lawsuit and withheld material evidence in support of a claim, or a finding that a party was delaying or disrupting the litigation or hampering enforcement of a court order.  *Metz*, 655 F.3d at 489 (internal citations omitted).

Fraud on the court, moreover, requires considerably more.  Fraud on the court refers to "the most egregious conduct involving a corruption of the judicial process itself." 11 Charles Alan Wright et al., FEDERAL PRACTICE & PROCEDURE § 2870 (West 2011).  It should embrace "only that species of fraud which does or attempts to, subvert the integrity of the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." *Demjanjuk v. Petrovsky*, 10 F.3d 338, 352-53 (6th Cir. 1993) (quotation omitted).

A party seeking to show fraud on the court must "present clear and convincing evidence of the following elements: 1) conduct on the part of an officer of the court; that 2) is directed to the judicial machinery itself; 3) is intentionally false, willfully blind to the truth, or is in reckless disregard of the truth; 4) is a positive averment or a concealment when one is under a duty to

disclose; and 5) deceives the court." *Gen. Med., P.C. v. Horizon/CMS Health Care Corp.*, 475 F.

App'x 65, 71 (6th Cir. 2012) (internal quotation omitted).

In addition, since attorneys "are officers of the court, their conduct, if dishonest, would

constitute fraud on the court." *H. K. Porter Co., Inc. v. Goodyear Tire & Rubber Co.*, 536 F.2d

1115, 1119 (6th Cir. 1976) (citation omitted).  In short, if the Court concludes that counsel for a

party, "an officer of the court," made "material averments that deceived the court, which he

knew or should have known were untrue," the Court could conclude that the attorney committed

fraud on the court.  *Okros v. Angelo Iafrate Const. Co.*, 298 F. App'x 419, 433 (6th Cir. 2008).

Applying this analysis to the above facts, the Court finds that there is clear and

convincing evidence to conclude that Robol unreasonably relied on his clients, and acted

willfully to blind himself to the truth of his and his clients' possession of other inventories.

In general, a trial attorney may rely on his client to gather responsive documents,

provided that he "participates in and oversees the collection process." *In re Porsche Cars N.

Am., Inc.*, 2:11-MD-2233, 2012 WL 4361430, at *8 (S.D. Ohio Sept. 25, 2012).  As long as the

attorney "exercise[s] some degree of oversight to ensure that [his clients] are acting competently,

diligently and ethically in order to fulfill their responsibility to the Court," such as by

"formulat[ing] a plan of action which will ensure full and fair compliance with the request,"

there is "nothing inherently wrong" with client reliance.  *Bratka v. Anheuser-Busch Co., Inc.*,

164 F.R.D. 448, 461 (S.D. Ohio 1995).  As the Advisory Committee to the Federal Rules of Civil

Procedure has explained, an attorney's duty to make a "reasonable inquiry" is satisfied "if the

investigation undertaken by the attorney and the conclusions drawn therefrom are reasonable

under the circumstances. It is an objective standard similar to the one imposed by Rule 11."  Fed.

R. Civ. P. 26 advisory committee's note, 1983 amendments.  In making this inquiry, the attorney

may "rely on assertions by the client and on communications with other counsel in the case," as long as that reliance "is appropriate under the circumstances." *Id.* What is reasonable is "a matter for the court to decide on the totality of the circumstances." *Id.*

In this case, however, the Court finds that Robol did not adequately "participate[] in and oversee[]" the collection process; he did not exercise sufficient oversight, and did not make the required "reasonable inquiry" such that the Court can conclude that his reliance was "appropriate" under the "totality of the circumstances." (*Compare 2/26/15 Hr. Tr.*, Doc. 291, at 263-64) ("I [Robol] think I met with him and gone through some of [the file cabinets] to make sure that people were doing the search"); (*Id.* at 272-74) ("I [Robol] would not have searched all 32 files. I'm sure of that.").

The Court is sensitive to the fact that an attorney must be allowed to depend, at least in part, on the truthfulness of his clients and their independent duty to act in accordance with Court orders. The Court is also aware that the nature of Defendant Thompson's disregard for this Court's authority was not fully revealed until sometime after Robol's various representations regarding the inventories. Nevertheless, the Court looks to the totality of the circumstances, including the testimony adduced at the hearing on this Motion demonstrating that Defendant Thompson intended to withhold information from the Court, and in general to engage in secretive practices to avoid fully complying with his production obligations (*2/25/14 Hr'g Tr*, Doc. 920 at 50) ("[Robol] said that Thompson . . . had great concerns about secrecy and confidentiality and therefore didn't want to share materials unless he was absolutely forced to"), and the fact that Robol himself was aware, due to his longstanding role as counsel for Defendants, of the existence of other inventories (*10/28/91 Letter to Bank One*, Pl.'s Ex. 23; Pl.'s Ex. 19; *2/26/14 Hr'g T.*, Doc. 921 at 281-82) ("I [Robol] think at points in time I would have

been aware of [the fact that his clients possess other inventories].").  In sum, it is not reasonable for an attorney merely to rely on his clients to gather all relevant documents, when he is personally aware that responsive documents exist which have not been produced, and when he is aware of his client's desire for less-than-full disclosure to the Court.  *Compare Okros v. Angelo Iafrate Const. Co.*, 298 F. App'x 419, 432 (6th Cir. 2008) (remanding to consider the possibility that fraud on the court was committed, where attorney had "cause to know" that the material averments he made to the court were untrue).  Nothing in the caselaw goes so far as to excuse such behavior; rather, Robol was obligated to inform the Court fully of everything of which he was aware – not to participate in his client's obfuscation.

Accordingly, the Court concludes that Robol acted in bad faith, and his conduct is sanctionable under the Court's inherent power.  He advanced meritless claims, by representing to this Court and the Court of Appeals, on multiple occasions, that his clients had no other inventories, or indeed that such inventories ever existed; he knew, or should have known, that such claims were meritless; and he was motivated by an improper purpose, by unreasonably relying on his clients and failing to fulfill his obligations to this Court, thus "disrupting the litigation" and "hampering the enforcement of a court order."  *Metz*, 655 F.3d at 489.

Robol's conduct, moreover, rises beyond mere bad faith to the level of "fraud on the court."  The Court finds that DPC has succeeded in proving, by clear and convincing evidence, that the misconduct here was done by an officer of the Court, directed at the judicial machinery itself, intentionally false, willfully blind to the truth, or in reckless disregard thereof, a positive averment or concealment when under a duty to disclosure, and did in fact deceive the Court.  *See Gen. Med.*, 475 F. App'x at 71.

As explained above, this category of misconduct embraces "that species of fraud" which subverts "the integrity of the court itself," or is a fraud "perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases." *Demjanjuk*, 10 F.3d at 352-53.  This is precisely what has taken place:  an officer of the Court has been willfully blind to the truth, and acted in reckless disregard thereof, with the result that the judicial machinery itself has been subverted.  The Court in its Orders made clear on multiple occasions the absolute necessity of these inventories in going forward with the ordered relief (*Opinion & Order*, Doc. 145 at 4, 8; *11/28/06 Hr'g Tr.*, Doc. 150 at 144, 157; *4/24/07 Hr'g Tr.*, Doc. 208 at 56; *9/7/07 Hr'g Tr.*, Doc. 245 at 5), and Robol's actions in representing that no other inventories were in Defendants' possession – or indeed ever existed (Pl.'s Ex. 10 at 27; *9/7/07 Hr. Tr.*, Doc. 245 at 30) – rendered the audit process ordered by this Court incomplete and unable to be completed (*see 2/25/14 Hr. Tr.*, Doc. 920 at 81).

The Court is cognizant that the misconduct proved here, to be sure, is not of the extreme nature seen in the most flagrant examples of fraud on the court.  *See, e.g.*, *Young v. Olympus Am., Inc.*, No. 07-2547-STA, 2013 WL 1103701, at *6 (W.D. Tenn. Mar. 15, 2013) (fraud on the court includes "bribing a judge, employing counsel to exert improper influence on the court, and jury tampering.").  Nevertheless, the necessity of an officer of the Court to respond honestly and fully to the Court's Orders is an integral component of the proper functioning of our system of justice.  *See Demjanjuk*, 10 F.3d at 352 ("As an officer of the court, every attorney has a duty to be completely honest in conducting litigation. . . . And when he departs from that standard in the conduct of a case, he perpetrates fraud upon a court.").  Robol's unreasonable reliance on the statements of his clients, his failure to verify the truthfulness of his representations to this Court,

and his firsthand knowledge of the falsity of his statements, compels this Court to conclude that he has acted in bad faith, and further acted to commit a fraud upon the court.

### E. The Order of Satisfaction

Robol argues that the Court's Order of Satisfaction bars any sanctions that the Court might impose on account of Defendants' failure to produce the requested documents. (Doc. 907 at 907; Doc. 893 at 6-11). He asserts that because the allegedly newly discovered evidence is "redundant of all the information the Dispatch possessed," and because DPC cannot prove fraud, then there are no grounds to set aside the Order under Fed. R. Civ. P. 60(d)(3).

Robol's argument misses the mark in several respects. First, the conduct alleged by DPC in its Motion is not the same conduct for which the Court granted the Order of Satisfaction. Rather, as DPC makes abundantly clear, it seeks sanctions against Robol "for making fraudulent misrepresentations to the Court regarding Defendants' possession of original inventories of the gold treasure at issue in this litigation." (Doc. 871 at 2). The Order of Satisfaction could not, and did not, absolve Defendants or Robol of any liability for misrepresentations to this Court. In addition, "collateral issues" such as sanctions are "independent proceedings supplemental to the original proceeding and not a request for a modification of the original decree." *Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 645 (6th Cir. 2006) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395 (1990)). Finally, this Court is fully capable of granting relief from its prior Order on the basis of "newly discovered evidence that, with reasonable diligence, could not have been discovered" previously, or "fraud . . . misrepresentation, or misconduct by an opposing party," under Rule 60(b)(2) & (3), or "fraud on the court," under Rule 60(d)(3).

Accordingly, because the Order of Satisfaction does not bar sanctions against Attorney Robol, nor absolve him of liability, the Court need not vacate it.  DPC'S Motion to Vacate the Order of Satisfaction (Doc. 902) is thus **DENIED**.

### F.  Sanctions

Having found bad faith and fraud on the court on the part of Attorney Robol, the Court must determine the appropriate sanctions.  The Court's inherent power to sanction serves the "dual purpose of vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy." *Chambers*, 501 U.S. at 46 (quotation omitted).  As the Court of Appeals has recognized, such sanctions are "punitive." *Red Carpet Studios*, 465 F.3d at 647. Indeed, a district court's "inherent power to sanction for violations of the judicial process is permissibly exercised not merely to remedy prejudice to a party, but also to reprimand the offender and to deter future parties from trampling upon the integrity of the court." *Salmeron v. Enter. Recovery Sys., Inc.*, 579 F.3d 787, 797 (7th Cir. 2009).

The Court finds, first, that sanctions equal to the entire cost of this litigation are inappropriate.  Instead, in order to vindicate the Court's authority, and to deter future is misconduct, Robol shall be sanctioned in the amount equal to the cost of pursuing this Motion for Sanctions, as well as the amount expended by DPC to uncover this fraud and locate the inventories uncovered by the Receiver. *See Salmeron v. Enter. Recovery Systems, Inc.*, 579 F.3d 787, 797 (7th Cir. 2009) (although a district court may permissibly invoke its inherent powers "not merely to remedy prejudice to a party, but also to reprehend the offender and to deter future [misconduct]," nevertheless the Court may also "consider the extent of the prejudice to the opposing party when determining an appropriate sanction.").  In this case, sanctions for the entire amount expended in the *appointment* of the Receiver are out-of-proportion with the wrongful

conduct, because DPC sought a Receiver for more reasons that simply to uncover the missing

inventories. *Cf. Pereira v. Felzenberg*, No. 96-CIV-7957 (RWS), 1997 WL 698186, at *6

(S.D.N.Y. Nov. 7, 1997) ("a court imposing litigation costs through its inherent powers will

calculate the amount based on costs related to specific bad acts, or directly resulting from those

acts"). Indeed, the Receiver has reorganized CX and RLP, and is even now preparing to travel

out to sea in search of further treasure remaining on the ocean floor. Kathy Lynn Gray, *Recovery

of Shipwreck's Gold Begins Again*, THE COLUMBUS DISPATCH (April 28, 2014).[6]

Accordingly, the Court hereby **ORDERS** that DPC shall submit to the Court a bill of

costs, reflecting the amount expended specifically in discovering these missing inventories, and

the amount expended in prosecuting this Motion.[7] DPC shall file its bill of costs and accounting

of time expended no later than **May 23, 2014**. Robol shall file his objections, if any, by **June 6,

2014**. DPC shall file its Reply, if any, by **June 13, 2014**.

## V.  CONCLUSION

The Court finds that Attorney Robol acted in bad faith, and further that he committed a

fraud upon the court. Accordingly, DPC's Motion for Sanctions (Doc. 871) and Supplemental

Motion for Sanctions (Doc. 888) are **GRANTED IN PART AND DENIED IN PART**. DPC's

Motion to Vacate the Order of Satisfaction (Doc. 902) is **DENIED**. The Court hereby

**SANCTIONS** Attorney Richard Robol an amount equal DPC's costs in discovering the missing

inventories, and in prosecuting this Motion.

**IT IS SO ORDERED.**

　　　　　　　　　　　　　　　　　**s/ Algenon L. Marbley**
　　　　　　　　　　　　　　　　**ALGENON L. MARBLEY**
　　　　　　　　　　　　　　　　**UNITED STATES DISTRICT JUDGE**

**DATED:  May 9, 2014**

---

[6] *Available at* http://www.dispatch.com/content/stories/local/2014/04/28/going-for-the-gold.html.
[7] Furthermore, a specific inquiry into Robol's ability to pay is not required, when sanctions are imposed under the Court's inherent power. *See Telechron, Inc. v. Intergraph Corp.*, 91 F.3d 144, at *2 (6th Cir. July 2, 1996).