IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL WILLIAMSON, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Case No. 2:06-cv-292 |
| | : | |
| v. | : | JUDGE ALGENON L. MARBLEY |
| | : | |
| RECOVERY LIMITED PARTNERSHIP, *et al.*, | : | Magistrate Judge Kemp |
| | : | |
| Defendants. | : | |

## ORDER

This matter comes before the Court on the Williamson Plaintiffs' motion for discovery (Doc. 1072) and motion to set a trial date (Doc. 1073). For the reasons that follow, and in the interest of judicial comity and judicial efficiency, the Court **DENIES** both motions while the *Recovery Limited Partnership* receivership proceeds in state court.

## I. BACKGROUND

This case has a long, interesting, but, by now, tortured history. Federal and state courts from Ohio and up and down the Atlantic Seaboard have recounted many of the facts in various opinions over the years. As this Court recently noted:

> The three-minute version of events is that Defendant Thomas G. Thompson discovered a shipwrecked steamer, the *S.S. Central America*, in the Atlantic Ocean off the coast of North Carolina; raised funds to finance a salvage operation (the ship was transporting gold to New York); actually salvaged some of the gold; did not pay his crew or his investors; disappeared with substantial assets; was located after a long search; has been held [and remains] in criminal and civil contempt of this Court; and has not provided complete information as to the whereabouts of some or all of the misappropriated assets.

*Williamson v. Recovery Ltd. P'ship*, No. 2:06-cv-292, 2016 WL 4920773, at *1 (S.D. Ohio Sept. 15, 2016) (discussing the "initial find" and salvage from the *Central America*).

1

The post-script to that three-minute version of events is that many of Thompson's former employees (the "Williamson Plaintiffs"), who were "hired to assist in the location and recovery of the *Central America* . . . as well as the company from which Thompson rented a side-scan sonar . . . . brought suit against Thompson and the board of directors of Columbus Exploration, LLC . . . and numerous business entities, including Recovery Limited, Columbus-America, and Columbus Exploration." *Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 616 (6th Cir. 2013). The Williamson Plaintiffs "demanded monetary relief for breach of their non-disclosure agreements, conversion of the recovered gold, and breach of fiduciary duty," and they ultimately ended up in this Court by virtue of its Admiralty Jurisdiction. *See id.*

From 2006 until now, the Williamson Plaintiffs' suit wound its way through various stages of pre-trial litigation and interlocutory appeals to the Sixth Circuit. *See id.* at 616-17; *see also, e.g.*, *Williamson v. Recovery Ltd. P'ship*, 826 F.3d 297, 298-99 (6th Cir. 2016). Although this suit once stood on the doorsteps of trial, the defendants' July 2011 appeal to the Sixth Circuit regarding this Court's ruling on various motions for summary judgment forestalled matters until October 2013. *See Williamson*, 731 F.3d at 608, 629. On October 13, 2013, the Sixth Circuit issued an opinion affirming this Court's summary judgment decision, in the process remanding matters for final adjudication. *Id.*

Under Judge Sargus's prior ruling, the following issues remain for a bench trial:

1) Under the doctrine of laches, have Defendants been prejudiced by Plaintiffs' delay in filing suit or was any delay unreasonable?

2) Should the remaining Defendants be held jointly liable on the Lease Agreement and NDAs either on a theory of direct liability or through alter ego/veil piercing/reverse veil piercing theories?

3) Did Columbus Exploration assume the liabilities of RLP or should it be otherwise liable for the obligations of RLP as RLP's successor?

> 4) Did Thompson's group earn profits or a net recovery (as those terms are used in the NDAs and Lease Agreement) from the salvage of the Central America?
>
> 5) What was the amount of profit, if any?
>
> 6) To what contractual damages are Plaintiffs entitled?

*Williamson v. Recovery Ltd. P'ship*, Case No. 2:06-cv-292, 2011 WL 2181813, at *32 (S.D. Ohio June 3, 2011) (Sargus, J.).

Simple enough, or so it would seem. In the meantime, in related state-court proceedings, the Franklin County Court of Common Pleas placed Defendants Recovery Limited Partnership ("RLP") and Columbus Exploration ("CX") into receivership to sort out claims from various non-maritime investors and other third parties. *Dispatch Printing Co. v. Recovery Ltd. P'ship*, 28 N.E.3d 562, 566 (Ohio Ct. App. 2015). The Court of Common Pleas "found the appointment of a receiver necessary, as RLP and [CX] were in a state 'of great disarray and insolvency, coupled with a lack of functional management.'" *Id.* (citation omitted). Once appointed as Receiver for RLP and CX, Ira O. Kane set out with "the ultimate goal" of "recovery, conservation and successful monetization of the Down Treasure." *Id.* (quotation omitted). In other words, the Receiver hoped to return to site of the *Central America* wreck, recover whatever gold and artifacts remained, and then reduce those treasures to money before paying outstanding claims in the state-court receivership. *See id.*

The Receiver's plan proved fruitful. RLP—under the Receiver's direction—returned to the site of the *Central America* wreck in 2014 and, through its salvage efforts, recovered large sums of gold and artifacts that were not recovered during Thompson's initial haul. *See generally Recovery Ltd. P'ship v. Wrecked & Abandoned Vessel*, 204 F. Supp. 3d 864 (E.D. Va. 2016) (recounting 2014 salvage action and awarding RLP a 100% salvage award). One estimate placed the value of the gold and artifacts recovered in 2014 at just over $48 million. *Id.*

With *some* gold and treasure once again in-hand (or, at least, not in Thompson's hands), the Williamson Plaintiffs now move to jump-start this Admiralty Action in federal court to resolve two over-arching issues:

(1) To determine liability, if any, from the defendants to the Williamson Plaintiffs (*see* Trial Issues (1) – (3), discussed above); and

(2) To determine what share (if any) of the profits or net recovery (if any) from the salvage of the *Central America* to which the Williamson Plaintiffs are entitled (*see* Trial Issues (4) – (6), discussed above).

More specifically, the Williamson Plaintiffs seek an order directing discovery as to: "(1) the treasure and other artifacts recovered from the wreck of the *S.S. Central America* since April 2014 (the 'Second Salvage Operation'), and (2) the expenses incurred by Defendants in connection with the Second Salvage Operation." (Pls.' Mot., Doc. 1072, PageID 20068).[1] The Williamson Plaintiffs also seek an order setting a trial date on the six remaining issues identified in Judge Sargus's prior ruling on the parties' motions for summary judgment. (Pls.' Mot., Doc. 1073). The defendants filed a combined memorandum in opposition to both of the Williamson Plaintiffs' requests, arguing that they are premature and conflict with the orderly administration of the state-court receivership. (Defs.' Opp'n, Doc. 1084). Both matters are fully briefed and ripe for review.

## II. STANDARD OF REVIEW

District courts retain broad discretion over "[m]atters of docket control and [the] conduct of discovery." *In re Air Crash Disaster*, 86 F.3d 498, 516 (6th Cir. 1996) (quotation omitted). That includes revisiting discovery and trial schedules, where necessary. *See id.* at 517-18.

---

[1] In their combined Reply Brief, the Williamson Plaintiffs narrowed the discovery sought to the following two categories: "(1) discovery regarding the appraisal of the 2014 treasure (how the appraisal was prepared, methods used, basis for estimated value of pieces and cost of curating pieces for sale); and (2) discovery regarding the expenses incurred by Defendants *in carrying out their salvage operation*." (Pls.' Reply Br., Doc. 1087, PageID 20713).

### III.  ANALYSIS

At their core, the Williamson Plaintiffs' motions hinge on the orderly administration of justice in this sprawling dispute, which has littered the dockets of so many courts, just as the *Central America*'s treasure once littered the floor of the Atlantic.  The Williamson Plaintiffs seek money to which they feel they are entitled and have been thwarted from receiving for nearly thirty years now—first at the hands of Tommy Thompson and his various business entities, and then again by the slow turn of the wheels of justice.

On one hand, the Williamson Plaintiffs have a point.  They performed services several decades ago in finding and recovering the *Central America*'s bounty, as they agreed to.  By all accounts, their modern-day treasure hunt was a smashing success.  For reasons not of their own doing, however, the Williamson Plaintiffs have yet to recover that which once seemed so close.  After resorting to the courts for relief, the Williamson Plaintiffs again feel stymied.  In the ten-plus years their suit has been pending, the Williamson Plaintiffs lost their trial counsel when he passed away in 2016; lost one of the plaintiffs himself (Don C. Craft), when he likewise passed away; and now, represent to the Court that another of their attorneys, who is retired, has fallen ill after a near-catastrophic cardiac event two years ago.  (Pls.' Mot., Doc. 1073, PageID 20140-41).  In light of Tommy Thompson's recalcitrance to say *anything* helpful about the whereabouts of the missing loot from the initial recovery, that attorney, James T. Shirley, Jr., "well may be the only witness . . . able to testify about [a key] issue" in the eventual trial.  (*Id.* at PageID 20140).  Thus, there is some merit to the Williamson Plaintiffs' argument that they will be prejudiced by any further delay in this action.

On the other hand, the Williamson Plaintiffs are not the only parties to this dispute, and it seems questionable (if not doubtful) that the Court can grant them their desired relief—even if the Court were to hold a bench trial tomorrow.  Start with the other parties.  The Williamson Plaintiffs are but a handful of claimants in the state-court receivership—each of whom possesses a colorable/legitimate claim to any proceeds from the *Central America* salvage efforts.  As claimants in that action, the Williamson Plaintiffs are bound by a state-court order that states:

> All persons, including all parties and counsel in this litigation, are enjoined from taking any action that would interfere with the Receiver in the performance of his duties.  All persons are ordered not to interfere with the Receiver as he performs these duties.  All persons shall affirmatively cooperate in assisting the Receiver in the performance of his duties.  Failure to comply shall be punishable under the contempt powers of [the state court].

(Ex. C. to Defs.' Opp'n, Doc. 1084-3, PageID 20691).

In other words, the state court already determined that it remains in everyone's best interest to stand back and allow the Reciever to do his work by gathering and liquating to cash all assets.  (*See id.*).  While the defendants do not go so far as to argue that *this* Court is bound by the state-court order, they raise a compelling point: re-opening discovery and proceeding to a bench trial now will interfere with Mr. Kane's efforts to comply with his charge as Receiver.  That is, the Williamson Plaintiffs' requested relief here could interfere with efforts to sell the gold and artifacts recovered in 2014.  That, of course, could slow a final judgment in the state-court receivership for *all* claimants, including the Williamson Plaintiffs.  These are appropriate considerations the state court likely weighed in imposing its order in the first place.  *See Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 552 (6th Cir. 2006) (recognizing that once assets are placed in receivership, the receivership court has a valid interest in the value of the claims and the cost of defending any suit as a drain on receivership assets).  Again, while these considerations do not bind *this* Court, they are appropriate to weigh in the interest of comity.

More problematically, the Court does not see a clear path to adjudicating all of the remaining issues at trial in the absence of total liquidation in the state-court receivership.  As this Court previously noted, each of the underlying agreements which form the basis for Plaintiffs' claims "provides for payment from the 'recovery of profits' or the 'net recovery'" of any salvage operation.  *Williamson*, 2011 WL 2181813, at *25.  But "there is nothing in the record to illuminate the Parties' intentions regarding the precise meanings of these phrases." *Id.*  This Court agrees that, without further evidence, the terms "recovery profits" and "net recovery" likely "imply an intent to pay Plaintiffs with cash generated through the sale of any treasure recovered." *Id.* at *18; *id.* at *25 ("[I]n the Court's view, the terms clearly suggest that an obligation to pay Plaintiffs is conditioned on there having been a profit made by Thompson's group in salvaging the Central America.").  If "profits" and "net recovery" hinge on the sale of any treasure recovered—the Court cannot adjudicate damages (if any) to the Williamson Plaintiffs until the gold and artifacts from the 2014 Salvage are sold.

The Williamson Plaintiffs try to avoid this problem by encouraging the Court to press ahead with a trial as to the defendants' liability only or, in the alternative, to adopt their view of the meaning of "profits" and "net recovery" before trial.  Under Plaintiffs' *first* argument as to the meaning of "profits" and "net recovery," the Court would adjudicate damages (if any) based solely on the appraisal and expense reports filed in the 2014 Salvage Action in the Eastern District of Virginia.  Or, under their *fallback* position, the Court could conduct a trial and determine damages (if any) as of just before the 2014 Salvage, while conducting follow-on proceedings or appointing a special master to adjudicate their damages following the 2014 Salvage. (Pls.' Mot., Doc. 1072, PageID 20073-74; Pls.' Mot., Doc. 1073, PageID 20716-17).

7

None of these approaches seems particularly appropriate or appealing. As for a trial on the defendants' liability only—the Williamson Plaintiffs did not plead a declaratory action claim. They pleaded damages claims. And bifurcating the trial as to liability and damages, even on the Court's volition, would waste scarce judicial resources and would not, in any event, provide the Williamson Plaintiffs the relief requested since the issue of damages would remain.

As for the appropriate construction of the underlying agreements and the operative phrases "recovery profits" or "net profits"—the Williamson Plaintiffs invite this Court to adopt their view, not at trial and after the presentation of evidence, but through a discovery order and trial held before the Receiver completes his business of liquidating the gold and artifacts from the 2014 Salvage. The Court declines that invitation. As Judge Sargus already concluded, "there is nothing in the record to illuminate the Parties' intentions regarding the precise meaning of these phrases." *Williamson*, 2011 WL 2181813, at *25. In other words, determining the meaning of those phrases is best left for trial, where the Court can make a ruling based on adequate briefing, argument, and the presentation of evidence—not here, in the context of a discovery order.

To be sure, the Williamson Plaintiffs cite a string of Admiralty Cases where courts based damages awards on the appraised value of the ships' cargo or the ship itself. *See, e.g.*, *The Diana*, 16 U.S. 58, 58 (1818) (affirming lower court's ruling that "the damages should be computed at the rate of six per centum on the amount of the appraised value of the cargo"); *The Manitoba*, 122 U.S. 97, 105 (1887) (enforcing plaintiff's claims against the appraised value of the vessel); *The George W. Roby*, 111 F. 601, 614 (6th Cir. 1901) (same); *Fleming v. Lay*, 109 F. 952, 958 (6th Cir. 1901) (same).

But in each of those cases, damages were based on the appraised value of the ships' cargo because the ships were sunk, the cargo valueless, and no salvage efforts were underway.  Thus, there was no cargo to sell or liquidate in providing an adequate measure of damages.  Here, in contrast, the Williamson Plaintiffs did not own the *Central America* or insure its cargo.  Rather, their claims to damages stem directly from a series of agreements providing for a share of the "net profits" or "net recovery" from an anticipated (and successful) salvage operation.  Accordingly, the Williamson Plaintiffs' focus on the appraisals conducted during the 2014 *in rem* salvage action in the Eastern District of Virginia seems misplaced or, at the very least, not controlling at this juncture.

The Court remains sympathetic to the Williamson Plaintiffs and the long road they have travelled in asserting their claims.  To the extent that continued delay might prejudice their case, the Williamson Plaintiffs remain free to move the Court to preserve trial testimony from Mr. Shirley or any other witness whose health is a concern.  But the Court opts not to interfere with the state-court receivership or to create even more piecemeal litigation in this already sprawling matter.

## IV.  CONCLUSION

For these reasons, the Court **DENIES** the Williamson Plaintiffs' motion for discovery (Doc. 1072) and motion to set a trial date (Doc. 1073).

**IT IS SO ORDERED.**

                                  s/ Algenon L. Marbley
                               **ALGENON L. MARBLEY**
                               **UNITED STATES DISTRICT JUDGE**

**DATED:  March 30, 2017**